UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA,          )
)
        Plaintiff,          )
)   Criminal Action
v.                          )   No. 13-10308-DPW
)
JAMES H. FITZPATRICK,          )
BERNARD J. MOROSCO,          )
)
        Defendants.          )
)


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


JURY TRIAL DAY 4

March 26, 2015
9:05 a.m.


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

On Behalf of the Government:
        UNITED STATES ATTORNEY'S OFFICE
        By:  AUSA S. Theodore Merritt
             AUSA Brian Perez-Daple
        One Courthouse Way
        Boston, Massachusetts 02210
        617.748.3954
        theodore.merritt@usdoj.gov
        brian.perez-daple@usdoj.gov

On Behalf of Defendant James H. Fitzpatrick:
        Syrie D. Fried, Esq.
        Two Clock Tower Place, Suite 260
        Maynard, Massachusetts 01754
        978.897.5600
        syrie@syriefried.com

On Behalf of Defendant Bernard J. Morosco:
        CARNEY & BASSIL
        By:  Janice Bassil, Esq.
        20 Park Plaza, Suite 1405
        Boston, Massachuestts 02116
        617.338.5566
        jbassil@bkandblaw.com

## INDEX

**WITNESS:**                                                          **PAGE:**

VITUS SHUM
            DIRECT EXAMINATION BY MR. MERRITT (cont.)      4
            CROSS-EXAMINATION BY MS. FRIED                14
            CROSS-EXAMINATION BY MS. BASSIL               62
            REDIRECT EXAMINATION BY MR. MERRITT          125
            RECROSS-EXAMINATION BY MS. FRIED             131
            RECROSS-EXAMINATION BY MS. BASSIL            136
PATRICK EVANS
            DIRECT EXAMINATION BY MR. PEREZ-DAPLE        140

                        * * * * *

| EXHIBIT | RECEIVED IN EVIDENCE |
|---------|----------------------|
| 29      | 7                    |
| 40      | 8                    |
| 43      | 14                   |
| 12      | 42                   |
| 9       | 112                  |
| 39      | 117                  |
| 77      | 118                  |
| 44B     | 143                  |
| 45      | 146                  |
| 114A    | 148                  |
| 114E    | 148                  |

                        * * * * *

P R O C E E D I N G S

1

2          (Deputy Clerk Lovett called the case to order.)

3          THE COURT:  Ready for the jury?

4   (Jury enters.)

5          THE COURT:  Good morning, ladies and gentlemen.  My

6   usual morning greeting, have any of you been exposed in any way

7   to any material given in this case outside of the courtroom?  I

8   see no response to that, so you may inquire, Merritt.

9          MR. MERRITT:  Thank you, your Honor.  Good morning,

09:06 10   Mr. Shum.

11          THE WITNESS:  Good morning.

12          MR. MERRITT:  Your Honor, could I have Exhibit 37 just

13   shown to the witness?

14   DIRECT EXAMINATION BY MR. MERRITT:

15   Q.   Mr. Shum, do you recognize this e-mail?

16   A.   Yes.

17   Q.   And who is it from?

18   A.   Jim Fitzpatrick.

19   Q.   And are you copied on it?

09:06 20   A.   Yes, I am.

21          MR. MERRITT:  Your Honor, I move in Exhibit 37.

22          THE COURT:  It's received.

23   Q.   Could you just read the text of the e-mail, Mr. Shum?

24   A.   "The attached used last time is no good.  There have been

25   changes.  I'm told you need to use the latest version of PIC.

1    Is that where you got the attached list you did for last time?"

2    Q.   Now, attached to the e-mail is a document, several pages.

3    Are you familiar with this kind of document?

4    A.   Yes, I am.

5    Q.   What is it?

6    A.   These are the listing -- another form of the listing of

7    the units.

8    Q.   Have you ever heard the term "rent roll"?

9    A.   Yes.

09:08 10    Q.   Is this a rent roll?

11    A.   No, I don't think so.

12    Q.   Anyway, this was sent to Mr. Morosco by Mr. Fitzpatrick

13    with the e-mail?

14    A.   Yes, it could be.

15    Q.   Now, yesterday, when we finished, I was asking whether you

16    recall creating a list of units to send to Mr. Morosco for the

17    2011 inspection.  Do you remember that?

18    A.   Yes.

19    Q.   Let me show you Exhibit 30.  All right.  If I could direct

09:08 20    your attention to the bottom of this page, do you see where it

21    notes "V.Shum/REAC/Scoring/Physical/2011"?  Are you familiar

22    with that folder?

23    A.   Yes.

24    Q.   Were those folders kept on your computer?

25    A.   Yes.

1   Q.   And the title of the document is what?

2   A.   Dwelling Units for Bernie.

3   Q.   And looking at the first page, who is the author of the

4   document?

5   A.   Me.

6   Q.   And when was it created?

7   A.   March 23, 2011.

8   Q.   All right.  Now, did you send Dwelling Units for Bernie to

9   Mr. Morosco?

09:09 10            MS. FRIED:  Objection.  Leading.

11            THE COURT:  Overruled.  You may answer the question.

12   A.   I don't remember.

13   Q.   Well, let me ask you this.  What was your purpose in

14   creating this document, Mr. Shum?

15   A.   It was for Mr. Morosco, yes.

16   Q.   When you say, "It was for Mr. Morosco," what was your

17   purpose in creating it for Mr. Morosco?

18   A.   To give it to him to see if it correlates with the rental

19   list.

09:10 20   Q.   Okay.  Is that why you created this document?

21   A.   Yes, it was.

22   Q.   If I could go back to then Exhibit 29, do you recognize

23   this?

24   A.   Yes.

25   Q.   Is this the same document that's shown in Exhibit 30?

```
 1    A.    Yes.
 2    Q.    Is this on your computer?
 3    A.    Yes.
 4          MR. MERRITT:  All right.  Your Honor, I move in
 5    Exhibit 29.
 6          THE COURT:  It's received.
 7          (Exhibit 29 received in evidence)
 8    Q.    Now, did you receive something back from either
 9    Mr. Fitzpatrick or Mr. Morosco?
10    A.    Yes.
11    Q.    Do you recall from whom you got that?
12    A.    Mr. Fitzpatrick.
13    Q.    And what was it?
14    A.    It was the list of the random unit that was generated by
15    Mr. Morosco.
16    Q.    And again, in what form was that list, if you recall?
17    A.    If I recall, it was in the paper form.
18    Q.    And what was on that list?
19    A.    Those were the numbers that were given us that Mr. Morosco
20    said would be the random list that the HUD inspector would
21    generate.
22    Q.    Okay.  And did you do something with that list?
23    A.    I tried to match it up with our unit listing.
24    Q.    And was that the same kind of thing you had done two times
25    before?
```

```
 1   A.   Yes.
 2        MR. MERRITT:  If I could show the witness Exhibit 40,
 3   your Honor.
 4   Q.   Do you recognize this, Mr. Shum?
 5   A.   Yes.
 6   Q.   What is it?
 7   A.   That would be the list of the units after we decided that
 8   these will match the random list.
 9   Q.   And did you create this document, Exhibit 40?
10   A.   Yes, I did.
11        MR. MERRITT:  Your Honor, I move in Exhibit 40.
12        THE COURT:  It's received.
13           (Exhibit 40 received in evidence)
14   Q.   On this document, Mr. Shum, there's a list on the left
15   called Primary and a list called Alternate.  What does that
16   mean?
17   A.   As I recall, there was some question as to whether the
18   unit will match up perfectly with the units from our listing,
19   because I believe at that time there was confusion relating to
20   whether some units were police-occupied or vacant that I
21   believe that the HUD inspector, if the unit that he chose is
22   vacant, then he would choose an alternate unit to inspect.
23   Q.   And who gave you that information?
24   A.   Mr. Morosco.
25   Q.   And who provided the alternate list?
```

1   A.   Mr. Morosco.

2   Q.   And if I could draw your attention to Exhibit 41.  Again,

3   this Exhibit 40, was this on your computer, Mr. Shum?

4   A.   Yes.

5        THE COURT:  Is it 40 or 41?

6        MR. MERRITT:  Well, 40.

7   Q.   Does this indicate it was on your computer?

8   A.   Yes.

9   Q.   And does it indicate when it was that you created this

09:14 10   list?

11   A.   March 24.

12   Q.   2011?

13   A.   2011.

14   Q.   Now, what did you do with the list of the units then after

15   you had --

16   A.   I would have given it to either Mr. Fitzpatrick or Mike

17   McLaughlin.

18   Q.   And what happened after you gave the list to either one of

19   those?

09:15 20   A.   Then it would be, you know, same as the prior inspections,

21   that Mr. McLaughlin organized meetings and assigned people to

22   prepare those units.

23   Q.   And was this the SWAT team meetings?

24   A.   Yes.

25   Q.   And was there anything different about the process in 2011

1   than the one you've described from 2007 and 2009, that you

2   remember?

3   A.   No.

4   Q.   Now, Mr. Shum, were there certain inspection logs that

5   were also reviewed by the REAC inspector?

6   A.   Yes.

7   Q.   And what kind of logs were those?

8   A.   Those would be logs relating to regular maintenance by

9   maintenance personnel so that these systems properly or

09:16 10   periodically check.

11   Q.   And when you say "systems," what kind of things do you

12   mean?

13   A.   Things like the generator, elevators, fire extinguisher or

14   fire prevention system.

15   Q.   And did you have any role in preparing those logs?

16   A.   Yes, I did.

17   Q.   What was your role?

18   A.   I prepared schedules, blank schedules with, you know,

19   boxes to be filled in, you know, for regular -- I guess the

09:16 20   maintenance person, whoever inspect those systems would sign

21   off and date it.

22   Q.   Okay.

23   A.   So I created these tables.

24   Q.   And when it came to the REAC inspection, were those tables

25   current?

1   A.   No.

2   Q.   Was the information filled in on them?

3   A.   They were filled in, yes.

4   Q.   Do you know who filled it in?

5   A.   I believe it was Mr. James DiMatteo.

6   Q.   And who was he?

7   A.   He was a retired maintenance personnel, staff, from the

8   Chelsea Housing Authority.

9   Q.   What kind of maintenance was he --

09:17 10   A.   He was an electrician.

11   Q.   And do you know, when they were filled in, were they

12   filled in contemporaneously when work was done?

13   A.   I don't believe so.

14          MS. FRIED:  Objection.  Mr. DiMatteo does not seem to

15   be within the scope, at least from what we've been told --

16          THE COURT:  This sounds like --

17          MS. FRIED:  -- of the --

18          THE COURT:  -- but what's the grounds for which this

19   is offered?

09:17 20          MR. MERRITT:  Well, it's another part of the REAC

21   inspection process.

22          THE COURT:  I have to sustain the objection if that's

23   all it is.  So the jury will disregard the question and the

24   answer.

25   Q.   Let me show you Exhibit 42 in evidence, Mr. Shum.

```
 1   A.    Yes, sir.

 2   Q.    Looking down at the bottom of this e-mail chain, the

 3   e-mail from an Adam Garvey --

 4   A.    Yes.

 5   Q.    -- to James Fitzpatrick?

 6   A.    Yes.

 7   Q.    Do you know who Mr. Garvey was at the time?

 8   A.    He was at the time the finance director of, I believe,

 9   Lowell Housing Authority.

10   Q.    I see.  So the e-mail address there is lhma.org?

11   A.    Yes, that would indicate Lowell Housing Authority.

12   Q.    All right.  Could you just read the bottom of that again?

13   A.    "Hey Jim, do you guys ever contract with a former REAC

14   inspector or other REAC consultant?  We want to get an

15   independent opinion on our units prior to our REAC inspection

16   in late October.  Thanks," signed, "Adam."

17   Q.    All right.  Then that e-mail is forwarded to J. McNichols

18   at Chelsea.  Who was he again?

19   A.    He was the accountant at the Chelsea Housing Authority.

20   Q.    Do you know if James McNichols was aware of the fact that

21   you were getting the advance lists?

22   A.    Yes.

23   Q.    How do you know that?

24   A.    Because he was working right on the same floor and in the

25   same office as Mr. Fitzpatrick and myself when we discussed
```

1    these, so he would have knowledge of it.

2    Q.    And if you could just read the e-mail from Mr. Fitzpatrick

3    to Mr. McNichols.

4    A.    "James, I certainly can tell Adam we use USIG, for all the

5    good it does us, to full-blown inspect every unit at about $12

6    a unit, which gets our work order system juices going good.

7    Now, I guess we need to talk to Mike about when we mention

8    Bernie, and I'm sure we don't mention Bernie's extra services.

9    This is a little bit of a dilemma."

09:20 10    Q.    Do you know who Mike is?

11    A.    Mike McLaughlin.

12          MR. MERRITT:  Can I show the witness, your Honor,

13    Exhibit 43?

14          THE COURT:  Yes.

15    Q.    Do you recognize the e-mail address in the top?

16    A.    Yeah, Bernie Morosco.

17    Q.    Sorry.  In the top of the e-mail address?

18    A.    From Mr. Fitzpatrick.

19    Q.    And who is it to?

09:21 20    A.    To Bernie Morosco.

21    Q.    And what's the subject?

22    A.    Information Embargo.

23          MR. MERRITT:  Your Honor, I move in Exhibit 43.

24          THE COURT:  It's received.

25

1          (Exhibit 43 received in evidence)

2    Q.    Now, you've identified who this is from.  The date is

3    March 22, 2011?

4    A.    Yes, from Mr. Fitzpatrick to Bernie Morosco.

5    Q.    And can you just read the text of the e-mail?

6    A.    "Mike asked me specifically to remind you again that Diane

7    Cohen is not in the REAC inner circle."

8    Q.    Who was Diane Cohen at that time?

9    A.    She was our boss.  She was the assistant executive

09:22 10   director.

11   Q.    So was she between you and Mr. McLaughlin?

12   A.    Yes.

13              MR. MERRITT:  No further questions, your Honor.

14              THE COURT:  All right.  Ms. Fried?

15              MS. FRIED:  Could I just have a minute to get my

16   things?

17   CROSS-EXAMINATION BY MS. FRIED:

18   Q.    Good morning, Mr. Shum.

19   A.    Good morning, ma'am.

09:23 20   Q.    Okay.  Now, you were telling us yesterday about your

21   background and experience before you started working at the

22   Chelsea Housing Authority.  Do you remember that?

23   A.    Yes.

24   Q.    And you told us that you had worked previously at the

25   Cambridge Housing Authority?

A.   Yes.

Q.   But it's also true, isn't it, that you worked, before you went to the Chelsea Housing Authority, as an accountant for a company or concern headed by another accountant named John Marotto?

A.   Yes, that's correct.

Q.   John Marotto's operation -- I don't know what it was called, but his accounting firm was what was known as the fee accountant for Chelsea Housing Authority, correct?

A.   That's correct.

Q.   And so Chelsea Housing Authority was a client of John Marotto's accounting firm, and you worked there with Mr. Marotto before you left that concern and joined the Chelsea Housing Authority staff yourself, correct?

A.   That's correct.

Q.   All right.  And the fee accountant is basically the outside accountant.  They do their -- they do whatever reconciliation or stuff that has to be done.  Obviously, they don't file taxes at Chelsea Housing Authority, but they do what record or accounting work that has to be done for that organization as their outside accountant, correct?

A.   That's correct.

Q.   When you came to the Chelsea Housing Authority after having worked for a period of about 18 months with Marotto, you were there for -- you had some familiarity with Chelsea Housing

1    Authority's systems and books and their finances, isn't that

2    right?

3    A.    That's correct.

4    Q.    Okay.  And you knew before you even got to the Chelsea

5    Housing Authority that one of the issues that the Chelsea

6    Housing Authority dealt with, or had to deal with as an

7    accounting issue, concerned Mike McLaughlin's very high salary;

8    that's true, isn't it?

9    A.    During the time I was working with John Marotto, I don't

09:25 10   think Mr. McLaughlin's salary was an issue.

11   Q.    Well, you joined the Chelsea Housing Authority, you told

12   us, in 2003?

13   A.    Yes.

14   Q.    All right.  And the person you replaced was a lady by the

15   name of Car -- let me find her name.

16   A.    Cardaris.

17   Q.    Cardaris, correct?

18   A.    Yes.

19   Q.    All right.  And you learned, at least, if you didn't know

09:26 20   this before, you learned certainly that one of the things that

21   you had to do, as the director of finance at Chelsea Housing

22   Authority, was find money in Chelsea's budget and in your

23   coffers in order to pay Mr. McLaughlin's very high salary.

24   That became one of your jobs, isn't that true?

25   A.    Yes.

```
 1    Q.   All right.  And in fact, you told -- well, let me just
 2    step back a little bit.
 3         Michael McLaughlin was forced to resign, or suddenly and
 4    abruptly resigned, from the Chelsea Housing Authority at the
 5    beginning of November of 2011, correct?
 6              MR. MERRITT:  Your Honor, I'm just going to object to
 7    the form of some of these questions.
 8    A.   Yes.
 9              THE COURT:  Well, I'll permit that.
10              MS. FRIED:  Thank you.  You can answer.
11    A.   Yes.
12    Q.   Almost immediately after his resignation, investigators
13    began talking to employees at the agency, including you,
14    correct?
15    A.   Correct, yes.
16    Q.   During the first month, two months after Mr. McLaughlin's
17    departure from the Chelsea Housing Authority, you were
18    interviewed a number of times, weren't you, by investigators
19    from the Office of the Inspector General and other agencies
20    about the accounting problems, the money issues at the Chelsea
21    Housing Authority?
22    A.   That's correct.
23    Q.   All right.  And a number of things, a number of issues
24    were gone into during those interviews that you had, correct?
25    A.   Yes.
```

Q.   And you told one of the interviews that you had -- I think
it was the second interview that you had after Mr. McLaughlin
left was an interview that happened on November 7, 2011,
correct?

A.   Yes.

Q.   And do you remember that you were interviewed by an agent
by the name of Tom Nabors from HUD as well as another person
named Lloyd Curry from HUD?

A.   I believe, yes.

Q.   Those names ring a bell to you?

A.   Yes.

Q.   And it's true, isn't it, that one of the things you told
them in that interview, that was within a week or so after
Mr. McLaughlin left, was that one of the things that you had to
do was, you were carrying on a system that was already in place
for paying Mr. McLaughlin's salary?

A.   Yes.

Q.   You told them that in November of 2011, correct?

A.   Yes.

Q.   Now, at that point, you had been -- let's just gain some
context.  You had already been at the Chelsea Housing Authority
at that point for eight years, isn't that right?

A.   That's correct.

Q.   During that entire eight-year period, or most of it, you
were responsible for making sure that their accounts and their

1  coffers were organized in such a way that Mr. McLaughlin could

2  get paid, correct?

3  A.   Yes.

4  Q.   There was approximately a $200,000 discrepancy between the

5  amount of money that Mr. McLaughlin was telling the

6  Commonwealth of Massachusetts authorities that he was making --

7  which was about 160,000, correct?

8  A.   That's correct.

9  Q.   -- and what his actual salary was, which was about

09:29 10 360,000, correct?

11 A.   That's correct.

12 Q.   So there was a $200,000 difference that it fell on your

13 shoulders to find the money for and pay him, isn't that right?

14 A.   Yes.

15 Q.   And one of the ways you did that, one of the ways you

16 found that money, was to find pockets or budget items where a

17 certain amount of money had been allocated; and if that money

18 hadn't been spent already, you took it out and used it in order

19 to pay Mr. McLaughlin to make sure he could get the check that

09:30 20 he expected to get, correct?

21 A.   I don't know.  I mean, I don't manipulate the budgets or

22 take money out of a certain place.  But I mean, we operate with

23 a budget.  I probably worked with a fee accountant to make sure

24 the budget is workable.  But during the operation, I don't

25 physically try to take money out of one program to feed another

1    program like that.

2    Q.    Well, okay.  When you were -- the first interview you had

3    after Mr. McLaughlin's departure was on November 4 of 2011,

4    correct?

5    A.    Yes.

6    Q.    And you were interviewed by Jamie Mazzone who is sitting

7    here in the courtroom?

8    A.    Yes.

9    Q.    And another person, an assistant deputy from the Office of

09:31 10    the Massachusetts State Inspector General's Office, a man by

11    the name of Daniel O'Neil, correct?

12    A.    Yes.

13    Q.    And these people were immediately focused on

14    Mr. McLaughlin's salary issue, isn't that true?

15    A.    That's true.

16    Q.    That was the real reason that they were coming in there to

17    talk, right?

18    A.    Right.

19    Q.    And you were the head of finance.  You were the money guy,

09:31 20    correct?

21    A.    Correct.

22    Q.    All right.  So one of the things they asked you was where

23    the Housing Authority "found" -- and I'm using that word in

24    quotes -- the money to pay the extra $250,000 that wasn't

25    budgeted for Mr. McLaughlin's salary.  They asked you that,

1    right?

2    A.    Right.

3    Q.    Because the budget -- what was budgeted for his salary was

4    the 160,000, correct?

5    A.    Correct.

6    Q.    And in response to that question, you explained that the

7    Housing Authority could take money from other revenue, from

8    other program revenues that had been allocated but that had not

9    been used.  You told them that, didn't you?

09:32 10    A.    Yes.

11    Q.    You also told them that you described these different

12    revenue program sources as buckets; that was your slang or your

13    vernacular for those sources of money, correct?

14    A.    Correct.

15    Q.    And you said that what would happen at the Housing

16    Authority was that the Housing Authority would basically take

17    money from under-budget programs and transfer those monies so

18    that the Chelsea Housing Authority could pay out overages and

19    expenses, for example, Housing Authority salaries.  You told

09:33 20    them that, didn't you?

21    A.    Yes.

22    Q.    All right.  So again, to step back, what you had to do --

23    and you were the money man, right?

24    A.    Correct.

25    Q.    All right.  What you had to do was to pick out extra money

1  and allocate it to Mr. McLaughlin's salary, correct?

2  A.   Yes.

3  Q.   And this was one of your jobs throughout the eight years

4  that we're talking about leading up to Mr. McLaughlin's

5  resignation, true?

6  A.   Yes.

7  Q.   All right.  And you know from working there that

8  Mr. McLaughlin, as the executive director, was always trying to

9  figure out ways to save money, right?

09:33 10  A.   Right.

11  Q.   One of the reasons he needed to save money was that he

12  needed to get paid, right?

13  A.   I believe, yes.

14  Q.   One of the ways -- and he saved money by not hiring to

15  replace attrition, isn't that true?

16  A.   Yes.

17  Q.   When you got to the Housing Authority in 2003, they had 51

18  employees, isn't that right?

19  A.   I think so.

09:34 20  Q.   By the time Mr. McLaughlin left in 2011, they were down to

21  about 35, 36, 37 employees, correct?

22  A.   Correct.

23  Q.   So that's a loss of 13, 14 people, correct?

24  A.   Correct.

25  Q.   Which represented at least a 25 percent loss in staff that

1   was not replaced, correct?

2   A.   Correct.

3   Q.   And all of the money devoted to those salaries could be

4   devoted to other purposes, including paying Mr. McLaughlin's

5   salary, isn't that true?

6   A.   True.

7   Q.   And one of the ways the Authority dealt with that issue,

8   dealt with satisfying his greed, was to make sure that

9   everybody else at the Authority did those extra jobs that

09:35 10   weren't replaced, correct?

11   A.   Correct.

12   Q.   And another thing that you did while you were there that

13   involved money was that you took advantage of a mistake that

14   was made by Jim McNichols, a coding error in 2005 that resulted

15   in 180,000 to the Authority, isn't that true?

16   A.   True.

17   Q.   And the way you took advantage of that coding mistake was

18   that you failed to alert the federal authorities, HUD and other

19   federal authorities, that a $180,000 expenditure had been

09:35 20   double-billed; it had been correctly billed to the state and

21   incorrectly billed to the feds, isn't that right?

22   A.   Yes.

23   Q.   You deliberately decided not to report that to HUD after

24   that mistake had been brought to your attention, correct?

25   A.   Yes.

Q.    Another issue relating to money that you had to deal with
as the finance director was that HUD, Department of Housing and
Urban Development, who gave your organization a lot of funding,
had cash requirements for all of its Housing Authorities,
didn't it?

A.    Yes.

Q.    That was one of the things that you got trained on that
you knew HUD was insisting upon, correct?

A.    Yes.

Q.    HUD required the Housing Authorities to have at least a
couple of months of reserve cash --

A.    Yes.

Q.    -- on hand to pay bills if for some reason money stopped
coming in altogether, correct?

A.    Yes.

Q.    The vendors and the people who sent bills to the Housing
Authority sent large bills, isn't that true?

A.    Yes.

Q.    For example, you know from your experience working there
that at least at around the time of 2011, the Chelsea Housing
Authority's budget, annual budget for simply utilities,
electric, water, et cetera, heat, was about $3 million a year,
correct?

A.    I believe so, yes.

Q.    Which meant that if the Housing Authority was going to

1  have a two-month reserve available just cash on hand to pay for

2  that, they needed to have at least $500,000 in cash sitting

3  aside just to be used for emergencies that no one was even

4  supposed to touch, correct?

5  A.   Yes.

6  Q.   So that was another pressure that was on you and on the

7  Authority to find money, because you had to have that, correct?

8  A.   Yes.

9  Q.   If you didn't have that cash reserve, you were going to be

09:38 10  in trouble with HUD, right?

11  A.   Yes, we would, yeah.

12       MS. FRIED:  Your Honor, I need a glass of water.  May

13  I?

14       THE COURT:  Yes.

15  Q.   Now, a year or so after you get hired at the Chelsea

16  Housing Authority, Bernard Morosco is hired to be a consultant,

17  correct?

18  A.   Correct.

19  Q.   Your best memory is that this happened maybe 2004, 2005,

09:39 20  correct?

21  A.   Yes.

22  Q.   All right.  And you'd been there a year or so, correct?

23  A.   That's correct.

24  Q.   All right.  And what you found out was that Mr. Morosco

25  offered the Chelsea Housing Authority as one of his clients

1    this ability to predict what apartment units were going to be

2    inspected in advance of a REAC inspection, correct?

3    A.    Yes.

4    Q.    Okay.  Now, just to be sure we all understand everything,

5    REAC is a particular inspection that HUD does, correct?

6    A.    Yes.

7    Q.    And there are other inspections that take place that the

8    Housing Authority was subject to that were HUD-related and also

9    state-related, correct?

09:40 10    A.    Yes.

11    Q.    All right.  The Commonwealth of Massachusetts, for

12    example, funded certain units and they were subject to

13    inspection by Commonwealth of Massachusetts inspectors, right?

14    A.    I believe, yes.

15    Q.    And -- excuse me.  The agency that had responsibility for

16    those was an agency called the Department of Housing and

17    Community Development, correct?

18    A.    Yes.

19    Q.    Also known as DHCD, correct?

09:40 20    A.    Correct.

21    Q.    So inspections were part of life at -- they were a way of

22    life or a part of regular life, regular business at the Chelsea

23    Housing Authority, correct?

24    A.    Yes.

25    Q.    Inspections by this agency or that agency for this purpose

1    or for that purpose, correct?

2    A.   Correct.

3    Q.   All right.  So Mr. Morosco is hired, and the Chelsea

4    Housing Authority becomes one of his clients, right?

5    A.   Correct.

6    Q.   And he offers this service, he offers this tool, if you

7    will, that could be used by the Housing Authority, right?

8    A.   Yes.

9    Q.   And let me see if I got this right.  You say it was you

09:41 10   and Mr. Fitzpatrick who were sort of first aware of the fact

11   that Mr. Morosco had this ability, correct?

12   A.   Yes.

13   Q.   All right.  Now, I want to show you --

14        MS. FRIED:  Your Honor, could the witness be shown, I

15   believe it's Exhibit 16?

16        THE COURT:  I'm not sure how you want to do this.

17        MS. FRIED:  If we could do it -- if you can just show

18   everybody, I think it's page 2 of that exhibit, Exhibit 16.

19        THE COURT:  Well, I don't have it.  You're going to do

09:42 20   it from the --

21        MS. FRIED:  I'll just put it on the projector, okay?

22        THE COURT:  Okay.

23   Q.   Can you see what I'm showing you there?

24   A.   Yes, I can.

25   Q.   And this has already been admitted in evidence as Exhibit

1    16, all right.

2         Okay.  Now, I want to ask you, we've talked about 2007,

3    2009 and 2011, but there was also a REAC inspection in 2005,

4    was there not?

5    A.    2004, I believe.

6    Q.    You think it was 2004?

7    A.    Yes.

8    Q.    And when Mr. Morosco first approached the Housing

9    Authority with this tool that he said was available --

09:43 10   A.    Yes.

11   Q.    -- what he showed you and Mr. Fitzpatrick was not this

12   specific chart but one that looked just like it, right?  I

13   mean, it was a square that had the buildings and had this sort

14   of grid with numbers, right?

15   A.    That's the one that I created.  Is that what you're

16   referring to?

17   Q.    Is this the one that you created?

18   A.    No.  This was the one that Mr. Morosco gave us.

19   Q.    And that's the question that I'm asking you, okay.  In

09:43 20   other words, the first time you ever learned about this, he

21   showed you a document that wasn't this specific document but it

22   looked just like it, correct?

23   A.    I can't remember.

24        MS. BASSIL:  Could we just have who the "he" is?

25        THE COURT:  Sorry?

| | |
|---|---|
| 1 | MS. BASSIL:  Could we have who the "he" is? |
| 2 | MS. FRIED:  Morosco.  I'm sorry if I wasn't clear. |
| 3 | Q.   Mr. Morosco showed you and Mr. Fitzpatrick a document that |
| 4 | looked like what is up there on the screen, Exhibit 16? |
| 5 | A.   Yes. |
| 6 | Q.   All right.  It wasn't that specific one, but it looked |
| 7 | just like it; it was the same format, correct? |
| 8 | A.   I'm not sure. |
| 9 | Q.   You're not sure.  You don't remember? |
| 09:44 10 | A.   Similar but -- |
| 11 | Q.   You don't remember? |
| 12 | A.   I'm not quite sure what your question is.  Something |
| 13 | similar but not that? |
| 14 | Q.   All right.  I don't want to be confusing you.  You saw -- |
| 15 | he gave you a document that -- it wasn't a list of the |
| 16 | apartments, was it? |
| 17 | A.   I don't remember. |
| 18 | Q.   It was a bunch of numbers, right? |
| 19 | A.   (No response) |
| 09:44 20 | Q.   You don't remember? |
| 21 | A.   I believe that's the only thing, the first time in 2004 |
| 22 | that he gave us. |
| 23 | Q.   Sir, I'm not trying to confuse you, but if you take a look |
| 24 | at the bottom, this was one that was on your computer for the |
| 25 | year 2006. |

```
 1   A.   Okay.
 2   Q.   Okay.  All right.  And there were a series of different
 3   inspections that happened that we're talking about in this
 4   courtroom today, right?
 5   A.   That's right.
 6   Q.   Not just one that happened in 2006, okay?
 7   A.   That's right.
 8   Q.   And what I'm trying to do is ask you about the one that
 9   preceded the one for this chart.  That's what I'm trying to ask
10   you about.
11   A.   Okay.  It would be a different listing, yes.
12   Q.   A different list, but it looked like this?
13   A.   Yes.
14   Q.   Or it had the same kind of information on it?
15   A.   Yes.
16   Q.   Correct.  All right.  That's all I'm trying to get at.
17   A.   Okay.
18   Q.   And it did not look like your finished list that you
19   created later on, did it?
20   A.   No.
21   Q.   All right.  In other words, it didn't have specific unit
22   numbers, right?
23   A.   Right, that's correct.
24   Q.   Okay.  So when this whole idea was first broached to the
25   Housing Authority in the persons of you and Mr. Fitzpatrick,
```

1    what you were shown was a piece of paper that looked kind of

2    like that?

3    A.   Yes.

4    Q.   And it's true, isn't it, that you were at a meeting with

5    Jim, and Mr. Morosco was either in the meeting with you or on

6    the telephone talking about this and that Jim, Mr. Fitzpatrick,

7    said, "This doesn't make any sense.  This isn't a list of

8    apartments."  Didn't he say that?

9    A.   I don't remember.

09:46 10    Q.   You don't remember?

11    A.   No, I don't.

12    Q.   You don't remember that he said, "This doesn't make any

13    sense at all.  This isn't a list of apartments"?  Right?

14    A.   His statement would have been correct, yes.  This is not a

15    listing of the apartments, yes.

16    Q.   And that shortly --

17         THE COURT:  Just so I'm clear, did he make that

18    statement?

19         THE WITNESS:  I can't remember, sir.

09:46 20    Q.   Well, you do remember shortly after Mr. Morosco presented

21    you with this information, you and Mr. Fitzpatrick, the two of

22    you then had a meeting either that day or shortly thereafter

23    with Mike McLaughlin, right?

24    A.   Yes.

25    Q.   To tell him that Mr. Morosco is offering us this to

1   communicate that to him, correct?

2   A.   Yes.

3   Q.   All right.  And Mike was very gung-ho about it, wasn't he?

4   He wanted to do it?

5   A.   Yes.

6   Q.   Mr. Fitzpatrick did not.  He said, "This doesn't even make

7   any sense.  You can't turn this into a list of apartments.  I

8   don't even know what this is"; isn't that right?

9   A.   I don't remember that particular statement, no.

09:47 10   Q.   You don't remember that particular statement?

11   A.   No.

12   Q.   Okay.  But you do remember that, as a result of this

13   meeting with Mr. McLaughlin, that you took on the job, you

14   volunteered to try to turn that list into an actual list of

15   apartments, correct?

16   A.   Yes, I was doing that, yes.

17   Q.   Okay.  That you were told to do that and you did it,

18   didn't you?

19   A.   Yes.

09:47 20   Q.   All right.  And what happened was that you eventually,

21   after a period of trial and error, managed to come up with a

22   way to collate or correlate the Chelsea Housing stock with the

23   buildings and apartment numbers into a list that seemed to

24   match or seemed to make sense with that grid that I just showed

25   you, correct?

A.   Yes.

Q.   Now, it's true, isn't it, that for that whole system to work, on the day of the inspection, the inspector has to have the first unit be the same unit that you identify as the first unit, correct?

A.   That's correct.

Q.   Okay.  And in fact, you were -- and if it's off even one, if the inspector's unit, the one that he's saying is one, is actually the unit next door, none of the units are going to be right, correct?

A.   That's correct.

Q.   The entire inspection list will be off by one, and none of the units that you think or that the Authority thought would be inspected would actually be the units being inspected, isn't that right?

A.   That's right.

Q.   So that was a built-in danger or flaw or weakness in this whole system, correct?

A.   Yes.

Q.   If the number that the inspector was starting at as apartment 1, if the way he eyed it up was, This is 1, not that unit, the whole thing fell apart and collapsed, right?

A.   It would be, yes.

Q.   In fact, Mr. Merritt was asking you some questions and talking about an e-mail that you had to send down to Bernie;

1    and the thrust of that e-mail, when we heard about it about

2    half an hour ago, was that you weren't quite sure how the

3    Chelsea buildings were lining up with what REAC was doing

4    because you didn't know how to count or how to categorize the

5    central office, correct?

6    A.    Yes.

7    Q.    Because the central office is a building that's part of

8    the housing stock, but there aren't any units in it to inspect,

9    right?

09:50  10    A.    That's correct.

11    Q.    So if you don't label and categorize that building

12    correctly, again, you're going to throw the whole grid off,

13    right?

14    A.    That's correct.

15    Q.    And none of it is going to work, correct?

16    A.    Correct.

17    Q.    All right.  And it was you who came up with the formula,

18    with the translation to turn that little grid of numbers into

19    an actual apartment list, correct?

09:51  20    A.    Yes.

21    Q.    All right.  It wasn't Mike McLaughlin, right?

22    A.    No.

23    Q.    He didn't do it.  It wasn't Jim Fitzpatrick, right?

24    A.    No.

25    Q.    It wasn't Richie Russell, correct?

```
 1   A.   Correct.

 2   Q.   And it wasn't Diane Cohen, right?

 3   A.   No.

 4   Q.   It was you?

 5   A.   Yes.

 6   Q.   All right.  And it was also the case that it was Mike

 7   McLaughlin who came up with the cover story in case anybody

 8   wanted to know how it was that you, the Authority, knew which

 9   apartments to inspect; that is, it was Mike who said, We should

10   tell people that Vitus came up with a formula for picking up

11   the apartments, for picking out the apartments, correct?

12   A.   Yes.

13   Q.   That was Mike's cover story.  It wasn't made up by Jim

14   Fitzpatrick.  It was made up by Mike McLaughlin, wasn't it?

15   A.   Yes.

16   Q.   Now, I mentioned the name Richie Russell, and it's been

17   mentioned before.  He worked at the Chelsea Housing Authority

18   as the director of maintenance, correct?

19   A.   Correct.

20   Q.   And it was maintenance's job to maintain, right?

21   A.   Correct.

22   Q.   They were responsible for making repairs, doing painting,

23   making sure trash got cleared away, fixing plumbing, that sort

24   of thing?

25   A.   Yes.
```

1    Q.   The kinds of jobs that didn't require the use of an

2    electrical contractor or a heating contractor or a building

3    contractor or an architect, right?

4    A.   I'm not sure.

5    Q.   Well, okay.  In any event, it was smaller jobs, not big,

6    major rehabilitation projects, correct?

7    A.   Correct.

8    Q.    It's also true, isn't it, that it was Richie Russell's

9    crew who needed to get the list because they were the ones that

09:52 10   were going to do the fixing up, right?

11   A.   Correct.

12   Q.   So Richie Russell was one of the very first people to get

13   the list after you made it up, right?

14   A.   He would be.

15   Q.   Right.  He's the one who needed it, right?

16   A.   Yes.

17   Q.   In other words, he was the one who was going to be

18   responsible for fixing up the apartments, right?

19   A.   Correct.

09:53 20   Q.    It wasn't, you know, the secretaries who were going to be

21   fixing up the apartments, right?

22   A.   Correct.

23   Q.   And let's talk about the role of the SWAT teams.  It's

24   true, isn't it, that at least before 2011, the SWAT teams --

25   that is the 37 or 40 people who worked on the staff of the

1    Chelsea Housing Authority -- didn't repair anything, correct?

2    They weren't there to make repairs?

3    A.    Well, I'm sorry.  Can I verify?

4    Q.    Sure, go ahead.

5    A.    The 30-something staff includes the maintenance staff.

6    Half of that pool are maintenance staff.  So they would be

7    doing the repairs, but the administrative side of the staff

8    wouldn't be doing that, yes.

9    Q.    All right.  So the 18 or 20 people who were not on

09:54 10   maintenance, when they were doing their SWAT team duties, that

11   was only -- that was literally just a visual inspection,

12   correct?

13   A.    Correct.

14   Q.    They weren't there actually plastering or painting or

15   cleaning or getting out screwdrivers, correct?

16   A.    Correct.

17   Q.    They were just there to look at the apartments and to

18   report on that sheet that you created, Exhibit 5, what they

19   saw, right?

09:54 20   A.    Right.

21        MS. FRIED:  Okay.  Now, could I have Exhibit 21 up on

22   the computer?  Would the government be so kind as to put that

23   up?  Can I put it on the screen?

24   Q.    This is already in evidence.  And you were talking about

25   this yesterday.  You can see it?

```
 1   A.   No, I can't.
 2           MS. FRIED:  I'm sorry.
 3           MR. PEREZ-DAPLE:  Your Honor, I did call it up on the
 4   government's computer.
 5           MS. FRIED:  I guess I need you to activate it for me,
 6   your Honor.  Thank you very much.
 7   Q.   You can see it now, right?
 8   A.   Yes.
 9   Q.   This was a chart that you were telling us about yesterday.
10   A.   That's correct.
11   Q.   And the numbers -- this is supposed to reflect information
12   that was given to you by the SWAT team people who filled out
13   that checklist that you created that's in evidence as Exhibit
14   5, correct?
15   A.   That's correct, correct.
16   Q.   And you took these documents, right; they were given to
17   you by Mike McLaughlin, correct?
18   A.   Yes.
19   Q.   He collected them from the SWAT team folks and gave them
20   to you, right?
21   A.   Yes.
22   Q.   And you were supposed to turn that information into some
23   way of being able to figure out how to triage the apartments
24   that needed work, correct?
25   A.   Yes.
```

Q.   All right.  And you came up with this grid where you list
on the left side a whole list of different conceivable
problems, like bathroom problems, kitchen problems, living room
problems, laundry room problems, et cetera, et cetera, correct?
A.   Correct.
Q.   All right.  And I just want to be clear about this.  You
assigned certain values, 1 or 2, correct?
A.   Correct.
Q.   All right.  Now, am I right that what you were telling us
yesterday was that the values you assigned were your own
interpretation of the severity of a problem that was identified
or observed in a specific apartment, correct?
A.   I believe I was relying on the Federal Register standard
to say, Okay, if that's a particular deficiency present, it
deserves a level 2 deficiency type of thing.  Because I
wouldn't be able to determine what level of deficiency they --
Q.   Let's unpack that a little bit.  What you'd get was a
sheet that said something like "broken stove"?
A.   Yes.
Q.   And then that's the information you got, something that
said "broken stove," right?
A.   Yes.
Q.   And you would see that, and you'd say to yourself, How
does the federal -- How does the Code of Federal Regulations of
the Federal Register quantify the severity of that issue,

1    right?

2    A.    Right.

3    Q.    That was the process that you went through in your mind,

4    right?

5    A.    Correct.

6    Q.    And you translated that into a number, and that number got

7    put down on this piece of paper, correct?

8    A.    Yes.

9    Q.    All right.  So in other words, these 1's and 2's do not

09:59 10   reflect, for example, numbers of different observed

11   deficiencies, correct?

12   A.    Correct.

13   Q.    All right.  What they reflect is a value that you

14   subjectively assigned to the deficiency that was noted based on

15   your knowledge or guesswork about how HUD would grade that

16   deficiency, correct?

17   A.    Yes.

18        MS. FRIED:  All right.  Could I have just a minute?

19        THE COURT:  Yes.

10:00 20   Q.    All right.  After Mr. McLaughlin resigned in November of

21   2011, you started talking to the investigators because they

22   started coming around to Chelsea Housing Authority and talking

23   to everybody, correct?

24   A.    Correct.

25   Q.    All right.  And you had a number of interviews in November

```
 1   and December of 2011, an interview again in February of 2012,
 2   correct?
 3   A.   Correct.
 4   Q.   And then in March of 2012, you got a lawyer and entered
 5   into an immunity agreement with the United States government,
 6   correct?
 7   A.   Correct.
 8   Q.   All right.  I want to ask you some questions about that
 9   agreement, sir.
10         MS. FRIED:  Could I show this to the witness only,
11   please?
12         THE COURT:  Yes.
13         MS. FRIED:  Is this where it should go?  This is a
14   letter that has been marked but not admitted into evidence, my
15   understanding.
16         THE COURT:  It hasn't, but the door may open up as a
17   result of examination.
18         MS. FRIED:  Okay.
19   Q.   This is a letter that is addressed to your counsel
20   regarding you, and the letter is dated March 6, 2012, correct?
21   A.   Correct.
22   Q.   And on the second page of that letter, it sets out some
23   terms.  But on the second page of that letter, your signature
24   appears with the date March 15, 2012, correct?
25   A.   Correct.
```

1   Q.   And below that is the signature of your counsel whose name

2   is Scott Lopez, also dated March 15, 2012, correct?

3   A.   Correct.

4        MS. FRIED:  Your Honor, I would move this into

5   evidence if there's no objection from the government.

6        MR. MERRITT:  No objection.

7        THE COURT:  Okay.  It's received.

8          (Exhibit 12 received in evidence)

9        MS. FRIED:  Then I would just have this displayed.

10:02 10        THE COURT:  The number?

11        MS. FRIED:  I'm sorry.  This is Exhibit Number 12,

12   your Honor.

13        THE COURT:  Okay.

14        MS. FRIED:  Thank you.

15   Q.   I want to ask you some questions about this agreement and

16   your understanding of what you need to do under this agreement

17   and what the government is supposed to do under this agreement.

18   All right?

19   A.   Okay.

10:02 20        MS. FRIED:  Sorry.  Could I have a moment?  Just a

21   minute.

22   Q.   I'm going to skip over a certain amount of the legalese on

23   it and just try to get to the substance of it.  The first

24   paragraph requires you -- the letter is addressed to Scott

25   Lopez who is your attorney, correct?

1    A.    Yes.

2    Q.    And the letter is telling your attorney that you, his

3    client, you, agrees to cooperate fully with law enforcement

4    agents and government attorneys, correct?

5    A.    Correct.

6    Q.    And again, just to step back, you agreed to these terms

7    not on the day this letter was written but shortly after that,

8    on March 15, right?

9    A.    Yes.

10:04 10    Q.    The letter is written on March 6, but you sign it nine

11    days later, correct?

12    A.    Correct.

13    Q.    And the letter requires, it says that if your testimony is

14    requested that the client must testify truthfully and

15    completely before any grand jury at any hearing and at any

16    trial, correct?

17    A.    Correct.

18    Q.    And that you must answer all questions put to him by any

19    law enforcement agents or government attorneys, correct?

10:04 20    A.    Correct.

21    Q.    And that you must not withhold any information from them,

22    correct?

23    A.    Correct.

24    Q.    And that you must not attempt to protect any person or any

25    entity or organization by providing either false information,

1    correct --

2    A.    Correct.

3    Q.    -- or leaving out information, omitting information,

4    correct?

5    A.    Correct.

6    Q.    And that you must not falsely implicate a person or an

7    agency or entity in any kind of wrongdoing, correct?

8    A.    Correct.

9    Q.    All right.  And the second paragraph sets out what the

10:05 10    government will do for you if you obey all of those terms and

11    conditions, and the letter says that in return for your full

12    and truthful cooperation, the United States agrees not to use

13    any statements made by you, correct --

14    A.    Correct.

15    Q.    -- or any information provided by you pursuant to this

16    agreement, correct?

17    A.    Correct.

18    Q.    And that they won't use that information either directly

19    or indirectly, right?

10:05 20    A.    Yes.

21    Q.    Now, do you -- let me ask you this.  What is your

22    understanding of making indirect use of your statements?  Did

23    your lawyer ever talk to you about what those words meant?

24    A.    No, I don't believe so.

25    Q.    He didn't tell you what "indirect use" meant?

1    A.    He didn't refer to that particular word.

2          THE COURT:   I think we're trenching on attorney-client

3    privilege, so it really is the question, what does this witness

4    understand.

5    Q.    Let me see whether this is your understanding.   Let me see

6    whether you understand this to be the terms of the agreement.

7          Do you understand that anything you told government agents

8    or lawyers couldn't be used or -- couldn't be the basis for

9    investigating other information that might turn up something

10:06 10   bad about anything you did?   Do you understand what I'm asking

11   you?

12   A.    Yes, yes.

13   Q.    And that was your understanding, correct?

14   A.    Yes.

15   Q.    That if you told them about stuff that happened, that

16   either you did or that someone you worked with did or anything

17   like that, not only could they not come into evidence and use

18   your own words against you like a confession, but they also

19   couldn't make any kind of an investigation and use whatever

10:07 20   their investigation turned up against you to prosecute you,

21   right?

22   A.    Yes.

23   Q.    And that's your understanding of what they were agreeing

24   to do for you, right?

25   A.    Yes.

Q.   Okay.  Now, with a few exceptions, right?  There were

always a couple of exceptions, right?  For example, the deal

was off if you committed perjury, correct?

A.   Correct.

Q.   And do you know what perjury is?

A.   Yes.

Q.   Perjury is lying under oath, right?

A.   Correct.

Q.   Or if you committed some other crime involving physical

10:07 violence against a person, if you did something like that, that

would nullify the deal as well, right?

A.   Yes.

Q.   Okay.  And then there were additional provisions.  Let's

see if I can get that to stay up there.

     Okay.  The third paragraph of this agreement said that if

you knowingly provide false or misleading information or

testimony or if you commit a crime that's a felony under state

or federal law, or if you otherwise violate any other term or

condition of the agreement, then the agreement is null and

10:08 void, right?

A.   Yes.

Q.   Okay.  So it covers things that you say and you do after

you signed it, which was on March 15, correct?

A.   Correct.

Q.   All right.  Now let's go to the second page of the

1    agreement.  Okay.

2        Now, paragraph 4 of the agreement provides that -- I'll

3    read it.  "The determination of whether the client," that's

4    you, "has violated this agreement and that therefore the

5    agreement would be null and void is made by the United States

6    Attorney and is not subject to appeal or review, and any

7    restrictions imposed by the agreement on the use of any

8    statements made or any restrictions made on the other

9    information provided by you will also be null and void," right?

10:09 10  A.   Yes.

11   Q.   Okay.  And you understand that that means that it's not a

12   Court, not you, that decides whether or not you've complied

13   with this agreement.  It's Mr. Merritt and Mr. Perez-Daple or

14   their superiors at the United States Attorney's Office?  You

15   understand that, right?

16   A.   Yes.

17   Q.   It's their decision whether you've lived up to this

18   agreement and nobody else's, right?

19   A.   Yes.

10:10 20  Q.   Okay.  Which would mean, for example, you understand that

21   even if they thought you violated this agreement, they're not

22   obliged to terminate it, correct?

23   A.   I don't know.

24   Q.   You don't know.  All right.  So you signed that agreement

25   on March 15, 2012?

1    A.    Yes.

2    Q.    And you continue -- excuse me -- March 15, 2012.  And you

3    continue to talk to government agents and to give interviews

4    and to provide information, right?

5    A.    Yes.

6    Q.    Now, it's true, isn't it, that at the time that you signed

7    this agreement -- and all the conversations that you had had

8    leading up to the execution of that Exhibit 12 that we were

9    just talking about, all of those conversations were centered

10:11  10   around Chelsea Housing Authority's finances and Michael

11   McLaughlin's salary, correct?

12   A.    Correct.

13   Q.    And they were centered around an inquiry into whether

14   Mr. McLaughlin was involved in any kind of improper or

15   inappropriate campaign fundraising activities, correct?

16   A.    Correct.

17   Q.    All right.  And those were the two areas that the

18   government was investigating at the time you executed that

19   agreement, right?

10:11  20   A.    Yes.

21   Q.    All right.  There were no questions put to you whatsoever

22   up to that time about the HUD, REAC inspection program, isn't

23   that right?

24   A.    No.  I mean, that's correct.

25   Q.    I'm correct about that, right?

A.   Yes, yes.

Q.   No one was looking at HUD, REAC; no one was talking about it; nobody had any interest in it, correct?

A.   Correct.

Q.   Okay.  But you signed this agreement, right?

A.   Yes.

Q.   And it's true, isn't it, it's your understanding that everything that you have told the government about HUD and REAC since you executed that immunity agreement is covered by the terms of that immunity agreement; that's your understanding, is it not?

A.   Yes.

Q.   All right.  So that anything that you later told them months later about HUD and REAC, you are protected by however much protection that immunity agreement gave you when you signed it earlier in March of 2012, right?

A.   Yes.

Q.   All right.  And it was -- correct me if your memory is different, but it was not until April of 2013 that you started getting asked serious questions about the HUD inspection program and REAC, isn't that right?

A.   Yes.

Q.   Okay.  It turned out they brought you in for an interview; and instead of asking you questions all about Mike McLaughlin's money and campaign fundraising activities, there was a

1    completely different subject on the menu for that day, right?

2    A.    Yes.

3    Q.    And it was HUD and REAC, right?

4    A.    Yes.

5    Q.    Okay.  And so you got interviewed on April 1, 2013, and

6    you were interviewed by Agent Mazzone and Mr. Merritt, who are

7    both sitting here in this courtroom, right?

8    A.    Correct.

9    Q.    And that was over -- that was actually downtown at the

10:14 10   Suffolk Superior Courthouse with your attorney, Scott Lopez,

11   right?

12   A.    Yes.

13   Q.    And you were interviewed for the first time about the Real

14   Estate Assessment Center and Chelsea Housing Authority's

15   approach to handling REAC inspections, right?

16   A.    Yes.

17   Q.    Okay.  And it's true that during that interview on April

18   1, 2013, you told them that it was Bernard Morosco who gave to

19   you a list of the specific units that were going to be

10:14 20   inspected?  You told them that on that day, didn't you?

21   A.    Yes.

22   Q.    Okay.  You also told them that you had spoken with

23   Mr. Morosco about the propriety of having the list ahead of

24   time and that he told you that it was fine and that it wasn't a

25   problem, correct?

```
 1            MR. MERRITT:  Objection, your Honor.

 2            THE COURT:  Grounds?

 3            MR. MERRITT:  Hearsay.

 4            THE COURT:  Overruled.  I'm going to permit it.

 5   Q.   You can answer it.

 6   A.   Yes.

 7   Q.   You also told them that it was your impression that it

 8   wasn't illegal to have the list ahead of time, right?

 9   A.   That was what I was told, yes.  I --

10   Q.   Well, I'm asking you a more specific question than that.

11   I'm not asking you what you were told.  I'm asking you whether

12   you told them at that meeting that it was your impression that

13   it wasn't -- that there was nothing improper or illegal about

14   having the list.  Didn't you say that?

15   A.   Yes.

16   Q.   And you also told them that it was Richie Russell that got

17   the list because he was the one who needed it.  You told them

18   that Richie Russell got the list, didn't you?

19   A.   Yeah, he would be one of them who would receive the list,

20   yes.

21   Q.   You also told them that it was Mr. Morosco who gave you

22   the list either through an e-mail or on a piece of paper.

23   That's what you told them, isn't it?

24   A.   Yes.

25   Q.   All right.  And you also told them that you never kept the
```

1   list of apartments that were going to be inspected yourself.

2   You told them that, didn't you?

3   A.   Yeah.

4   Q.   All right.  Now, in fact, that wasn't true at all, was it,

5   that you never kept the list of the apartments?

6   A.   I didn't know I had it, yes.

7   Q.   Well, you had the list of apartments on your computer.

8   You had created those lists, right?

9   A.   Correct.

10:16 10   Q.   All right.  So you did keep them, right?

11   A.   Yes.

12   Q.   So when you told them that you hadn't kept that list, that

13   was a falsehood, wasn't it?

14   A.   Yes.

15   Q.   Okay.  And that was a falsehood that you told them almost

16   more than a year after you had executed your immunity agreement

17   promising to be truthful, correct?

18   A.   Correct.

19   Q.   You also told them that you were never asked to send

10:17 20   anything to Bernard Morosco.  You told them that during that

21   April 1 interview, didn't you?

22   A.   Yes.

23   Q.   All right.  In fact, that wasn't true either, was it?

24   A.   No.

25   Q.   Because you had sent an e-mail to Bernard Morosco in 2008,

1    five years earlier, with information that he needed about how

2    to put this list together, correct?

3    A.    Yes.

4    Q.    So you lied to the prosecutor and to the agent on April 1,

5    2013, more than a year after you executed your immunity

6    agreement, isn't that right?  You lied to them?

7             THE COURT:  So we understand what the word "lie"

8    means, it is intentionally misrepresenting a fact.

9             MS. FRIED:  All right.  Yes.

10:18 10   Q.    And you --

11   A.    It wasn't intentional.

12   Q.    Well, you told them that you had never sent anything to

13   them, to Mr. Morosco, right?

14   A.    That's what was my -- that was what I thought then, yes.

15   Q.    Well, had you forgotten then that you had sent this series

16   of e-mails between yourself and Mr. Fitzpatrick and Bernie

17   Morosco in 2008?  Had you completely forgotten about that?

18   A.    Yes.

19   Q.    You had forgotten.  That's why that statement was not

10:18 20   untrue, because you didn't remember; is that it?

21   A.    That's right.

22   Q.    You did not tell them during that interview that, in fact,

23   you yourself had created the list of specific apartments; isn't

24   that right?

25   A.    I don't remember.

1    Q.   You don't remember whether you told them that, but you do

2    remember telling them that it was Morosco who gave you the list

3    of the units?

4    A.   Yeah, the random list, yes.

5    Q.   Well, you did not tell them that you had created the list,

6    did you?

7    A.   (No response)

8    Q.   Sir?

9    A.   Yes.

10:19 10   Q.   You knew yourself in the spring of 2013 that for the

11   inspections of 2011, 2009, 2007 and 2005, that you had created

12   those lists, didn't you?

13   A.   Yes.

14   Q.   You knew that?

15   A.   Yes.

16   Q.   That you had done those things, right?

17   A.   Yes.

18   Q.   And you didn't tell these people when they were

19   interviewing you about that, did you?  Didn't say one word

10:19 20   about how you had created the lists?

21   A.   Yes.

22   Q.   You agree with that, don't you?

23   A.   Yeah.

24        MR. MERRITT:  Your Honor, I'm going to object.

25        THE COURT:  Well, I think the way we're going to deal

1    with this is on redirect.

2           MR. MERRITT:  All right, your Honor.  Thank you.

3    Q.   You also did not tell them, Ms. Mazzone and Mr. Merritt,

4    on April 21, 2013, you did not tell them that Jim Fitzpatrick

5    was the person who had given you the list?  You didn't tell

6    them that, did you?

7    A.   No.

8           MS. FRIED:  Could I have a moment, your Honor?

9           THE COURT:  You may.

10:20 10           MS. FRIED:  Could I consult with my co-counsel?

11           THE COURT:  Yes.

12   Q.   Just stepping back a little bit, you knew that Jim

13   Fitzpatrick's job was director of modernization, right?

14   A.   Yes.

15   Q.   In fact -- well, step back a little bit farther.  You and

16   Mr. Fitzpatrick have offices on the same floor, right?

17   A.   Correct.

18   Q.   So you used to see him, right?

19   A.   Yes.

10:22 20   Q.   You didn't work in the same office, but you worked down

21   the hall from each other, correct?

22   A.   Correct.

23   Q.   And your offices were not where most of the people work

24   because you were up on the second floor at 54 Locke Street,

25   correct?

```
 1   A.   Correct.
 2   Q.   So you had a little bit more privacy, and it was you on
 3   that floor and Mr. Fitzpatrick on that floor and a couple of
 4   the other people who worked in accounting on that floor, right?
 5   A.   Yes.
 6   Q.   Okay.  And it's true, isn't it, that at some point you
 7   started feeling very oppressed by all of the demands that Mike
 8   McLaughlin put on you as regarding money, right?
 9   A.   Yes, yes.
10   Q.   Right.  I mean, you started complaining about how you
11   always had to -- you started complaining to Jim about how you
12   always had to be looking for money, grubbing for money, trying
13   to find money for Mike, right?
14   A.   Yes.
15   Q.   That was something that you constantly -- well, often
16   enough, you would go down to his office and complain to him
17   about all this stuff that Mike McLaughlin was making you do,
18   right?
19   A.   Yes.
20   Q.   Okay.  And that affected Jim Fitzpatrick, too, right?
21   A.   Yes.
22   Q.   Because he couldn't do his job, could he?
23   A.   I don't know.
24   Q.   Well, you knew that funds that were supposed to be used
25   for modernization projects were not allowed -- well, Mike
```

1    McLaughlin wouldn't allow those expenditures to be made for

2    modernization.  You knew that, right?

3    A.    Yes, yes.

4    Q.    And you knew that at least on the federal side, if Mike

5    McLaughlin didn't authorize Jim Fitzpatrick to spend the money

6    to buy a new boiler or to put on a new roof, it didn't get

7    done, right?

8    A.    Right.

9    Q.    And at the end of the day, it wasn't Jim Fitzpatrick who

10:24 10   made that decision, right?

11   A.    Correct.

12   Q.    It was Mike McLaughlin who made that decision, right?

13   A.    Yes.

14   Q.    It was Mike who decided whether roofs were going to be put

15   on, doors were going to be replaced, boilers were going to be

16   replaced, sidewalks were going to get fixed, because Jim

17   Fitzpatrick didn't have the authority to do that on his own,

18   did he?

19   A.    No.

10:24 20   Q.    No.  And in fact, Jim Fitzpatrick had no authority over

21   you at all, did he?

22   A.    No.

23   Q.    Not on the organizational chart, right?

24   A.    No.  That's correct.

25   Q.    On the organizational chart, the only people who had

1  authority over you were Diane Cohen and Mike McLaughlin,

2  correct?

3  A.   Correct.

4  Q.   And you had authority over the other two accountants that

5  worked for you, Jenny Cohen and Jim McNichols, correct?

6  A.   Correct.

7  Q.   That was your hierarchy below you, right?

8  A.   Yes.

9  Q.   But Jim couldn't give orders to the accountant?

10:25 10  A.   No.

11  Q.   Right.  That wasn't his bailiwick at all, right?

12  A.   Right.

13  Q.   And at the same time, though, Mr. Shum, it's true, isn't

14  it, that you took advantage of the perks that the job offered

15  you, right?

16  A.   I don't know.

17  Q.   Well, you mentioned specifically yesterday going to a

18  conference in San Diego, right?

19  A.   Yes.

10:25 20  Q.   Do you remember you said that in January of 2009, you and

21  Diane Cohen got to go to San Diego to go to a conference,

22  right?

23  A.   Yes.

24  Q.   And you ended up turning that conference into a golf

25  junket, right?

1    A.    I wouldn't characterize it that way.

2    Q.    Well, you had a friend named Ray Wong, correct --

3    A.    Right.

4    Q.    -- who was going to be out there, right?

5    A.    Yes.

6    Q.    And you made plans to get together with him and play golf,

7    right?

8    A.    Yes.

9          MS. FRIED:  Okay.  Hold on just a minute, please.

10:26 10         Could I have an exhibit sticker put on this, your

11   Honor?  I want to show it just first to the witness.  It's been

12   shown to opposing counsel.  They've seen it.  May I have it

13   marked?

14         THE COURT:  We're going to have this marked as number

15   117.

16         MS. FRIED:  Sorry.  I thought this was -- okay.  117.

17   I thought it was already marked.

18         Your Honor, I believe that was previously marked as

19   109.  That's what I believe.

10:27 20         THE COURT:  Then why are you marking it now?

21         MS. FRIED:  The piece of paper that I'm showing to the

22   witness does not have a sticker on it, that's all.

23         THE COURT:  Are you introducing number 109 or making

24   reference to 109?

25         MS. FRIED:  I'm going to make reference to it and then

1    seek to introduce it if the witness --

2        THE COURT:  So it's 109.  I'm not sure that we had to

3    take the time from the jury to mark something that's already

4    marked.

5    Q.   I want to show you what's been marked as Exhibit 109.

6    This is for the witness only.

7        THE COURT:  Is it opposed?

8        MR. MERRITT:  I don't know what purpose, at this

9    point, it is.

10:28 10       THE COURT:  Okay.  We'll show it only to the jury -- I

11   mean only to the witness.  Excuse me.

12       MS. FRIED.  Thank you.

13   Q.   And Mr. Shum, I want to ask you if you recognize what's

14   shown on this e-mail chain to be an e-mail exchange between you

15   and Ray Wong that starts in -- that goes in January 2009, all

16   right?

17   A.   Yes.

18   Q.   Okay.  And in this e-mail chain -- well, first of all, do

19   you recognize that you are the person who wrote these e-mails,

10:28 20   the ones that say Vitus?

21   A.   Yes.

22   Q.   And Ray Wong is somebody that you know, correct?

23   A.   Correct.

24   Q.   All right.  And in this e-mail chain, you are trying to

25   make plans to get together with your friend, Mr. Wong, out in

California, right?

A.    Correct.

Q.    And that's because you know you're going to be going out to California to go to a conference, the conference that you alluded to yesterday, correct?

A.    Correct.

Q.    All right.  I want to direct your attention to page 7 --

        MS. FRIED:  I'd actually seek to admit this at this time since it's been identified by the witness.

        MR. MERRITT:  Again, your Honor, I have an objection because I don't see the purpose yet.

        THE COURT:  Well, frankly, it seems like there's a bit more paper than is needed.  You have the narrative response of the witness.  I'm not sure that anything else is needed.

Q.    Well, I want to ask you specifically about, directing your attention to page 7 of this e-mail chain.  In that exchange with Mr. Wong, you're talking about trying to figure out where you're going to stay and how much it's going to cost and what time you're coming into San Diego, correct?

A.    LAX.

Q.    LAX?

A.    Yeah.

Q.    For this conference, right?

A.    Yes.

Q.    And you're talking about getting together to play some

1 golf and getting together to eat, right?

2 A.   Yes.

3 Q.   All right.  And you say to him, and you wrote to him on

4 December 15, 2008, you said, "I'll plan to fly into LAX late

5 Friday night January 24, rent a car and stay two nights at a

6 hotel/motel near you.  San Dimas, right"?

7 A.   Yes.

8 Q.   You wrote that, correct?

9 A.   Correct.

10:30 10 Q.   And the message continues, "Two days of golf and a drive

11 to San Diego Sunday day.  Now these conferences are a joke

12 usually.  I'm available Monday and Wednesday to do what I want

13 as well.  Maybe another round," round of golf, "somewhere

14 between LA and San Diego.  Who needs retirement with jobs like

15 ours?  Vitus."  You wrote that, didn't you?

16 A.   I did.

17          MS. FRIED:  No further questions.

18          THE COURT:  Ms. Bassil?

19 CROSS-EXAMINATION BY MS. BASSIL:

10:31 20 Q.   By the way -- good morning, Mr. Shum.

21 A.   Good morning.

22 Q.   Were you paid for those days you were in San Diego?

23 A.   Yes.

24 Q.   And were you paid for the time you took to go golfing?

25 A.   No.

1    Q.   Did you put in a request or something that showed that you

2    had taken personal time?

3    A.   Yes.

4    Q.   Now, that issue -- well, let me go in order here.

5    Mr. Morosco was a consultant to the Housing Authority, correct?

6    A.   Correct.

7    Q.   And he certainly -- are you familiar -- are you aware that

8    he did 100 percent inspections of every unit of the federal

9    units?

10:32 10   A.   Yes.

11   Q.   He would come every year and inspect every single unit?

12   A.   Yes.

13   Q.   And did you ever see the list he drew up in handwriting

14   with things that were wrong or needed to be fixed?

15   A.   I might have.  I don't remember.

16   Q.   All right.  And he would submit an invoice for that annual

17   inspection, correct?

18   A.   Yes.

19   Q.   And that would take, what, three or four days for him to

10:33 20   do that?

21   A.   Yes.

22   Q.   Okay.  And he also would help the Housing Authority appeal

23   certain scores or certain deficits that were found in the REAC

24   inspection, correct?

25   A.   Correct.

|    |    |
|----|----|
| 1  | Q.   Perfectly legitimate to appeal that? |
| 2  | A.   Yes. |
| 3  | Q.   And in fact, at one point didn't Mr. McLaughlin want you |
| 4  | to try to figure out what the scores would be if an appeal were |
| 5  | successful? |
| 6  | A.   Yes. |
| 7  | Q.   All right.  Now, he also, do you recall that he also wrote |
| 8  | up a preventive maintenance policy for the Chelsea Housing |
| 9  | Authority? |
| 10 | A.   He might have, yes. |
| 11 | Q.   And he was paid for that as well, correct? |
| 12 | A.   Yes -- oh, Mr. Morosco?  Yes. |
| 13 | Q.   Mr. Morosco was paid for that, and he also -- do you |
| 14 | recall that in 2011, the REAC system was changed and it went |
| 15 | from three separate inspections of each federal building to one |
| 16 | asset management; do you recall that? |
| 17 | A.   Yes. |
| 18 | Q.   And so the issue of what would be the units and their |
| 19 | numbers was more difficult, was it not? |
| 20 | A.   Yes. |
| 21 | Q.   It was a whole new system that had to be figured out, |
| 22 | correct? |
| 23 | A.   Yes. |
| 24 | Q.   And Mr. Morosco helped to create that rent roll, correct? |
| 25 | A.   I did it, and I'm not sure -- he might have some input |

10:33 (line 10)
10:34 (line 20)

```
 1    into it, you know.
 2    Q.   You had to figure out, for example, if a unit -- there
 3    were certain units in the Chelsea Housing Authority where a
 4    police officer might live, correct?
 5    A.   Correct.
 6    Q.   And that unit couldn't be counted or examined by the REAC
 7    inspector, correct?
 8    A.   Correct.
 9    Q.   And that could throw off the count?
10    A.   Yes.
11    Q.   All right.  And Mr. Morosco helped you sort of look at
12    what units were actually part of the REAC inspection?
13    A.   Yes.
14    Q.   Correct?  All right.
15         Now, Mr. Shum, you were interviewed many, many times by
16    various investigators, correct?
17    A.   Correct.
18    Q.   Let me run through this with you.  Do you remember being
19    interviewed on November 2, 2011?
20    A.   Could have very likely, yes.
21    Q.   And November 4, 2011?
22    A.   Yes.
23    Q.   November 7, 2011?
24    A.   Yes.
25    Q.   November 17, 2011?
```

```
 1   A.   Yes.

 2   Q.   November 30, 2011?

 3   A.   Yes.

 4   Q.   December 8, 2011?

 5   A.   Yes.

 6   Q.   February 7, 2012?

 7   A.   Yes.

 8   Q.   All right.  And then on March 6, the immunity letter came

 9   for you, correct?

10   A.   Yes.

11   Q.   And is it your understanding of this immunity letter not

12   just that things wouldn't be used against you but that you

13   wouldn't be prosecuted?

14   A.   Yes.

15   Q.   You wouldn't be charged?

16   A.   Yes.

17   Q.   You wouldn't be charged in this conspiracy?

18   A.   Yes.

19   Q.   Otherwise, you might be sitting at this table --

20   A.   Yes.

21   Q.   -- without that letter; you knew that?

22   A.   Yes.

23   Q.   Now, after you were given this immunity, you were

24   interviewed on March 15, 2012?

25   A.   Yes.
```

```
      1   Q.   April 3, 2012?

      2   A.   Yes.

      3   Q.   You testified in a grand jury on April 4, 2012?

      4   A.   Yes.

      5   Q.   You were interviewed on September 19, 2012?

      6   A.   Yes.

      7   Q.   October 25, 2012?

      8   A.   Yes.

      9   Q.   April 1, 2013?

10:37 10   A.   Yes.

     11   Q.   May 3, 2013?

     12   A.   Yes.

     13   Q.   May 24, 2013?

     14   A.   Yes.

     15   Q.   And you also testified in another -- or testified in a

     16   grand jury on May 28, 2013, correct?

     17   A.   Yes.

     18   Q.   And have you also met with the agents who are the

     19   prosecutors to prepare your testimony for yesterday and today?

10:37 20   A.   Yes.

     21   Q.   All right.  And how many times had you met with them?

     22   A.   Twice.

     23   Q.   In the last week or so?

     24   A.   Couple of weeks.

     25   Q.   Couple of weeks, all right.
```

1          Now, when you worked for the Chelsea Housing Authority,

2     your responsibility was to oversee financial operations,

3     correct?

4     A.   Yes.

5     Q.   That included compiling the annual operating budget?

6     A.   Yes.

7     Q.   Submitting quarterly and annual filings to the state?

8     A.   Yes.

9     Q.   And to the federal government, to HUD?

10:38 10    A.   Yes.

11    Q.   Assisting outside auditors?

12    A.   Yes.

13    Q.   And the fee accountants, correct?

14    A.   Yes.

15    Q.   Financial reporting requirements?

16    A.   Yes.

17    Q.   Maintaining account records?

18    A.   Yes.

19    Q.   And reconciling the Chelsea Housing monthly checking

10:38 20    accounts at the Bank of America and Century Bank?

21    A.   Yes, correct.

22    Q.   And that's what your job was?

23    A.   Yes.

24    Q.   Your job was not to be involved in creating lists of

25    buildings?

```
 1    A.    No, no.

 2    Q.    Or in figuring out scores for deficits?

 3    A.    No.

 4    Q.    That was not part of your job?

 5    A.    No.

 6    Q.    What percentage of your job, what percentage of your time

 7    was spent on these REAC inspections?

 8    A.    During the period that these inspections took place, it

 9    was quite a bit.

10:38 10    Q.    All right.  Let's just say in the month before the

11    inspections, what percentage of your time was spent related to

12    these inspections?

13    A.    30 percent of my time.

14    Q.    30 percent of your time, all right.  Now, you also had two

15    people who worked under you; is that correct?

16    A.    Yes.

17    Q.    Mr. Jim McNichols?

18    A.    Yes.

19    Q.    And a woman named Jenny Cohen?

10:39 20    A.    Yes.

21    Q.    And McNichols did accounts payable and payroll, correct?

22    A.    Correct.

23    Q.    And you were responsible to supervise him?

24    A.    Yes.

25    Q.    You were responsible for what he did?
```

1    A.    Yes.

2    Q.    Now, one of the things that people who worked at Chelsea

3    were required to do was to submit records of the time that they

4    worked, correct?

5    A.    Yes.

6    Q.    Did you submit time records?

7    A.    Yes.

8    Q.    Was it a card that you submitted weekly?

9    A.    Yes.

10:39 10    Q.    All right.  And on that, you might submit if you were sick

11    for a day or if you took a personal day, correct?

12    A.    Yes.

13    Q.    And you would also put down what kind of vacation you

14    took?

15    A.    Yes.

16    Q.    All right.  And you were aware that Michael McLaughlin was

17    not submitting any time records, correct?

18    A.    Yes, correct.

19    Q.    And, in fact, Michael McLaughlin every year was sort of

10:40 20    cashing out his unused vacation time, for example?

21    A.    Not every year, I don't think.  I can't recollect, but I

22    don't think he did it every year.

23    Q.    Many years he did it?

24    A.    He may have, yes.

25    Q.    And that was to the tune of about $20,000 or so in extra

1    income to him?

2    A.    Yes.

3    Q.    All right.  And you knew that there were no records or

4    documents that supported that?

5    A.    Yes.

6    Q.    All right.  And that was your responsibility?

7    A.    Yes.

8    Q.    Now, you also knew that -- you knew what Mr. McLaughlin's

9    real salary was, did you not?

10:41 10   A.    Yes.

11   Q.    All right.  And when you first met with investigators, all

12   right, on November 2, 2011, you told them you didn't feel his

13   salary was far out of line, correct?

14   A.    Yes.

15   Q.    You told them that you thought it was similar to middle

16   management with a company like Ernst & Young?

17   A.    Yes.

18   Q.    You thought 360,000 or so was a reasonable salary?  That's

19   what you told the investigators?

10:41 20   A.    Yes.

21   Q.    You didn't really think it was a reasonable salary, did

22   you?

23   A.    No.

24   Q.    And you also told them you didn't know what other local

25   Housing Authority executive directors earned, correct?

A.    Correct.

Q.    But you also knew that Michael McLaughlin wanted to keep his salary very quiet?

A.    Yes.

Q.    All right.  And you never reported his full salary on any state budget that you had to submit, correct?

A.    Correct.

Q.    And you never reported his full salary on any federal budget that you had to submit, correct?

10:42  A.    Correct.

Q.    All right.  And in fact, Mr. Marotto, he would take, at the end of the year, all of the financial information and put together the budgets, correct?

A.    Correct.

Q.    And you were never honest with him about what Mr. McLaughlin's true salary was, were you?

A.    No.

Q.    All right.  And you had worked for him?

A.    Yes.

10:42  Q.    All right.  Now, there was also an outside auditor that came in.  Do you recall that?

A.    Yes.

Q.    That was part of the HUD regulations or HUD requirements. There had to be outside audits?

A.    Yes.

1    Q.   And the outside auditor was a Mr. Scafidi?

2    A.   Scafidi.

3    Q.   Mr. Scafidi?

4    A.   Yes.

5    Q.   Did you find Mr. Scafidi as the outside auditor?

6    A.   No.

7    Q.   Was he there as the outside auditor before you came to

8    work at Chelsea?

9    A.   No.

10:43 10   Q.   But he was the person who was responsible for looking at

11   whether the books were in line, correct?

12   A.   Correct.

13   Q.   And you were never honest with him either, were you?

14   A.   He request to -- I don't know.

15   Q.   Well, he got fake budgets, didn't he?

16   A.   Yes.

17   Q.   All right.  And in fact, at one point the state sent an

18   auditor, did they not?  Do you recall that?

19   A.   Yes.

10:43 20   Q.   And the state sent an auditor to look at the Housing

21   Authority books, correct?

22   A.   Yes.

23   Q.   And there was -- in fact, this auditor raised the issue of

24   Mr. McLaughlin's salary, didn't he?

25   A.   Yes.

Q.   And you didn't give him an answer, did you?

A.   I didn't know the answer.

Q.   You didn't know the answer of what Mr. McLaughlin's true salary was?

A.   Well, I gave him his true salary, yes.  I gave him all the records, all the payroll records.

Q.   And when he asked you to explain the discrepancy, you told him to talk to Mr. McLaughlin?

A.   That's correct.

10:44  Q.   Ms. Fried brought up that Mr. McLaughlin had fired a large number of people at Chelsea?

A.   Yes.

Q.   You went from about 51 to 37 employees?

A.   Yes.

Q.   In fact, you as the finance director got assigned to do quality control inspections for Section 8 housing?

A.   Yes.

Q.   And this is privately-owned housing where tenants are helped with rent by HUD?

10:44  A.   Yes.

Q.   And they must be kept up to certain standards of safety and maintenance?

A.   Yes.

Q.   And you had no training at all in these quality controlled inspections, did you?

1    A.    I did at these seminars that we had.

2    Q.    At what seminars?

3    A.    At either these DHCD organized seminars, annual seminars,

4    workshops and stuff.

5    Q.    All right.  And you did not receive any additional income

6    for this?

7    A.    No.

8    Q.    All right.  And this took up about 30 percent of your

9    time, didn't it?

10:45 10    A.    Yeah.

11    Q.    Now, one of the things that happened was that when there

12    were fewer employees, there was a savings in their salary and

13    money put aside for their pension and their health care,

14    correct?

15    A.    Yes.

16    Q.    All right.  And was that money used to make up

17    Mr. McLaughlin's salary?

18    A.    Yes.

19    Q.    And you were part of doing that, of making up his salary,

10:45 20    correct?

21    A.    Yes.

22    Q.    All right.  Now, on the state budget that was submitted

23    every year, did you sign off on that budget?

24    A.    No.

25    Q.    All right.  Was that budget reported to the board of

1    directors of the Chelsea Housing Authority?

2    A.    Yes.

3    Q.    And did the directors have to certify that the budget was

4    true and accurate?

5    A.    Yes.

6    Q.    And you knew when that budget was submitted to these

7    boards of directors, that it was not a true and accurate

8    budget, correct?

9    A.    Yes.

10:46 10    Q.    You lied to each and every one of those board members,

11    didn't you?

12    A.    Yes.

13    Q.    Now, the federal government did not ask what anyone's

14    salary was, did they?

15    A.    No.

16    Q.    And in 2011, there was a change, and they wanted to know

17    the top five salaries, correct?

18    A.    Correct.

19    Q.    All right.  And that was a problem, was it not?

10:46 20    A.    Yes.

21    Q.    Mr. McLaughlin was very concerned about that?

22    A.    Yes.

23    Q.    He had you doing research on what kinds of things he had

24    done for Chelsea that were positive, correct?

25    A.    Correct.

1    Q.   He wanted you to draw up tables or documents that would

2    show the cost savings he had effected, correct?

3    A.   Correct.

4    Q.   All right.  Also, the accolades that he had gotten,

5    correct?

6    A.   Yes.

7    Q.   He had done some good things at Chelsea?

8    A.   Yes.

9    Q.   He had cleaned up the buildings?

10:47 10   A.   Yes.

11   Q.   There was no more graffiti on the outside of them,

12   correct?

13   A.   Yes.

14   Q.   He had built a water park for kids?

15   A.   Yes.

16   Q.   Let me see.  He had brought in social workers to be

17   in-house in the elderly buildings?

18   A.   I believe, yes.

19   Q.   All right.  And he had done some other programs, like he

10:47 20   had brought in some job training in-house for residents,

21   correct?

22   A.   Yes.

23   Q.   He had also brought in, I think he had done a program with

24   a local farmer's market for elderly residents to receive fresh

25   food?

1    A.    Yes.

2    Q.    These are some of the things that he did, correct?

3    A.    Yes.

4    Q.    All right.  Now, the first time, as we just said, the

5    first time you spoke to investigators about Mr. McLaughlin's

6    salary, you told them it seemed okay to you, right?

7    A.    Mm-hmm, yes.

8    Q.    But the second time, they came back to interview you

9    again; is that correct?

10:48 10   A.    Yes.

11   Q.    And did you realize at that time that this wasn't going

12   away?

13   A.    Yes.

14   Q.    That there was going to be a pretty serious investigation;

15   is that correct?

16   A.    That's correct.

17   Q.    All right.  And then you told them in the second interview

18   that instead of using money to modernize buildings and systems,

19   it was being used for Mike McLaughlin's salary, correct?

10:48 20   A.    Yes.

21   Q.    All right.  In fact, when you did the state budget, you

22   would put down the salary that the state would allow for

23   Mr. McLaughlin, correct?

24   A.    Yes.

25   Q.    And you would not put down what his true salary was?

1    A.    Yes.

2    Q.    All right.  The state wanted to know what he was earning,

3    correct?

4    A.    Yes.

5    Q.    All right.  Now, one of the -- one of the areas of funds

6    that Chelsea had was capital funds; is that correct?

7    A.    Yes.

8    Q.    All right.  And capital funds, they were both capital

9    funds from the state and capital funds from the federal

10:49 10   government, correct?

11   A.    Yes.

12   Q.    All right.  And capital funds are supposed to be used for

13   things like modernization, right?

14   A.    Yes.

15   Q.    Replacement of elevators?

16   A.    Yes.

17   Q.    Okay.  They're not supposed to be used for things like

18   garbage removal, right?

19   A.    Yes.

10:50 20   Q.    Okay.  They're not supposed to be used for things like

21   salaries, right?

22   A.    There was, a part of that budget is, you know, allocated

23   to salaries.

24   Q.    Well, there was a part of that budget that was allocated

25   to --

1    A.    Small portion of it.

2    Q.    And what was the title of that?  It was management

3    improvements, wasn't it?

4         I'm sorry.  Ten percent of the capital funds could be used

5    for administrative costs, correct?

6    A.    Yes.

7    Q.    And is that where you put salary?

8    A.    Yes, it would be, yes.

9    Q.    All right.  And 20 percent could be used for management

10:50 10   improvements; is that correct?

11   A.    Correct.

12   Q.    And what did you determine were management improvements?

13   A.    Training, I was told training, administrative needs,

14   upgrades, computers, that sort of thing.

15   Q.    So this conference you went to in San Diego, was that

16   considered management improvement?

17   A.    I would interpret it, yes.

18   Q.    And you would put your costs, your airplane, your housing

19   your car rental, et cetera, you would put that in that sort of

10:51 20   allocated costs, correct?

21   A.    Yes.

22   Q.    All right.  And in fact, Michael McLaughlin went to a lot

23   of conferences, didn't he?

24   A.    Yes.

25   Q.    And he -- and many times Linda Thibodeau, who worked at

1    Chelsea Housing Authority, would go with him, correct?

2    A.   Correct.

3    Q.   And he often went to conferences in places like Florida

4    when it was cold out, when it was winter, correct?

5    A.   Correct.

6    Q.   All right.  And you would consider those to be management

7    improvements, correct?

8    A.   Yes.

9    Q.   All right.  Now, when the federal government -- before the

10:52 10   federal government gave money for a capital fund, there was a

11   proposal and a budget submitted to them, correct?

12   A.   The federal government?

13   Q.   Yes.  The capital fund was awarded annually by HUD, and it

14   was a grant?

15   A.   Yes.

16   Q.   All right.  And it was based on a proposal and a budget

17   that was submitted to them on where capital improvements were

18   needed?

19   A.   Yes.

10:52 20   Q.   All right.  In fact, when that money was received, right,

21   was it received all at once, the entire grant?

22   A.   No.

23   Q.   All right.  It was received in pieces?

24   A.   Yes.

25   Q.   And in fact, you made the determination that you would

1    pull 40 percent of the money received right away, even if it

2    weren't spent, right?

3    A.   Yes.

4    Q.   It went right into the bank to be part of these reserves,

5    correct?

6    A.   Yes.

7    Q.   Now, in fact, is it fair to say that federal money and

8    state money were put together in an operating expense account?

9    A.   No.  They have to be separate.

10:53 10   Q.   They have to be separate.  Let me ask you this.  When a

11   building -- when something was fixed on a state building,

12   right, it would be fixed, the cost of it would be paid, and

13   then a request would be put to the state for that cost to be

14   paid, correct?

15   A.   Correct.

16   Q.   In other words, the state would reimburse when the project

17   was done?

18   A.   Yes.

19   Q.   But in order to sort of front that money to get it going,

10:53 20   to pay whatever needed to be paid, you would use the federal

21   money?

22   A.   Yes.

23   Q.   Okay.  Now, it was your understanding that if a Housing

24   Authority was a high performer in these REAC inspections, they

25   could spend their capital fund grant however they wanted; isn't

1  that what you understood?

2  A.   Yes.

3  Q.   And that's what Michael McLaughlin told you?

4  A.   Yes.

5  Q.   So money that could have been going to replacing windows

6  could be spent entirely on trips to Florida?  Yes?

7  A.   I suppose.

8  Q.   Okay.  Now, when expenditures were needed to be made, you

9  did not go to Michael McLaughlin for approval, did you?

10:55 10  A.   No.

11  Q.   In fact, you felt that that was Mr. Russell's job or

12  Mr. Fitzpatrick's job, right?

13  A.   Depending on what the expenditure is.

14  Q.   Well, you didn't want to go to Michael McLaughlin because

15  he always said no, isn't that right?

16  A.   That's correct.  That's correct, yeah.  I never go to him

17  to say, I need to pay this or I need to do that, no.

18  Q.   Okay.  Now, when you create -- you would create the budget

19  for these capital fund grants, would you not?

10:55 20  A.   Yes.

21  Q.   All right.  And, for example, one of the projects you

22  might put down is that the elevator needed to be replaced in --

23  I think Margolis has an elevator.  It's a high rise, right?

24  A.   Yes.

25  Q.   And that the elevator needed to be replaced, correct?

1    A.   Yes.

2    Q.   All right.  But you also knew that that was never done?

3    A.   Yes.

4    Q.   And you never once went to Michael McLaughlin and said,

5    Look, we can't do this.  We can't list things that are going to

6    be fixed and not fix them, right?

7    A.   Right.

8    Q.   You never went to him and said that?

9    A.   No.

10:56 10   Q.   And you never once went to him and said, Look, we need to

11   do real capital fund improvements so that we spend the money

12   the way we're supposed to, right?

13   A.   Yes.

14   Q.   You were the director of finance.  You were responsible

15   for the financial operations, right?

16   A.   Yes.

17   Q.   And you never once told anyone in HUD that money was not

18   being spent on capital improvements the way it was supposed to?

19   A.   No.

10:56 20   Q.   And you never once told anybody on the state side that

21   money wasn't being spent the way it was supposed to?

22   A.   No.

23   Q.   All right.  Now, when you spoke to investigators about

24   this, you knew that you had lied about budgets, right?

25   A.   Yes.

1    Q.    And you told the investigators you were an obedient

2    employee?

3    A.    Yes.

4    Q.    Is that a fair description?

5    A.    Yes.

6    Q.    You didn't make waves, right?

7    A.    Yes.

8    Q.    And you also told them, "I leave my soul at home when I

9    come to work, I guess"?

10:57 10    A.    Yes, I said that.

11    Q.    What did that mean?

12    A.    That the ethical -- there was some ethical issues to what

13    I was doing.

14    Q.    When you say there were ethical issues to -- what do you

15    mean by that?

16    A.    That I may be following wrong orders.

17    Q.    That you might be following the wrong orders?

18    A.    Yeah.

19    Q.    All right.  So what you were telling them was you left

10:57 20    your soul at home for eight years?

21    A.    Close to that, yeah.

22    Q.    You didn't look for another job, did you?

23    A.    If I left Chelsea Housing Authority, I would never find a

24    job.

25    Q.    Well, you were an accountant, correct?

```
 1   A.    Yeah, but I was in my 60s, too.

 2   Q.    All right.  Are you a certified public accountant?

 3   A.    Yes.

 4   Q.    Do you have an MBA, a Masters in Business?

 5   A.    Yes.

 6   Q.    All right.  And you never looked -- so you never looked

 7   for another job, whether you were 60 or not, right?

 8   A.    Right.

 9   Q.    And in fact, you retired from Chelsea after all of this,

10   didn't you?

11   A.    Yes.

12   Q.    And you were able to retire with your full pension?

13   A.    Yes.

14   Q.    How much is your pension?

15   A.    22,000.

16   Q.    A year?

17   A.    A year.

18   Q.    Now, do you recall that you were interviewed on November

19   2, November 7, November 30, and it was only in the fourth

20   interview that you told the investigators that you knew

21   Mr. McLaughlin's real salary?

22   A.    I don't remember that, but yes, could be.

23   Q.    It could be?

24   A.    Yes.

25   Q.    And you knew his real salary because you completed the W2
```

1   forms?

2   A.   Yes.

3   Q.   Those are the forms we all get usually in February that

4   report what your salary is, right?

5   A.   Yes.

6   Q.   And we use those to fill out our tax returns?

7   A.   Yes.

8   Q.   And you didn't want to monkey around with those, did you?

9   A.   No.

10:59 10   Q.   Now, you also instructed Mr. Marotto, the fee accountant,

11   to adjust the salaries that were reported based on the state

12   limits, right?

13   A.   Well, he has better knowledge of, you know, the budget

14   than I do because he's done it for 30 years.

15   Q.   Well --

16   A.   So he, when he prepared it, he has better knowledge on the

17   requirements of the -- you know -- of the acceptable, you know,

18   budget.  So I'm not sure.

19   Q.   Let me ask you this.  You were the director of finance.

11:00 20   You were responsible for preparing budgets, right?

21   A.   Yes.

22   Q.   But you had to rely on the outside accountant to do that?

23   A.   The fee accountant, yes.

24   Q.   You had to rely on him to make everything, sort of all the

25   books balance at the end of the year?

A.    Yes.

Q.    Right.  Okay.  How did he make the books balance, if you

know, if you were hiding $200,000 of Michael McLaughlin's

salary, if you know?

A.    He made it work.

Q.    He made it work?

A.    Yes.

Q.    And did he make it work because you never gave him the

correct information?

11:01 A.    Yes.

Q.    Okay.  And you relied on Mr. Marotto to make sure no laws

were broken, right?

A.    Yes.

Q.    And what laws -- did you think some laws were being

broken?

A.    I don't know.

          THE COURT:  Ms. Bassil, is this a point of --

          MS. BASSIL:  Yes, this would be fine.  I was just

going to move into another topic.

11:01          THE COURT:  We'll take our morning break, ladies and

gentlemen, and be back around 11:20.

(Jury exits.)

          THE COURT:  You may be seated.  Mr. Shum, you can

leave the courtroom at this point.

(Witness exits.)

1           So do let me get an idea about schedule from the

2   government.

3           MR. MERRITT:  Well, I don't know how much more

4   cross-examination there is, your Honor, but Mr. Evans --

5           THE COURT:  At this point, you have some idea.

6           MR. MERRITT:  I still think we'll finish Monday,

7   Monday morning.

8           THE COURT:  You'll finish your case, the government's

9   case on Monday morning?

11:03 10           MR. MERRITT:  Yes, your Honor.

11           THE COURT:  So the question I guess is, without

12   prejudice to the defendants' case and apart from the question

13   of whether the defendants are going to testify themselves, and

14   if they don't, I'm going to inquire of them to be sure that

15   they understand the choice that they're making.  But apart from

16   that, is there going to be any defense case?

17           MS. BASSIL:  Your Honor, I have the investigative,

18   what would be the equivalent of a summary witness.  Actually, I

19   should talk to the government about whether they're going to

11:03 20   put on certain evidence.  Because if they don't, I don't need

21   her.  So I will find that out from them today.  But I don't

22   expect her to be a long witness anyway.

23           THE COURT:  Right.

24           MS. FRIED:  I don't think I'm going to need any

25   impeachment witnesses.  That was what I was concerned about.

1           THE COURT:  So just in terms of scheduling, what's the

2   best thing for us to do?  I don't want to rush through the day.

3   On the other hand, I do want to have at least some discussion

4   of charge and look to a view of finishing, doing a half day on

5   Monday and then argue it with a view that we're going to argue

6   a charge on Tuesday, rather than keeping the jury coming in.

7   Any problem with that?

8           MR. MERRITT:  Well, I think that makes sense, your

9   Honor.  Although, I think we could be a little more sure of

11:04 10   that schedule if the defense would be at least as kind to tell

11   us when they know whether their clients are going to testify.

12           THE COURT:  I think you'll be told in good time.

13           MR. MERRITT:  Thank you.

14           MS. BASSIL:  I think Tuesday sounds fine, your Honor.

15   That's my thought anyway.

16           THE COURT:  I'm simply going to tell the jury there's

17   a likelihood that we're going to be giving them the case on

18   Tuesday and that they ought to plan for a full day once the

19   case is given to them.  That's my concern.

11:04 20           MS. BASSIL:  I just have one question about your

21   practice, your Honor.  Do you bring the jury back when they're

22   deliberating at the end of the day to excuse them for the

23   night?

24           THE COURT:  First day.

25           MS. BASSIL:  Just the first day, okay.  Thank you.

1          THE COURT:  I give them kind of a reinoculation about

2     not talking to anybody, that sort of thing, and then tell them

3     when they go back to the jury room the following morning, don't

4     begin deliberations until everybody is there and wait to hear

5     what they have to say.

6          MS. BASSIL:  What time do you excuse them if they're

7     deliberating all day?

8          THE COURT:  Depends.  What I generally do is if we

9     haven't heard from them, say, by 4:45, I ask Mr. Lovett to go

11:05 10     in just to ask them whether they want dinner.  I don't want to

11     pressure them one way or the other.

12          MS. BASSIL:  I'll be back to coming back from school,

13     so that's why I wanted to know.  I teach from 2:00 to 4:00, and

14     I will come back on Wednesday.  That's what I wanted to know.

15          THE COURT:  Okay.  That's the way I ordinarily deal

16     with it.  I don't think that I will -- if the jury were to

17     return a verdict while you're there, I don't think I would

18     delay it.

19          MS. BASSIL:  No.  Ms. --

11:05 20          THE COURT:  Or with respect to questions, either.

21     Although, I would permit some effort for her to get in touch

22     with you.

23          MS. BASSIL:  That's fine.  If you'd like to excuse

24     them after the first day, I would like to be here.

25          THE COURT:  Yes.  That's generally the way I like to

```
  1   do it.  We'll simply tell the jury it's likely they're going to

  2   be here on Tuesday.  We'll see how it unfolds.

  3              Okay.  So back here at 11:20.

  4              (Recess taken 11:06 a.m. to 11:31 a.m.)

  5              THE COURT:  Ready for the jury?

  6   (Jury enters.)

  7              THE COURT:  You may continue.

  8              MS. BASSIL:  Thank you, your Honor.

  9   BY MS. BASSIL:

11:31 10   Q.   Mr. Shum?

 11   A.   Yes.

 12   Q.   Every year you sat down with Mr. McLaughlin with people's

 13   salaries, is that correct, as part of the budget?

 14   A.   Yes.

 15   Q.   And he would tell you what numbers to put down, would he

 16   not?

 17   A.   Yes.

 18   Q.   And he would tell you what numbers to put for his salary

 19   and where to put it, correct?

11:31 20   A.   He would give me -- he would not tell me where to put it.

 21   Q.   But he would tell you, he would give you a number for his

 22   salary to put in the budget that was not his real salary?

 23   A.   Yes.

 24   Q.   And you knew that, right?

 25   A.   Yes.
```

```
 1    Q.   And he knew that you knew?

 2    A.   Yes.

 3    Q.   Okay.  Now, in 2011, HUD for the first time wanted the

 4    reported salaries, right?

 5    A.   Yes.

 6    Q.   And Mr. McLaughlin wanted you to collect information on

 7    rent collection?

 8    A.   Yes.

 9    Q.   Vacancy rates?

10    A.   Yes.

11    Q.   And turnaround time for rentals for apartments, right?

12    A.   Yes.

13    Q.   Because he wanted you to show or provide information that

14    his salary was justified?

15    A.   Yes.

16    Q.   And you did that as part of your desire to hide his salary

17    as well, didn't you?

18    A.   I followed his orders, yes.

19    Q.   You followed his orders.  If he kept his job, you were

20    safe about the things you had hidden, weren't you?

21    A.   Yes.

22    Q.   And if he was gone, you knew you might be in trouble with

23    the new executive director who might really look at the books,

24    right?

25    A.   I don't know.
```

```
 1   Q.   Do you remember sending an e-mail to Mr. Marotto about

 2   this reporting requirement?

 3   A.   No, I don't remember.

 4   Q.   Okay.  Did you discuss with Mr. Marotto the fact that

 5   Mr. McLaughlin's salary was going to have to be revealed?

 6   A.   Probably, yes.

 7   Q.   I'm sorry?

 8   A.   Probably, yes.

 9   Q.   Probably yes.  And why did you discuss it with him?

10   A.   Because it was required for the first time.

11   Q.   Did you tell him what the true salary was?

12   A.   I don't remember.

13   Q.   All right.  Now, you had known Mr. Marotto; he had given

14   you a job before you went to work for Chelsea, right?

15   A.   Correct.

16   Q.   And were you friendly with him over the years?

17   A.   Yes.

18   Q.   All right.  Did you consider him to be kind of a mentor to

19   you?

20   A.   Yes.

21   Q.   All right.  And you had no trouble lying to him year after

22   year after year?

23   A.   That's correct.

24   Q.   Okay.  Now, you also knew that Michael McLaughlin was only

25   in his office about 50 percent of the time, correct?
```

1  A.   Yes.

2  Q.   And you didn't tell the investigators about that for the

3  first eight times they interviewed you, did you?

4  A.   I don't remember.

5  Q.   But you certainly didn't tell them about that in the

6  beginning of these interviews?

7  A.   No.

8  Q.   All right.  And certainly, you never spoke up to Michael

9  McLaughlin, where was he when he wasn't in the office, did you?

11:34 10  A.   No.

11  Q.   All right.  And did you ever speak up to him about

12  concerns that he might be overpaid?

13  A.   No.

14  Q.   Did you speak to anybody about concerns that Michael

15  McLaughlin might be overpaid?

16  A.   I don't think so.

17  Q.   Didn't you speak to Diane Cohen about it?

18  A.   Probably, yes.

19  Q.   All right.  Didn't you tell investigators you spoke to

11:35 20  Diane Cohen about it when they interviewed you on April 3,

21  2012?

22  A.   Yes.

23  Q.   All right.  And where did you speak to her about it?

24  Where were you?

25  A.   In her office.

Q.   In her office?

A.   Yeah.  I'm guessing.  I don't know.  I don't remember.

Q.   All right.  And what did you say to her?

A.   I can't remember the conversation, the details of the conversation.

Q.   When did you first express to her that you thought Michael McLaughlin might be overpaid?

A.   Just before -- well, when we were -- I think when we were required to report it for the first time to HUD, the five highest salary personnel in the office.

Q.   Did you report to her, as the person under sort of the next-in-command after Michael McLaughlin, that budgets had been falsified over the years?

A.   No.

Q.   Now, at the Chelsea Housing Authority, all checks had to be signed by Diane Cohen and Michael McLaughlin; is that correct?

A.   Yes.

Q.   And you knew there were stamps for their signatures, correct?

A.   Yes.

Q.   And in fact, you knew that Mr. McNichols used those stamps all the time, correct?

A.   Yes.

Q.   And you didn't supervise his use of those stamps?

```
 1   A.   No.
 2   Q.   All right.  You didn't supervise whether or not he was
 3   signing for checks that were or were not appropriate, correct?
 4   A.   Correct.
 5   Q.   And you know that on November 3, 2011, when Michael
 6   McLaughlin resigned, that Mr. McNichols wrote him three checks
 7   totaling over $200,000, correct?
 8   A.   Yes.
 9   Q.   And those were for sort of -- allegedly they were for
11:36 10   unused vacation time, yes?
11   A.   Yes.
12   Q.   Unused sick time?
13   A.   Yes.
14   Q.   Unused personal time?
15   A.   Yes.
16   Q.   Even though there were no records to back that up?
17   A.   Yes.
18   Q.   All right.  And Mr. McNichols was very close to
19   Mr. McLaughlin, was he not?
11:37 20   A.   Yes.
21   Q.   In fact, by the way, Mr. McLaughlin was not very good on
22   the use of a computer, isn't that true?
23   A.   Yes, that's true.
24   Q.   And in fact, he would have Mr. McNichols write things for
25   him on the computer if he wanted to send out an e-mail, for
```

1    example?

2    A.    Yes.

3    Q.    All right.  And Mr. McNichols wrote out these three

4    checks, and you knew he was printing checks, didn't you, that

5    day?

6    A.    Yes.

7    Q.    Because he had to switch the paper in the printer from

8    paper to check print?

9    A.    Yes.

11:37 10    Q.    And you never inquired, right?

11    A.    No.

12    Q.    And you never looked at what he was doing?

13    A.    No.

14    Q.    And you knew that the issuance of those two checks over

15    $200,000 was fraudulent, didn't you?

16    A.    Yes.

17    Q.    And when the investigators asked you about this, you told

18    them, "I guess that's mea culpa."  Do you remember saying that?

19    A.    Probably, yes.

11:38 20    Q.    What did you mean by that?

21    A.    Probably -- I'm not 100 percent sure.  Probably that the

22    fact that McNichols wrote those checks without my approval, if

23    you -- you know -- look at the hierarchy, like you said, and

24    that he released those to Mr. McLaughlin.

25    Q.    So what did that have to do with you saying, "It's mea

1    culpa"?

2    A.    Because I was supposed to supervise Mr. McNichols.

3    Q.    All right.  And in fact, why didn't you keep the signature

4    stamps?

5    A.    I'm sorry?

6    Q.    Why didn't you keep the signature stamps in your office

7    under lock and key?

8    A.    I don't know.

9    Q.    Now, you didn't -- when investigators spoke to you about

11:39 10   this cash out of Mr. McLaughlin for this unused time, you told

11   them you understood it was part of the contract he had with the

12   board of directors, correct?

13   A.    Yes.

14   Q.    And they wanted -- and they came to see you on November

15   12, 2011, and they wanted a copy of the contract, correct?

16   A.    Correct.

17   Q.    And you told them you didn't have a copy, correct?

18   A.    Yes.

19   Q.    In fact, Diane Cohen came into the room and told you to

11:39 20   get the contract, and you removed it from the safe in your

21   office, didn't you?

22   A.    Yes.

23   Q.    It took her to tell you, "Go get the contract"?

24   A.    Yes.

25   Q.    So in the very early interview with investigators, you

1   started out by lying to them?  This was the first interview.

2   A.   Yes.

3   Q.   Now, I had spoken before a little bit that there was an

4   independent audit by Mr. Scafidi?

5   A.   Yes.

6   Q.   And he did that independent audit for six years, right?

7   A.   Yes.

8   Q.   Based on the information you provided to him?

9   A.   Yes.

11:40 10   Q.   And you told the investigators that in six years -- you

11   told them on November 7, 2011, that in six years there were no

12   findings by Mr. Scafidi about the budget, correct?

13   A.   Yes.

14   Q.   And what you meant by that was he never found anything

15   wrong with the budget?

16   A.   Yes.

17   Q.   All right.  And in fact, he never found anything wrong

18   with the budget because he got false information, right?

19   A.   Yes.

11:41 20   Q.   Okay.  Now, were you aware that Mr. McNichols had told

21   federal investigators that there were time records for Michael

22   McLaughlin and that he had shredded them?

23   A.   Yes, I was aware of it.

24   Q.   And how were you aware of that?

25   A.   I guess through interviews with the investigators.

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | Q.   All right.  And you knew that was a lie?                        |
|       | 2  | A.   Yes.                                                            |
|       | 3  | Q.   And you knew there were no time records?                        |
|       | 4  | A.   I wasn't sure at the time.                                      |
|       | 5  | Q.   You weren't sure at the time whether Mr. McLaughlin had         |
|       | 6  | provided time records?                                               |
|       | 7  | A.   That's correct.                                                 |
|       | 8  | Q.   Well, weren't there occasions when you did the payroll and      |
|       | 9  | Mr. McNichols was on vacation?                                       |
| 11:41 | 10 | A.   Yes.                                                            |
|       | 11 | Q.   Didn't you do the payroll six or seven times?                   |
|       | 12 | A.   Yes.                                                            |
|       | 13 | Q.   And when you did the payroll six or seven times, didn't         |
|       | 14 | you look at employees' time cards in order to pay them?              |
|       | 15 | A.   Yes.                                                            |
|       | 16 | Q.   And didn't you see, or not see, there were no time cards        |
|       | 17 | for Mr. McLaughlin?                                                  |
|       | 18 | A.   That's correct.                                                 |
|       | 19 | Q.   Now, after Mr. McLaughlin resigned, were you aware of           |
| 11:42 | 20 | people in your office shredding documents?                           |
|       | 21 | A.   Yes.                                                            |
|       | 22 | Q.   Did you shred any documents?                                    |
|       | 23 | A.   No, I didn't.                                                   |
|       | 24 | Q.   Did you delete anything from your computer?                     |
|       | 25 | A.   I might have.                                                   |

1    Q.   All right.  Now, you were also aware that Mr. McNichols

2    asked you and other people for political contributions to

3    campaigns, correct?

4    A.   Yes.

5             MR. MERRITT:  I'm going to object, your Honor.

6             THE COURT:  Overruled.

7    Q.   And this was during work hours?

8    A.   Yes.

9    Q.   And you knew this was illegal?

11:43 10   A.   Yes.

11   Q.   And you didn't report this to anyone?

12   A.   No.

13   Q.   And you didn't say, Hey, you're not supposed to be doing

14   this?

15   A.   No.

16   Q.   And you were also aware -- in fact, Mr. McNichols asked

17   you to work physically at political campaigns?

18   A.   Yes.

19   Q.   And you did that, in fact.  You worked at a polling

11:43 20   station?

21   A.   Yes.

22   Q.   All right.  And you were upset about this?

23   A.   Yes.

24   Q.   And why were you upset about it?

25   A.   Because it's illegal.

```
 1   Q.   All right.  And not everyone did this, correct?

 2   A.   I'm not sure.

 3   Q.   You know Diane Cohen refused to work on polling stations

 4   or on political campaigns?

 5   A.   That's correct.

 6   Q.   But you went along with it?

 7   A.   Yes.

 8   Q.   Now, also, Ms. Fried referenced the prior finance

 9   director, Diane Cardaris?

11:44 10   A.   Yes.

11   Q.   And you were aware that she had a sexual harassment

12   complaint against Mr. McLaughlin, correct?

13   A.   Yes.

14   Q.   And he told you to cut her a check for $40,000?

15   A.   Yes.

16   Q.   And that was pretty much your first year there, wasn't it?

17   A.   Yes.

18   Q.   And you cut the check?

19   A.   Yes.

11:44 20   Q.   And he told you to report the check as legal fees for the

21   Housing Authority, right?

22   A.   Yes.

23   Q.   You knew it wasn't legal fees?

24   A.   It was paid to a lawyer.

25   Q.   There was no lawsuit, was there?
```

A.    No.

Q.    In fact, Mr. McLaughlin just said, "Cut her a check for 40,000"?

A.    Yes.

Q.    He wanted to get rid of this issue?

A.    Yes.

Q.    And he told you to list it as legal fees that the Chelsea Housing Authority had incurred?

A.    Yes.

11:44 Q.    All right.  And that was not true?

A.    Yes.

Q.    Okay.  Earlier you said you got some training for doing this Section 8 housing.  Do you recall that?

A.    Yes.

Q.    And do you remember investigators asking you about that on December 8, 2011 or you speaking about it?  I don't know if they asked you a specific question.

A.    Yeah, I could have, yes.

Q.    And did you tell them you could not recall if you received 11:45 formal training for the extra inspection duties, except for reading regulations and following the inspection checklist?

A.    Yes.

Q.    That's what you told investigators?

A.    Yes.

Q.    You didn't tell them about going to conferences where you

1  got that kind of information, right?

2  A.   No.

3  Q.   Okay.  Now, we've looked at, throughout yesterday and this

4  morning, the spreadsheets you wrote on your computer which you

5  said were the random list of units that would be inspected,

6  correct?

7  A.   Yes.

8  Q.   All right.  And you created those spreadsheets, correct?

9  A.   Yes.

11:46 10  Q.   Not Bernie Morosco?

11  A.   That's correct.

12  Q.   No one else?

13  A.   Yes.

14  Q.   You don't have a single piece of paper from Bernie Morosco

15  with any list of numbers, do you?

16  A.   My understanding was that the box --

17  Q.   That one box?

18  A.   Yeah.

19  Q.   But nothing else for any other year?

11:46 20  A.   I don't recall.  That's correct.

21  Q.   And you never received anything directly from Bernie

22  Morosco?

23  A.   No.

24  Q.   You never spoke to him about this so-called list, correct?

25  A.   I can't remember.  We might have a conference call between

             1    the three of us, but I don't recall exactly.

             2    Q.   When was this conference call?

             3    A.   I can't remember.

             4    Q.   Now, you created those checklists for the inspections,

             5    correct?

             6    A.   Yes.

             7    Q.   All right.  No one else created that for you?

             8    A.   No.

             9    Q.   And you looked at the rules or the protocol for REAC

11:47  10    inspections, and you did that checklist, correct?

            11    A.   Yes.

            12    Q.   That was not part of your job description?

            13    A.   No.

            14    Q.   And you also created that list of which administrative

            15    people would work with someone to inspect units, right?

            16    A.   It would be assigned by Mr. McNichols.

            17    Q.   But you created the list itself?

            18    A.   Yes.

            19    Q.   All right.  And by the way, did Alexandra Jimenez do any

11:48  20    of those inspections?

            21    A.   Yes.

            22    Q.   Now, she was not on that list, was she?

            23    A.   I don't know.

            24    Q.   I'll move on and come back to it.

            25         Now, Mr. Shum, did you have any kind of number and

1    password for accessing the HUD server website?

2    A.    I have access to the grand database.  I believe they have

3    many databases that my scope of duties allow me to enter

4    certain of the servers to report financial reportings.

5    Q.    Let me ask you about that.  The prosecutor the other day

6    showed you a document, Exhibit 13, that was Physical Assessment

7    System Overview.  Do you remember that?

8    A.    Not offhand -- oh, yes, yes.

9           MS. BASSIL:  Can we put up Exhibit 13, and I can just

11:49 10    show the jury what it is?

11          THE COURT:  Yes.

12    Q.    They showed you this, correct?

13    A.    Yes.

14    Q.    And you said that you got that at some kind of training,

15    right?

16    A.    Yes.  I believe it was in San Diego.

17    Q.    Now, part of the REAC inspection was something called a

18    Financial Assessment System Overview, correct, or a Financial

19    Assessment Subsystem?

11:49 20    A.    Yes.

21    Q.    And was that your responsibility?

22    A.    Yes.

23    Q.    And did you have any training on that?

24    A.    Yes.

25    Q.    And did you save any documents on that training?

1    A.    I would have, yes.

2    Q.    All right.  And what were your responsibilities in terms

3    of the REAC inspection for the financial assessment of Chelsea

4    Housing?

5    A.    As I recall, they would score us based on the financial

6    strength of the agency.

7    Q.    And what would they look at?  Did you prepare anything to

8    show them what the financial strength and weaknesses, I assume,

9    of the agency were?

11:50 10   A.    I can't remember.

11   Q.    Well, what would you show them for them to evaluate?

12   A.    Probably inputting the financial data from our balance

13   sheet and operating statements.

14   Q.    Okay.  So you would provide a balance sheet.  And would

15   that show what expenses Chelsea had spent?

16   A.    I honestly don't remember.

17   Q.    Well, you're an accountant.  What do you put on a balance

18   sheet?

19   A.    There were many, many different reporting entities in

11:51 20   different periods, and so it's not -- they were, you know -- my

21   duties involved a lot of these different ones, and I don't

22   remember particularly that particular scoring module.

23   Q.    So every piece of financial information you provided that

24   related to salaries and expenditures was false, was it not?

25   A.    In the case of Mr. McLaughlin's salary, yes.

```
 1   Q.   And didn't that affect the rest of how things were spent,
 2   what kind of money was available?
 3   A.   It might, yes.
 4        MS. BASSIL:  All right.  If I may show the jury what's
 5   been marked as Exhibit 20, your Honor.
 6        THE COURT:  Yes.
 7   Q.   Mr. Shum, just to go back to this, this was your creation,
 8   correct?
 9   A.   Yes.
10   Q.   This was for 2007?
11   A.   Yes.
12   Q.   And is Alexandra Jimenez anywhere on that list?
13   A.   No.
14   Q.   Thank you.
15        Now, when you had these meetings with Mr. McLaughlin and
16   the administrative staff --
17   A.   Yes.
18   Q.   -- those checklists were passed out?
19   A.   Yes.
20   Q.   Okay.  And Mr. Morosco was not present?
21   A.   No.
22   Q.   Mr. Morosco was not present when these teams of people
23   went out and inspected apartments?
24   A.   No.
25   Q.   Mr. Morosco was not present when those apartments were
```

1   fixed by maintenance and reinspected again, correct?

2   A.   Correct.

3   Q.   You never showed Mr. Morosco that checklist?

4   A.   No.

5   Q.   You never showed him that list of that grid of teams,

6   right?

7   A.   That's correct.

8   Q.   Okay.  Now, you said yesterday that Mr. Fitzpatrick told

9   you, "Bernie says it's not illegal," right?

11:54 10   A.   Yes.

11   Q.   And did you consult with anyone about that?

12   A.   No.

13   Q.   Did you read anything, regulations, anything else about

14   that?

15   A.   No.

16   Q.   Did you discuss it with anybody?

17   A.   No.

18        MS. BASSIL:  Your Honor, if we could have Exhibit 21.

19   Q.   Now, we went over this a bit.  You went over this, right,

11:55 20   Mr. Shum?

21   A.   Yes.

22   Q.   And this was your attempt to, I guess, quantify or put on

23   a spreadsheet what these checklists were; is that correct?

24   A.   Yes.

25   Q.   And as I understand it, these were your efforts to

1    enumerate how serious the deficit was, correct?

2    A.    Correct.

3    Q.    And how did you determine how serious it was?

4    A.    Like I said, I was drawing the information from the

5    federal guidelines.

6    Q.    Okay.  Now, looking at number 3 here, do you see that?

7    A.    Investation [sic].

8    Q.    Did you mean infestation?

9    A.    Infestation, yes.

11:55 10  Q.    All right.  And that would have to do with --

11   A.    Bugs.

12   Q.    -- bugs or mice, right?

13   A.    Yes.

14   Q.    And that's considered a health and safety hazard, is it

15   not?

16   A.    Yes.

17   Q.    That in fact is at least a level 3 violation, is it not?

18   A.    I don't remember.

19   Q.    Well, you put it down -- I think here we have it in 3

11:56 20  Parkway, level 1, right, Unit 2, Unit 8; and 2 Parkway, Unit 4?

21   A.    Yes.

22   Q.    Right.  Okay.  Now, in fact, Mr. Shum, did you -- could I

23   have the number for the exhibit for the 2007 inspection?

24           MS. BASSIL:  Your Honor, if we could pull up Exhibit

25   9.

1          THE COURT:  If I'm correct, this has not been

2     introduced yet?

3          MR. MERRITT:  We have no objection to it.

4          THE COURT:  It's received, but it hadn't been

5     introduced.

6          MS. BASSIL:  Thank you.

7          (Exhibit 9 received in evidence)

8     Q.   Mr. Shum, are you familiar with this?

9     A.   Yes.

11:57 10    Q.   You've looked at these, have you not?

11    A.   I have.

12    Q.   This was for the inspection on February 8, 2007?

13    A.   Yes.

14    Q.   All right.  And looking at this second page, these are the

15    units that are going to be inspected, are they not?

16    A.   Yes.

17    Q.   All right.  And just as an example, I'm not going to go

18    through everything, but as an example, on the bottom, Unit

19    1-11 -- Building 1, Unit 1-11.

11:58 20    A.   Yes.

21    Q.   That's 1 Clinton Court, right?

22    A.   Yes.

23    Q.   Unit 11, right?

24    A.   Yes.

25    Q.   And it says, "Refrigerator missing/damaged/inoperable"?

1    A.    Yes.

2    Q.    Going back to Exhibit 21 -- if I could have 21.  Just

3    looking at that, Exhibit 21, 1 Clinton Court, right?

4    A.    Yes.

5    Q.    1-11, right?

6    A.    Yes.

7    Q.    You have nothing.  There's nothing at fault in the kitchen

8    there, except for sink stopper, right?

9    A.    Yes.

11:59 10   Q.    So in fact, the inspector might find entirely different

11   deficits than what you were reporting, correct?

12   A.    Yes.

13   Q.    All right.  And did you ever compare whether the deficits

14   that you were reporting on this spreadsheet, Exhibit 21,

15   whether there were additional deficits that the inspector would

16   find?

17   A.    No.

18   Q.    All right.  Did Michael McLaughlin ever get upset because

19   inspectors found deficits that the administrative staff didn't

12:00 20   find?

21   A.    Yes.

22   Q.    All right.  So in fact, everybody was trying to find

23   everything they could, correct?

24   A.    Yes.

25   Q.    All right.  Now, by the way, Exhibit 21 was for the 2007

1    inspection, correct?

2    A.    Yes.

3    Q.    And there is no such spreadsheet for inspections in 2004,

4    correct?

5    A.    Correct.

6    Q.    There is no such spreadsheet for inspections in 2009?

7    A.    Correct.

8    Q.    And there is no such spreadsheet for inspections in 2011,

9    correct?

12:00  10   A.    Correct.

11   Q.    Did you delete those or shred them?

12   A.    No.

13   Q.    You didn't create them?

14   A.    No.

15   Q.    And by the way, that grid that we saw of the people who

16   were doing the inspections --

17   A.    Yes.

18   Q.    -- there's no similar grid for the other years of the

19   inspections; that was just for a single inspection, correct?

12:01  20   A.    Yes.

21   Q.    And did you do a grid for other years?

22   A.    I can't remember whether it was that particular schedule

23   or I might have -- we might have used a paper, paper schedules.

24   Q.    Well, didn't you do -- you were pretty good at creating

25   spreadsheets, were you not?

```
     1    A.    Yes.

     2    Q.    You knew how to use the Excel program, and you liked to do

     3    spreadsheets, didn't you?

     4    A.    Yes.

     5    Q.    And you had done that sheet of people who were doing

     6    inspections as a spreadsheet, had you not?

     7    A.    Yes.

     8    Q.    All right.  And it was only that one year -- are you

     9    saying you did it on other years?

12:02 10   A.    I might have, but everything was very ad hoc.

    11    Q.    Did you delete the other years from your computer?

    12    A.    I don't think so.

    13    Q.    Did you shred it?

    14    A.    No.

    15    Q.    But we don't have any --

    16    A.    So I didn't create it in the computer.

    17    Q.    You didn't create it on the computer?

    18    A.    Right.  Maybe we use blank ones on those other years and

    19    copy them to have Mr. McLaughlin handwrite, assign people on

12:02 20   during those meetings.

    21    Q.    Did you save those?

    22    A.    No, they were not, no.

    23    Q.    Now, Mr. Shum, you were responsible for not just the

    24    federal cost but the state budget as well; is that correct?

    25    A.    Yes.
```

1    Q.   All right.   There's a total of over 1,450 units in

2    Chelsea, isn't that right, individual apartments?

3    A.   Yes.

4    Q.   Okay.   And how many maintenance people were there?

5    A.   When I left, probably around 13, 14.

6    Q.   So there are 13 or 14 people to cover over 1,400 units; is

7    that right?

8    A.   The 1,400 might include Section 8, so that would be not

9    physical units that the maintenance people would be responsible

12:04 10   for.

11          MS. BASSIL:   Okay.   I'm not sure if this has gone in

12   yet or not, your Honor.   Could we show it to the witness?   This

13   will be 39.

14          THE COURT:   Just to the witness?

15          MS. BASSIL:   Just to the witness.

16   Q.   Mr. Shum, do you recognize this?

17   A.   Yes.

18   Q.   And what is this?

19   A.   This is a listing of the three developments, federal

12:04 20   developments.

21          MS. BASSIL:   Okay.   And your Honor, if we have not put

22   it in, I'd like to ask that that be admitted.

23          THE COURT:   Okay.   Do we have a premarked number for

24   this yet?

25          MR. MERRITT:   No objection.

1        MS. BASSIL:  It's been premarked as 39.

2        THE COURT:  39.  Okay, it's received.

3            (Exhibit 39 received in evidence)

4   Q.   I'm sorry.  You said that this is -- looking at this next

5   page, right --

6   A.   Yes.

7   Q.   -- this shows the Webster unit within Scrivano, right?

8   A.   Yes.

9   Q.   And it shows all the different units that exist in those

12:05 10   three buildings, right?

11  A.   Yes.

12  Q.   And this shows how many bedrooms in each building?

13  A.   Yes.

14  Q.   And this is also known as a rent roll, is it not?

15  A.   No.

16  Q.   Doesn't a rent roll have the same information?

17  A.   No, the rent roll would list the tenant and the rent

18  history or some kind of information on the rent roll.

19  Q.   This information, it says, Property Information Sheet For

12:05 20   REAC Inspection.  This is what the inspector needed to know how

21  many units were in each building, correct?

22  A.   Yes.

23  Q.   And whose handwriting is this?

24  A.   I believe it's Mr. Fitzpatrick's.

25  Q.   All right.  Do you know that for sure?

```
 1   A.    Fairly certain.

 2   Q.    Didn't Mr. Morosco help you with this?

 3   A.    Yes.

 4   Q.    And that was because the HUD went to that new asset

 5   management system, correct?

 6   A.    Yes.

 7   Q.    And you needed a lot of help in getting that, right?

 8   A.    Yes.

 9   Q.    Okay.

12:06 10           MS. BASSIL:  At this time, your Honor, this should

11   just be published to the witness.

12                 THE COURT:  All right.

13                 MS. BASSIL:  This has been premarked as 77.

14   Q.    Mr. Shum, do you recognize that?

15   A.    Yes.

16   Q.    And what is that?

17   A.    That would be a invoice from Mr. Morosco, I think.

18                 MS. BASSIL:  All right.  Your Honor, may this be

19   entered as an exhibit?

12:07 20                 MR. MERRITT:  No objection.

21                 THE COURT:  The number?

22                 MS. BASSIL:  77.

23                 THE COURT:  All right.  It's received.

24             (Exhibit 77 received in evidence)

25   Q.    This is an invoice from Mr. Morosco in 2007, right?
```

1    A.    Yes.

2    Q.    And it shows REAC Inspection Consulting/Shadowing?

3    A.    Yes.

4    Q.    That was for him walking around with the inspector on the

5    day of the inspection?

6    A.    I believe so, yes.

7    Q.    February 6 was preinspection?

8    A.    Yes.

9    Q.    All right.  And then he went through each of the buildings

12:07 10    on a separate day each of those days, right?

11    A.    Yes.

12    Q.    And that was that 100 percent inspection, correct?

13    A.    I believe, yes.

14    Q.    And so he charged you for four days of work, and it was a

15    price of $3,400?

16    A.    Yes.

17    Q.    And going to the last page -- there we go -- of Exhibit

18    77, this says Vendor Name, Vendor Code.  What are we looking at

19    here?

12:08 20    A.    I believe it's an extraction of or filter of all the bills

21    paid to Mr. Morosco over a period of time.

22    Q.    Did you have a computer system for putting down Vendor

23    Name, Vendor Code, Check, the amount and so forth?

24    A.    Yeah, that would be the accounting system that the Housing

25    Authority had.

1    Q.   And was that done for every single check that the Housing

2    Authority paid out?

3    A.   I don't understand the question.

4    Q.   Well, it says here, it gives the vendor name, then it

5    gives the date of the check and the amount, and it even has

6    remarks, what the check is for, right?

7    A.   Right.

8    Q.   Was that done for every single check that the Chelsea

9    Housing Authority paid?

12:09 10    A.   No.

11    Q.   Now, who would put -- who would input this into the

12    financial system?

13    A.   This would automatically be inputted when we cut a check

14    or when we put an invoice in pending payment.

15    Q.   Okay.  And this -- sorry.  I didn't mean to cut you off.

16    A.   Sorry.

17    Q.   This shows payments to Mr. Morosco between 2004 and 2011;

18    is that correct?

19    A.   That's correct.

12:09 20    Q.   All right.  And it has things like REAC inspection forms

21    and guides, he provided you with information?

22    A.   Yes.

23    Q.   Section 504 review, that has to do with disability and

24    handicapped --

25    A.   Yes.

1    Q.   All right.  And other services that he provided,

2    inspectional services, right?

3    A.   Yes.

4    Q.   And the total over four years was 25,879.90?

5    A.   Yes.

6    Q.   By the way, had the Chelsea Housing Authority used any

7    other -- any other consulting service?

8    A.   I believe, yes.

9    Q.   All right.  So that they had used people other than

12:10 10   Mr. Morosco; is that correct?

11   A.   Yes.

12   Q.   Now, the only list or document that you say came from

13   Mr. Morosco was that grid we looked at for 2006; is that

14   correct?

15   A.   Yes, as far as I know, yes.

16   Q.   All right.  And you don't have one for any other year

17   here, do you?

18   A.   No.

19   Q.   Now, when you first got to the Chelsea Housing Authority,

12:11 20   that was in 2003?

21   A.   Yes.

22   Q.   And at that time, when you got there, was Mr. McLaughlin

23   focused on these REAC inspections?

24   A.   Not that I know.  That's the first year.  No.

25   Q.   That first year, you don't have a memory of anything about

1    that?

2    A.    No, there wasn't a REAC inspection.

3    Q.    Did you have a memory of the Chelsea Housing Authority

4    scoring high on every -- as a high performer every year on

5    these inspections?

6    A.    Yes.

7    Q.    Now, were you there when the 2012 inspection was done;

8    were you still working there?

9    A.    Yes.

12:11 10    Q.    Okay.  That was after Mr. McLaughlin had resigned?

11    A.    Yes.

12    Q.    That was after all of this had kind of blown up in the

13    newspaper, correct?

14    A.    Yes.

15    Q.    And do you recall for that inspection that people were

16    very, sort of, discouraged and demoralized?

17    A.    Yes.

18    Q.    And they weren't doing much of an effort of anything; is

19    that correct?

12:12 20    A.    I don't know.

21    Q.    All right.  Do you know if anybody was working on cleaning

22    up the outside of the buildings or the site of the buildings?

23    A.    I don't remember.

24    Q.    You don't remember?

25    A.    No.

1    Q.    Okay.  Now, were you responsible for knowing how much

2    money was in the Chelsea operating account at any given time?

3    A.    Yes.

4    Q.    And were you also responsible for knowing how much money

5    was in reserve on any given day?

6    A.    Yes.

7    Q.    And were you able to pull up that information through the

8    computer?

9    A.    I was, yes.

12:13  10    Q.    And on the day that Mr. McLaughlin resigned and was given

11    over $200,000 in checks, did you check that there was money to

12    pay that?

13    A.    I didn't check, no.

14    Q.    Didn't Mr. McNichols ask you if there was enough money to

15    clear those checks, and you said yes, there was?

16    A.    And I did, yes.

17    Q.    Then you did?

18    A.    Yeah.

19    Q.    All right.  And did you have any questions about these

12:13  20    three checks of over $200,000?

21    A.    I don't remember asking.  I know what they were for, yes.

22    Q.    All right.  You knew what they were for, you knew there

23    were no records to back them up, and you had no trouble with

24    those checks going out?

25    A.    It wasn't my -- it wasn't -- it was not under my control,

```
 1   no.
 2   Q.   Well, you were the director of finance?
 3   A.   Mr. McNichols worked pretty much directly under Mike
 4   McLaughlin.
 5   Q.   Wasn't he under you in your department?  He was your --
 6   you were his supervisor?
 7   A.   Yes, I was, by name.
 8   Q.   And so you were a supervisor, but it was okay for him to
 9   issue these checks?
12:14 10  A.   Yes.
11   Q.   You had no control over it?
12   A.   No.
13   Q.   You had no responsibility over any of the financial
14   budgets that you faked; is that your testimony?
15   A.   I do have responsibilities, yes.
16   Q.   At the time, you didn't act on any of your sense of
17   responsibility, did you?
18   A.   No.
19   Q.   And based on your testifying and the immunity grant that
12:15 20  you got, you are now retired, correct?
21   A.   Yes, yes.
22   Q.   Receiving your federal pension?
23   A.   Yes.
24   Q.   And not sitting in this courtroom as a defendant at this
25   table?
```

```
 1    A.    Yes.
 2              MS. BASSIL:  I have no further questions.
 3              THE COURT:  All right.  Mr. Merritt?
 4    REDIRECT EXAMINATION BY MR. MERRITT:
 5    Q.    Mr. Shum, I'm going to clear up one thing.  Ms. Bassil
 6    said that you were getting a federal pension?
 7    A.    It's a state pension.
 8    Q.    A state pension?
 9    A.    It's a state pension.
10    Q.    But you agreed with her question anyway, didn't you, when
11    you answered it?
12    A.    I wasn't thinking -- I wasn't . . .
13    Q.    Also, just to clear up something, you were shown an
14    invoice, Exhibit 77.  Do you remember that, Mr. Morosco's
15    invoices?
16    A.    Yes, yes.
17              MR. MERRITT:  And excuse me one second.  If I may put
18    it on the screen, your Honor.
19              THE COURT:  Yes.
20    Q.    You were shown these dates of February 7th, 8th, 9th in
21    the Scrivano, Mace and Margolis?
22    A.    Yes.
23    Q.    And Ms. Bassil suggested to you that was the 100 percent
24    inspections that were conducted?
25    A.    Yes.
```

12:15 (line 10)
12:17 (line 20)

```
 1   Q.   Do you remember what the dates were of the actual REAC
 2   inspection?
 3   A.   No, but it would be after this date.
 4   Q.   Let me show you --
 5            MR. MERRITT:  If I may approach the witness, your
 6   Honor.
 7            THE COURT:  You may.
 8   Q.   Look at what's been received as Exhibit 9, identified as
 9   the inspection report.
10   A.   Yes.
11   Q.   What date was the inspection?
12   A.   February 7, 2007.
13   Q.   And actually, there were three days of inspections in
14   2007, correct?
15   A.   Yes.
16   Q.   One for Mace, one for Scrivano and one for Margolis?
17   A.   Yes.
18   Q.   And those were on February 7th, 8th and 9th?
19   A.   Yes.
20   Q.   So that invoice is not for 100 percent inspections, is it?
21   A.   No.
22   Q.   Just a couple of other things.  The role you played in
23   Mr. McLaughlin's inflated salary was hiding it from the
24   state --
25   A.   Yes.
```

12:17 (line 10)
12:18 (line 20)

```
 1   Q.    -- regulators?

 2   A.    Yes.

 3   Q.    And did you know whether his salary had been approved by

 4   the board of directors of Chelsea?

 5   A.    My understanding was it was.

 6   Q.    And when the state auditors came, they came more than

 7   once, didn't they?

 8   A.    Yes.

 9   Q.    And you told them what his salary, his true salary, was,

10   didn't you?

11   A.    Yes.

12   Q.    Did anything happen after that?

13   A.    No.

14   Q.    You were asked several questions about all the interviews

15   you had with law enforcement agents after all this blew up in

16   November 2011.

17   A.    Yes.

18   Q.    And you had many, many interviews?

19   A.    Yes.

20   Q.    And it was not until April of 2013 that you were first

21   asked about REAC; is that right?

22   A.    That's correct.

23   Q.    In all those previous interviews, were you trying to

24   conceal anything from law enforcement agents about the REAC

25   inspection?
```

1          MS. FRIED:  Objection.

2     A.    No.

3          THE COURT:  Overruled.

4     A.    No, I was not trying to conceal it.

5     Q.    You were asked some questions about the capital fund and

6     how to put the various costs associated with that.  Do you

7     recall that?

8     A.    Yes.

9     Q.    Did you have discussions with Mr. Fitzpatrick about the

12:20 10   capital fund as the director of modernization?

11    A.    Yes.

12    Q.    Did you have any discussions with him about where to

13    charge certain costs?

14    A.    Yes.

15    Q.    And what did he say?

16    A.    He said, "Charge it to capital funds."

17         MS. FRIED:  Objection to that question, without

18    specifying what costs are being discussed.

19         THE COURT:  That was a phrase that was used before, so

12:20 20   I'll permit it.

21    Q.    And did he say why, did he give you a reason why you could

22    charge those costs to the capital funds?

23    A.    Because Mike McLaughlin stress all the time that these

24    funds are time limits.  So if they're not used by the time the

25    life of the fund ends, then you lose it.  So he stress the

```
 1   point that you have to use up the funds.  You have to draw it
 2   down or use it.
 3   Q.   Did Mr. Fitzpatrick show you any regulations having to do
 4   with the capital fund?
 5   A.   As far as -- yeah, there's no excerpts about how we could
 6   use it.
 7   Q.   And did Mr. Fitzpatrick use, do you remember the term
 8   force account?
 9   A.   Yes.
12:21 10  Q.   Okay.  And what did Mr. Fitzpatrick tell you about when
11   the force account applied?
12   A.   I believe this is related to high-performing agencies that
13   there are some leeways as to how you spend, in, particularly,
14   management improvements, which includes, you know, maintenance
15   and other miscellaneous costs.
16   Q.   Now, you were also asked some questions about the April 1,
17   2013 interview by law enforcement agents when you were first
18   asked about the REAC inspections.  Do you remember that?
19   A.   Yes.
12:22 20  Q.   And sir, do you remember telling them that Morosco gave
21   them -- you gave them a list of the specifics?  Do you remember
22   telling them, "He gave it to us"?
23        MS. BASSIL:  Objection.  I'm not following the
24   question with all the pronouns.
25   Q.   Well, do you remember telling investigators that, "Morosco
```

1    gave us the specific units"?

2    A.    Yes.

3    Q.    Did you tell investigators -- by the way, when you first

4    had this interview, had you reviewed any of your computer files

5    before that?

6    A.    No.

7    Q.    Had you looked at any e-mails or anything before that?

8    A.    No.

9    Q.    Did you tell investigators that Morosco provided a

12:22 10   physical list, e-mail or piece of paper that listed the units

11   that would be inspected by REAC?

12   A.    Yes.

13   Q.    Did you tell them that you created a REAC inspection

14   spreadsheet from the list that Morosco provided to keep track

15   and get the detailed punch list of the units and their repairs?

16   A.    Yes.

17   Q.    Did you tell them that you had saved that REAC inspection

18   spreadsheet on your computer in a folder named REAC?

19   A.    Yes.

12:23 20   Q.    Do you remember telling them that James Fitzpatrick was

21   the point person coordinating with Morosco?

22        MS. FRIED:   Objection to all of these questions.

23   They're not responsive to the impeachment.

24        THE COURT:   To the contrary.   Overruled.

25   Q.    Sir, did you tell them that James Fitzpatrick, the

```
 1    director of modernization, was the point person coordinating
 2    with Morosco?
 3    A.   Yes.
 4    Q.   Did you tell them, in fact, later in the interview that
 5    Fitzpatrick was the point person for Morosco and would have
 6    asked Morosco how the list came about?
 7              MS. FRIED:  Objection.
 8              THE COURT:  Overruled.
 9    A.   Yes.
10    Q.   Did you tell them that you thought that Fitzpatrick told
11    them how Morosco got the list of the units to be inspected and
12    that Morosco was an eligible REAC contractor and had access to
13    the REAC database --
14    A.   Yes.
15    Q.   -- and got the list of units to be inspected ahead of
16    time?
17    A.   Yes, yes.
18    Q.   Did you finally tell them, did you reiterate that
19    Fitzpatrick would communicate with Morosco?
20    A.   Yes.
21              MR. MERRITT:  One moment, your Honor.
22              THE COURT:  Yes.
23              MR. MERRITT:  No more questions.
24              THE COURT:  All right.  Ms. Fried?
25    RECROSS-EXAMINATION BY MS. FRIED:
```

12:24 (line 10)

12:24 (line 20)

```
 1   Q.   Good afternoon, Mr. Shum.  I'll try to make this quick,

 2   but there are just a couple of things I want to go over about

 3   your duties as a Section 8 inspector.

 4   A.   Yes.

 5   Q.   It's true that this was a job that was added or dumped on

 6   you because of a staff shortage, correct?

 7   A.   Yes.

 8   Q.   All right.  Again, this was not part of your job as

 9   finance director, correct?

12:26 10   A.   Correct.

11   Q.   This was also a job that you were not trained for, isn't

12   that so?

13   A.   Originally, no.

14   Q.   Well, you told investigators at some point that you had

15   not gotten any formal training to be a Section 8 inspector,

16   isn't that right?  After this whole thing was over, you told

17   them that you had received no formal training to be a Section 8

18   inspector?

19   A.   Can I elaborate on that?

12:26 20   Q.   I'm just asking you, yes or no, whether you told that to

21   investigators.

22   A.   Yes, yes.

23   Q.   All right.  And this was after all of this was over when

24   you were being interviewed in 2011 and 2012 and 2013, correct?

25   A.   Yes.
```

1    Q.   All right.  Now, you were asked some questions about your

2    opinion about Mr. McLaughlin's salary in the context of the

3    fact that you were supposed to be hiding it, okay?

4    A.   Yes, yes.

5    Q.   I want to bring you around to that area, okay?

6    A.   Yes.

7    Q.   It's true, isn't it, that when you were first approached

8    by the investigators to talk about Mr. McLaughlin's salary, you

9    told them that, as far as you were concerned, the salary didn't

12:27 10   seem to be particularly out of line, right?

11        MR. MERRITT:  Your Honor, objection.  Asked and

12   answered.

13        THE COURT:  Well, I guess this is a preliminary to

14   something else.

15        MS. FRIED:  It is a preliminary to something else.

16   Q.   But it's true later that you were interviewed four months

17   afterwards on April 3, 2012 and that you told investigators

18   then that you were very concerned and upset about the size of

19   McLaughlin's salary and that you had been so regretful over

12:27 20   your role in concealing it that you wanted to quit.  Didn't you

21   tell the investigators that?

22   A.   Yes.

23   Q.   Okay.  So in April of 2012, you're full of regret about

24   your role, yet four months earlier, in November of 2011, as far

25   as you were concerned, there was nothing particularly wrong

1    with the salary, and it didn't seem to be out of line.  Is that

2    it?  Those are the two sets of statements you made to

3    investigators, true?

4    A.    Over four months, yes.

5    Q.    Yes, over that four-month period.

6    A.    Yes.

7    Q.    So are we to infer then that your level of regret came

8    into existence in the four months between November 2011 and

9    April of 2012?

12:28 10    A.    Probably longer than that.

11    Q.    But you didn't express any regret in November of 2011, did

12    you?

13    A.    It was probably the context of the question.  They were

14    asking my opinion as to whether this particular figure is

15    outrageous as compared to, you know, the context of it.

16    Q.    And as a followup to that, your comments in April of 2012

17    about feeling regret to the agents who were investigating you

18    were in the context of, or you said that they were in the

19    context of a conversation that you had with Diane Cohen who was

12:29 20    over you and who was the director of operations, correct?

21    A.    Yes.

22    Q.    All right.  But when Ms. Bassil was asking you questions,

23    it's accurate, isn't it, that you could remember no particulars

24    whatsoever of where that conversation took place or when that

25    conversation took place, isn't that so?

1    A.    That's correct.  I couldn't remember specifically.  I am

2    not 100 percent where it took place.

3    Q.    Okay.  That's because that conversation never happened,

4    isn't that right?

5    A.    It happened, yes.

6    Q.    Now, let me ask you this.  You've worked for many years

7    alongside or at least in the same operation as my client,

8    Mr. Fitzpatrick, correct?

9    A.    Yes.

12:30  10    Q.    And is it accurate then that you do not know what his

11    handwriting looks like after all those years?

12    A.    Well, I recognize some of it, yes, and some I don't.

13    Q.    Okay.  And Exhibit 39, which was -- let me find it.  It

14    was shown to you.  I have it.

15          MS. FRIED:  I would like to have the overhead.  This

16    is in evidence.  That focus doesn't look so good.

17          THE COURT:  It's supposed to soft-focus if you don't

18    touch the plate.

19          MS. FRIED:  Okay.  It doesn't seem to be doing so.

12:31  20          THE COURT:  Jarrett, can you see if she's changed the

21    soft focus?

22          MS. FRIED:  Can you see any of that at all?

23    Q.    I'm going to ask you again.  You said you were asked a

24    question earlier, I think it was by Ms. Bassil, and in response

25    to that question you said that that handwriting was

1    Mr. Fitzpatrick's?

2    A.    Yes.

3    Q.    Okay.  And I just want to be clear about it.  Are you

4    saying that it's Mr. Fitzpatrick's handwriting through that

5    whole front page?

6    A.    Pardon me?

7    Q.    I just want to ask you, is that your testimony that that's

8    Mr. Fitzpatrick's handwriting on that entire front page?

9    A.    It appears so, yes.

12:32 10    Q.    And on the second page?

11    A.    Yes.

12    Q.    It's your testimony, based on your knowledge and working

13    with Mr. Fitzpatrick, that all of that handwriting is his?

14    A.    Yes.

15    Q.    The third page, is it your testimony that that handwriting

16    is Mr. Fitzpatrick's?

17    A.    Yes.

18         MS. FRIED:  All right.  I don't have anything else,

19    your Honor.

12:33 20         THE COURT:  All right.  Ms. Bassil?

21    RECROSS EXAMINATION BY MS. BASSIL:

22    Q.    Mr. Shum, when you were shown the invoice just a few

23    moments ago, that was Exhibit 77, and it listed February 7,

24    February 8 and February 9 from Mr. Morosco.  Do you recall

25    that?

1     A.   Yes.

2     Q.   Mr. Morosco, in fact, walked with the REAC inspector on

3     the date of inspection, correct?

4     A.   Yes.   After I realize the date of the inspection, yes,

5     ma'am.

6     Q.   So I was wrong.   It was not the 100 percent inspection.

7     It was the walking through with the inspector?

8     A.   It would appear so, with the date of the inspection, yes.

9     Q.   All right.   And Mr. Merritt asked you, your role in sort

12:34 10   of involving Mr. McLaughlin's salary was hiding that from state

11    regulators.   Do you recall him asking that?

12    A.   Yes.

13    Q.   But in fact, you were also using money that should have

14    been spent on other operations to pay for that salary, were you

15    not?

16    A.   Yes.

17    Q.   So in fact, if there was -- let's say that garbage

18    collection, how much does garbage collection cost, if you

19    remember, for Chelsea in a year?

12:34 20   A.   Probably 150,000.

21    Q.   So if garbage collection was 150,000 and you were using

22    that money for Mr. McLaughlin's salary, you would have to pay

23    that 150,000 from some other fund, correct?

24    A.   Yes.

25    Q.   And you might pay it, and you did pay it from this capital

1    fund, didn't you?

2    A.    Yes.

3    Q.    And in fact, you would refer to this as buckets, right?

4    A.    Yes.

5    Q.    That you would take from that, instead of taking it from,

6    let's call it, the garbage collection bucket, the money

7    earmarked for that, you would take it from the capital fund,

8    right?

9    A.    Yes.

12:35 10    Q.    That was also another way in which you were hiding his

11    salary?

12    A.    Yes.

13    Q.    Okay.  Now, Mr. Merritt also asked you about, on April

14    2013 was the first time you spoke to investigators about these

15    REAC inspections.  And he said you weren't trying to conceal

16    it.  Do you recall he just asked you that?

17    A.    Yes.

18    Q.    And at any time between November 2, 2011 and April of

19    2013, did any investigators say to you, "Do you have any more

12:35 20    to tell us"?

21    A.    Yes.

22    Q.    And you never offered that issue of the REAC inspections,

23    did you?

24    A.    No.

25    Q.    All right.  You waited until they asked you about it?

1   A.   Yes.

2   Q.   Okay.  And in fact, you said that -- I'm not sure it was

3   totally clear, but if the capital funds were not spent, the

4   money would have to be returned?

5   A.   Yes.

6   Q.   And so you made sure the money was spent, whether it was

7   on new projects or garbage collection, correct?

8   A.   Yes.

9   Q.   All right.  Now, you stated that Mr. Fitzpatrick told you

12:36 10   that Mr. Morosco was a HUD inspector?

11   A.   Yes.

12   Q.   All right.  And you had no knowledge whether he was a

13   current HUD inspector, correct?

14   A.   No, I don't.

15   Q.   And he certainly was not the inspector for the Chelsea

16   Housing Authority?

17   A.   No, no.

18   Q.   All right.  And one final question.  You knew that if you

19   were charged in this case and convicted, you would lose your

12:36 20   state pension?

21   A.   Yes.

22         MS. BASSIL:  I have no further questions.

23         THE COURT:  All right.  You may step down.  Thank you.

24         MR. PEREZ-DAPLE:  Your Honor, the government calls

25   Patrick Evans.  May I leave some exhibits for Mr. Evans?

1        THE COURT:  Yes.

2                     (PATRICK EVANS, sworn)

3        THE CLERK:  Please state your full name, spelling your

4   last.

5        THE WITNESS:  My name is Patrick Evans, E-v-a-n-s.

6   DIRECT EXAMINATION BY MR. PEREZ-DAPLE:

7   Q.   Good afternoon, Mr. Evans.

8   A.   Good afternoon.

9   Q.   Would you please tell us what you do for a living?

12:37 10  A.   I am the IT director for the Office of Public and Indian

11  Housing in the Department of Housing and Urban Development.

12  Q.   And for how long, sir, have you been the IT director?

13  A.   About two and a half years.

14  Q.   Did you work for HUD before becoming the director?

15  A.   Yes.  I had worked continuously since 2001, first as a

16  contractor and then as the development coordination manager

17  starting about five years ago.

18  Q.   In your current role, sir, what are your job

19  responsibilities?

12:38 20  A.   My job is to ensure the development and maintenance of the

21  application systems that support the Real Estate Assessment

22  Center.

23  Q.   Are application systems computer systems?

24  A.   Yes, they are computer systems.

25  Q.   Do you have any connection to the software used by REAC

1     inspectors?

2     A.    Yes, that is one of the applications that we support in

3     the Real Estate Assessment Center.

4     Q.    What is the name of the software?

5     A.    That is Pass.

6     Q.    And what is DCD?

7     A.    DCD is a portion of the Pass application that runs on the

8     inspectors' tablets that they take on-site when they perform

9     physical inspections.

12:38 10    Q.    What's DCD stand for?

11    A.    I think it's Data Collection Device.

12    Q.    And what's the purpose or the function of the DCD portion

13    of the Pass software?

14    A.    The inspector takes that tablet on-site, and they

15    physically inspect the property, basically notifying -- noting

16    defects that they find according to the rules as they've been

17    trained to observe defects.

18    Q.    And can the DCD software enable a HUD inspector to gain

19    access to the HUD database?

12:39 20    A.    Yes.  The initial portion is that an inspector will

21    download physical characteristics of a property that basically

22    gives the contact information, the number of buildings, the

23    expected unit count within that property, the addresses of the

24    buildings, et cetera.  So they interface with the REAC servers

25    to obtain that information.

1    Q.   And what pieces of information would a REAC inspector need

2    in order to be able to log into the HUD database at all?

3    A.   All users that access the Pass application require a user

4    ID and password that is uniquely assigned to them and them

5    alone.

6    Q.   Does HUD have any rules governing the proper use of HUD

7    user IDs and passwords?

8    A.   Yes.  Each user of our REAC systems is required to

9    annually accept a Rules of Behavior before they are allowed to

12:40 10  continue accessing our systems.  If they do not accept that

11   Rules of Behavior, they are not allowed access to our computer

12   systems.

13   Q.   Mr. Evans, in front of you are some pieces of paper.

14   Among them should be some papers with stickers --

15   A.   Yes.

16   Q.   -- saying Exhibits 44A and 44B.  Do you have those?

17   A.   I do indeed.

18   Q.   Do you recognize 44A and B?

19   A.   44A and B, yes, I do.

12:40 20  Q.   What are they?

21   A.   44A is the code that is stored in the database that will

22   display the Rules of Behavior for a user when they log on.  And

23   44B is what the user would actually see when they sign on and

24   are presented with those Rules of Behavior.

25   Q.   How do you know that's what those are?

A.    Because I extracted that from the database and I produced

the reports this week.

          MR. PEREZ-DAPLE:  Your Honor, the government moves for

the admission of Exhibits 44A and B.

          THE COURT:  Is there a reason why we have to have

the --

          MR. PEREZ-DAPLE:  No, Your Honor.

          THE COURT:  So I'll accept 44B.

          (Exhibit 44B received in evidence)

12:41    MS. FRIED:  The objection as to admissibility against

Mr. Fitzpatrick similar to the discussion we had yesterday on

Exhibit -- I think it was Exhibit 13.

          THE COURT:  I overrule that objection.

          MR. PEREZ-DAPLE:  I'd like to display to the jury

Exhibit 44B, which has just been admitted.  I'm trying to blow

this up.

Q.    I'm going to focus on the top portion, Mr. Evans.  I think

you said that users are required to agree with these terms

annually.  How is that requirement enforced?

12:42 A.    When the user logs on, the first time the user logs on a

year later than the last time they accept the rules, they will

be presented with these Rules of Behavior before they are

allowed to continue.  At the bottom of the next page, it shows

an accept or a log-out.  The user needs to accept to continue;

or they can log out, and they would not have access to any of

1    the systems.

2    Q.   And at the bottom of the first page, just above where the

3    Accept button would appear, there's a certification; is that

4    right?

5    A.   Yes, that is correct.

6    Q.   And focusing here, just that last clause after the "and,"

7    would you read that to us, please?

8    A.   Sorry.  "And I agree to comply with these requirements as

9    a condition of being granted limited access to the Department's

12:43 10   computer resources."

11   Q.   So every year, a REAC inspector needs to agree with this

12   if he's going to have access to the HUD system?

13   A.   That is correct, yes.

14   Q.   All right.  So now, returning to the upper portion of the

15   Rules of Behavior, do you see that here in the second paragraph

16   it's discussing user ID and the password issued to the

17   inspector?

18   A.   Yes, I do.

19   Q.   Would you read for us, please, the sentence beginning with

12:43 20   the "They," where I've just highlighted?

21   A.   Okay.  "They are to be used solely in connection with the

22   performance of your responsibilities as set forth in your job

23   description, contract or agreements with the Department."

24   Q.   And then the sentence beginning with the word "you" where

25   I've just --

A.    "You agree to be responsible for the confidentiality of
the assigned information and accountable for all activities
with your user identification, user ID."

Q.    Mr. Evans, is there a record made in HUD's computer
systems when inspectors agree to these terms?

A.    Yes.  When a user accepts these terms, we audit that fact
and store a record of that in our databases, yes.

Q.    Is that record made by a human?

A.    No.  That is part of the code that actually presents these
rules and records their acceptance.

Q.    It happens automatically?

A.    It happens automatically.

Q.    Before you, you should also have Exhibit 45.  Do you
recognize that?

A.    I do, yes.

Q.    What is that?

A.    That is an extract from the ordered records that show the
dates that user ID M36855, Bernard Morosco, accepted the Rules
of Behavior for our systems.

Q.    And how do you know it's an extract?

A.    I extracted this from the database.

       MR. PEREZ-DAPLE:  Your Honor, the government moves for
the admission of Exhibit 45.

       THE COURT:  It's received.

```
 1              (Exhibit 45 received in evidence)
 2              MR. PEREZ-DAPLE:  Let's put 45 up for the jury.
 3      Q.   You said, Mr. Evans, that these are the dates on which
 4      user ID M36855, Bernard Morosco, accepted these Rules of
 5      Behavior.  Would you tell us in what years he accepted them?
 6      A.   He accepted them in October 2006, October 2007, October
 7      2008, October 2009 and November 2010.
 8      Q.   Why did it only start in 2006?
 9      A.   The Rules of Behavior was introduced at the beginning of
12:45 10   October 2006.
 11     Q.   Did they ever change?
 12     A.   They have not changed, no, in that whole period of time.
 13     Q.   So at the very least, from this acceptance in November of
 14     2010, what does that tell you about Mr. Morosco gaining access
 15     to the system?
 16     A.   He would not have access after that point.
 17     Q.   He would not have it?
 18     A.   Yes.  If he has not accepted the Rules of Behavior, he
 19     would -- yes.
12:46 20   Q.   But he did accept it in --
 21     A.   Sorry.  Yes, he did accept the Rules of Behavior in
 22     November of 2010, yes.
 23     Q.   So he had at least another year?
 24     A.   He had at least another year, that is correct.
 25     Q.   All right.  Now, Mr. Evans, if you would, please, take out
```

1   Exhibits 114A and 114E, which should be bound together there.

2   Do you have that?

3   A.   I do, yes.

4   Q.   Could you tell us what those are, please?

5   A.   114A is an Inspection Summary Report for the Mace

6   apartments and Clinton Street in Chelsea, Massachusetts, and

7   the inspection was carried out -- if I can find the date on

8   this -- on the 29th of December 2004.

9   Q.   Okay.  And the other exhibit?

12:46 10   A.   The other exhibit is an inspection for the Scrivano, Mace

11   and Margolis in Chelsea, Massachusetts performed on the 19th of

12   February 2009.  That's an Inspection Summary Report as well.

13   Q.   Mr. Evans, do you know how Inspection Summary Reports are

14   generated?

15   A.   I do, yes.

16   Q.   How?

17   A.   The inspector, once he has finished his inspection,

18   normally in the evening, when he returns to connectivity, he

19   will upload the results of that inspection to our servers.

12:47 20   Then overnight, those inspections are processed, they are

21   scored, and an Inspection Report is generated and stored in our

22   databases.

23   Q.   That happens shortly after the actual inspection?

24   A.   Yes.  It normally happens in the early hours of the

25   morning, between about midnight and 5:00 a.m. each day.

1    Q.    Is it part of the regular practice to generate those

2    records?

3    A.    Yes, that is part of our system, yes.

4    Q.    It's typical to keep them?

5    A.    Yes.  They are stored in the database.

6              MR. PEREZ-DAPLE:  Your Honor, the government moves for

7    admissions of Exhibits 114A and E.

8              MS. BASSIL:  No objection.

9              THE COURT:  They're received.

12:48 10             (Exhibit 114A received in evidence)

11             (Exhibit 114E received in evidence)

12    Q.    Now, I'd like to show you, Mr. Evans, rather than either

13    of those, Exhibit 10.  If you could tell us if Exhibit 10 is

14    the same form of the documents we were just looking at.  Is

15    this the same sort of thing?

16    A.    Yes, that is an Inspection Summary Report.

17    Q.    All right.  I'd like to focus here in the Scores box, in

18    particular on the Units scores -- I'm sorry.  I should at least

19    show that Exhibit 10 relates to an inspection April 2011; is

12:48 20    that right?

21    A.    That is correct, yes.

22    Q.    So now returning to the scores, would you tell us the unit

23    scores that Chelsea Housing Authority received for the April

24    2011 inspection?

25    A.    Okay.  Out of a possible 38.7 points, they received 38

1    points, and they had no health and safety deductions.

2    Q.    Okay.  Now, let's go to Exhibit 114G, which I believe is

3    already in evidence, another Inspection Summary Report.

4    A.    This is May 2012.

5    Q.    Okay.  Now, let's look at the Score box in 2012.  Would

6    you walk us through the unit score this year, please?

7    A.    Okay.  That one had out of a possible 38.9 points, they

8    scored 35.4, but they had 6.6 points deducted due to health and

9    safety issues found in the units.

12:49 10    Q.    Okay.  Do you have in front of you, Mr. Evans, government

11    Exhibit 11?

12    A.    I do, yes.

13    Q.    What is it?

14    A.    It is a list of the physical unit inspection scores

15    between 2004 and 2012.

16    Q.    For?

17    A.    Sorry.  For the Chelsea Housing Authority.

18    Q.    Okay.  What information does that summarize?

19    A.    That summarizes, for each of the inspections that we've

12:50 20    had, how we scored the units out of total possible points for

21    each of the properties that we inspected.

22    Q.    Have you had occasion, sir, to compare the contents of

23    that chart with the Inspection Summary Reports for the

24    underlying years?

25    A.    Yes.  They match.

1        MR. PEREZ-DAPLE:  Your Honor, the government moves for

2    the admission of Exhibit 11.

3        THE COURT:  All right.  It's received.

4    Q.   Mr. Evans, here is Exhibit 11.  Now, we've got batches

5    here, 2004, 2007, 2009 and then '11 and '12 each separately; is

6    that right?

7    A.   That's correct, yes.

8    Q.   Is that because there was some change in the way HUD did

9    its inspections between the '07 and '09 inspections?

12:50 10  A.   Yes.  The rules were changed for how we defined properties

11   due to a change by Congress in that time period.  So previously

12   we inspected three different -- sorry -- three different

13   properties as separate properties.  But starting with the 2009

14   inspections, we inspected them as one group together, and that

15   was due to a change in legislation.

16   Q.   And beginning with, let's say, with some 2007 scores here

17   for the Housing Authority, am I right that they got a 37.9 out

18   of a possible 37.9, 37.1 out of a possible 38.6, 35.8 out of

19   35.8; is that right?

12:51 20  A.   That is correct, yes.

21   Q.   And in 2009, 36.8 out of a possible 38.9?

22   A.   That is also correct, yes.

23   Q.   2011, 38 out of 38.7, as we saw?

24   A.   That is correct, yes.

25   Q.   In 2012, as you described, 28.8 out of 38.9 possible

1  points?

2  A.    That is correct, yes.

3  Q.    That is a drop of about 28 percent or so, 25 percent

4  maybe?

5          MS. BASSIL:  Objection.

6          THE COURT:  Well, he can ask him what the percentage

7  is.

8  A.    It's about just a little over a quarter, yes.

9  Q.    All right.  Mr. Evans, returning to Exhibit 114G, the

12:52 10  Inspection Summary Report for 2012, this reflects where the

11  deficiencies were found that are summarized on this score

12  section of the first page, doesn't it?

13          THE COURT:  Perhaps I misunderstood.  Did you mean to

14  introduce A through E or just A and E?

15          MR. PEREZ-DAPLE:  Not all of them, your Honor, but I

16  believe, if we tally up the 114s that have been admitted in

17  Exhibits, I think, 9 and 10, it's every year that the Chelsea

18  Housing Authority --

19          THE COURT:  So now I'm looking at 114G.

12:53 20          MR. PEREZ-DAPLE:  Yes, Your Honor, the 2012 Inspection

21  Summary Report.

22  Q.    Mr. Evans, does the 2012 Inspection Summary Report itemize

23  the deficiencies, the health and safety deficiencies, that

24  resulted in that score that they got?

25  A.    It does, yes.

1   Q.   I'd like to look at some of those.  To the third page,

2   Building 1, Unit 5, this is a health and safety deficiency for

3   air quality; is that right?

4   A.   That is right, yes.  There is mold and mildew observed in

5   the bathroom on the ceiling, was the comment provided by the

6   inspector, yes.

7   Q.   Looking at the next page, some units here, more health and

8   safety violations, clogged toilet --

9   A.   Yes.  That -- later, down on Units 2-9, there were roaches

12:54 10   found in the kitchen.

11   Q.   Roaches?

12   A.   Right.

13   Q.   Looking at the next page, these are dwelling units; is

14   that right?

15   A.   These are, yes, inhabited dwelling units.

16   Q.   What was the condition of Unit 2-5?

17   A.   Mold and mildew observed in the bathroom, on the ceiling,

18   and then another health and safety one of insects, which is

19   dead roaches again in the kitchen.

12:54 20   Q.   2-9 also had a clogged toilet?

21   A.   Yes, that has a clogged toilet, yes.

22   Q.   Next page, Unit 3-8, another health and safety violation?

23   A.   Yes.  Again, mold on the bathroom ceiling and, again,

24   roaches in the kitchen.

25   Q.   And at the bottom, this unit?

1   A.   Again, we have mold observed on the bathroom ceiling.

2   Q.   And the next page, Unit 11-07?

3   A.   We actually have roaches in the living room in this unit,

4   yes.

5   Q.   Mr. Evans, how many dwelling units were inspected in 2012?

6   A.   25.

7   Q.   Of the 25, how many had deficiencies?

8   A.   A little over three-quarters, 19.

9   Q.   And how many of those deficiencies were health and safety

12:55 10   deficiencies?

11   A.   A little over half.  13 of the units had health and safety

12   issues within them.

13        MR. PEREZ-DAPLE:  Your Honor, I'm about to turn to

14   another topic.  We can continue.

15        THE COURT:  Why don't we break for the day, and

16   actually for the weekend.  We will be reminded that we're not

17   sitting tomorrow.  You are not sitting tomorrow in this case.

18   We'll start back on Monday.

19        I've been chatting with the lawyers about the timing,

12:56 20   and I think the timing is this, that the case is probably going

21   to be given to you on Tuesday.  So we'll sit for the half day,

22   that is 9:00 to 1:00 on Monday, but you should arrange your

23   schedule so that you can be here all day on Tuesday.  Once you

24   start receiving the case and deliberate on the case, you're

25   expected to work the full day, 9:00 to 5:00, until you've

1    reached your conclusion.

2          But in consultation, it appears we're close enough

3    here so that I can give you that kind of specific instruction.

4    So half day on Monday, not tomorrow, and then we'll anticipate

5    that you'll be sitting here starting Tuesday for full days.

6    Okay?  Have a good afternoon and good weekend.  We'll see you

7    on Monday.

8    (Jury exits.)

9          THE COURT:  Anything else before Monday?  Okay.  See

12:57 10    you on Monday morning.

11          (Whereupon the proceedings adjourned at 12:58 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that pursuant to Section 753, Title 28, United States

 7    Code that the foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12                        Dated this 6th day of April, 2015.

13

14                        /S/ KELLY MORTELLITE

15                        _____

16                        KELLY MORTELLITE, RMR, CRR

17                        OFFICIAL COURT REPORTER

18

19

10:33 20

21

22

23

24

25
```