UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA            )
                                    )
vs.                                 )
                                    )
                                    )  No. 1:13-cr-10308-DPW
JAMES H. FITZPATRICK AND            )
BERNARD J. MOROSCO,                 )
                                    )
                   Defendants.      )


BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK


<u>DAY ONE OF JURY TRIAL</u>




John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
Monday, March 23, 2015
9:15 a.m.




Brenda K. Hancock, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210
(617)439-3214

1    APPEARANCES:

2

        UNITED STATES ATTORNEY'S OFFICE
3        By: AUSA S. Theodore Merritt
            AUSA Brian Perez-Daple
4        John Joseph Moakley Federal Courthouse
        1 Courthouse Way
5        Suite 9200
        Boston, MA 02210
6        On behalf of the United States of America.

7

        LAW OFFICES OF SYRIE D. FRIED
8        By: Syried D. Fried, Esq.
            Jason c. Feinberg, Esq.
9        2 Clock Tower Place, Suite 260
        Maynard, MA 01754
10       On behalf of the Defendant James H. Fitzpatrick.

11

        CARNEY & BASSIL
12       By: Janice Bassil, Esq.
            Sara Javaheri, Esq.
13       20 Park Plaza, Suite 1405
        Boston, MA 02116
14       On behalf of the Defendant Bernard J. Morosco.

15

16

17

18

19

20

21

22

23

24

25

1                          I   N   D   E   X

2                                                              Page

3   DISCUSSION WITH COUNSEL PRIOR TO JURY SELECTION...............4
    JURY SELECTION................................................43
4   OPENING STATEMENT BY MR. MERRITT............................155
    OPENING STATEMENT BY MS. FRIED..............................165
5   OPENING STATEMENT BY MS. BASSIL.............................174

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S:

2      (Lobby conference held with Witness Richard Russell on the

3  record)

4                        IN OPEN COURT:

5          THE CLERK:  All rise.

6      (The Honorable Court entered the courtroom at 9:15 a.m.)

7          THE CLERK:  This Honorable Court is in session.  You

8  may be seated.

9          This is Criminal Action 13-10308, United States v.

10  James H. Fitzpatrick and Bernard J. Morosco.

11          THE COURT:  I have the Government's witness list and

12  the witness list for Mr. Morosco.  Is there something as well

13  for Mr. Fitzpatrick in terms of witnesses?

14          MS. FRIED:  Other than possibly Mr. Fitzpatrick,

15  himself, the only other witness that I conceive of calling, and

16  I've just mentioned this to Mr. Merritt, is if I need an

17  impeachment witness for -- I can't foresee it right now, but

18  there were certain agents who interviewed various people.

19          THE COURT:  All I want to do is apprise the jury --

20          MS. FRIED:  Of a name.

21          THE COURT:  -- of people whose names may come to their

22  attention.  So, if there is someone like that, I want to know

23  about it.

24          MS. FRIED:  Yeah, right.  Okay.  Then I will give you

25  a name, your Honor, and it would be somebody from the Inspector

1    General's Office, last name O'Neill, and I will find a first

2    name for you shortly.

3            MR. MERRITT:  Daniel.

4            THE COURT:  Daniel O'Neill.  And Mr. O'Neill is with

5    the Inspector General's Office of HUD, is that it?

6            MR. MERRITT:  No.  It's actually the State,

7    Massachusetts Inspector General.

8            THE COURT:  So, what is the name of the entity in the

9    State of Massachusetts?

10           MR. MERRITT:  Inspector General's --

11           MS. FRIED:  I think it's Office of the Inspector

12   General.  That was the way it was written.

13           THE COURT:  For the Commonwealth of Massachusetts?

14           MR. MERRITT:  Yes, your Honor.

15           Your Honor, we filed a supplemented list that has two

16   additional names.  I don't know if the Court has gotten that

17   yet.

18           THE COURT:  I am not sure.  Mr. Lovett is printing it

19   out now.

20           And on Mr. Morosco's list Ms. Alcorn is simply a

21   civilian witness?

22           MS. BASSIL:  She is an investigator, your Honor, but

23   she has sorted through various work orders and charts --

24   various work orders.  She would be testifying essentially as a

25   summary witness, if we need her.

```
 1              THE COURT:  All right.  I guess I have had added two

 2      more names to the Government's list.

 3              Now, in terms of people sitting in the courtroom,

 4      because I try to identify whoever is here, and I have your

 5      motion, Ms. Bassil, which I will allow here --

 6              MS. BASSIL:  Thank you, your Honor, I appreciate it.

 7              THE COURT:  -- starting right now.

 8              MS. BASSIL:  Yes, of course.

 9              THE COURT:  But if you can identify who is going to be

10      in the courtroom.

11              MS. BASSIL:  Yes.  Your Honor, this is Sarah Javaheri.

12              THE COURT:  I'm sorry?

13              MS. JAVAHERI:  Javaheri, J-a-v-a-h-e-r-i.

14              THE COURT:  One more time.

15              MS. JAVAHERI:  One more time?  J-a-v-a-h-e-r-i.

16              THE COURT:  Sarah?

17              MS. JAVAHERI:  Sarah with an "h."

18              THE COURT:  Right.

19              MS. BASSIL:  And Mr. Morosco, and that's it.

20              THE COURT:  And Mr. Morosco.

21              Ms. Fried.

22              MS. FRIED:  Your Honor, if I may, I have my associate,

23      Jason Feinberg, here with me.  With your permission, I would

24      like to have him at counsel table.

25              THE COURT:  Yes.
```

1          MS. FRIED:  I have not filed a motion for permission

2     to compensate him.  I will do that.

3          THE COURT:  Well, there has to be a justification for

4     it.

5          MS. FRIED:  Right.  He is here to assist.

6          THE COURT:  But it is Jason Feinberg?

7          MS. FRIED:  Jason Feinberg, that's correct.  He is my

8     associate.

9          THE COURT:  And you have Mr. Fitzpatrick with you,

10    too.

11         MS. FRIED:  Yes.

12         THE COURT:  So, I will introduce all of those people.

13         And Mr. Merritt.

14         MR. MERRITT:  Your Honor, Special Agent Jamie Mazzone,

15    who is formerly of HUD, she will be assisting us.

16         THE COURT:  What is her --

17         MR. MERRITT:  Now with the Department of

18    Transportation.

19         THE COURT:  And it is Jamie?

20         MR. MERRITT:  Mazzone, as the former Judge.

21         THE COURT:  And she is your designated representative

22    as well?

23         MR. MERRITT:  Representative, yes.

24         THE COURT:  All right.  I think that deals with those

25    kind of preliminary matters.

1          Now, the reason that we got together earlier is, as I

2     understood, there may be some questions with respect to

3     exhibits that the defendants may have that we can resolve

4     outside of the presence of the jury.  So, what are we dealing

5     with?

6          MS. FRIED:  Well, I guess I can start on some of

7     these, your Honor, just to get the ball rolling.  Is that what

8     you would like?

9          THE COURT:  Well, yes.  I was told that there were

10    going to be objections, that they could be dealt with before

11    the jury came in.  So, here we are.

12         MS. FRIED:  Okay.  The Government put together sort of

13    a universal list listing out exhibits --

14         THE COURT:  Right, I have got it.

15         MS. FRIED:  -- and listing which ones were opposed by

16    one side or the other.  So, would you like to hear those?

17    Maybe I'm just misunderstanding you.  I'm sorry.

18         THE COURT:  I just do not want to waste time in front

19    of the jury, if we do not have to, with respect to objections.

20    If I can give a preliminary determination about it, I would

21    like to do it outside of the presence of the jury, because I do

22    not want to take the jury's time.

23         MS. FRIED:  Sure, sure.  Well, then, first, I am happy

24    to start.

25              There was an objection that was interposed to

1    Exhibit 4, and I believe that was by Morosco.

2              MS. BASSIL:  Yes, your Honor.  Exhibits 4 and 5 are

3    simply related to the idea that they are hearsay, unless and

4    until the Government proves a conspiracy.

5              THE COURT:  Well, as far as I am concerned at this

6    point, I will make a determination under Petrozziello at the

7    end of the case.

8              MS. BASSIL:  Right.

9              THE COURT:  But I am going to permit the Government to

10   introduce these matters on that --

11             MS. BASSIL:  I just wanted to flag it.

12             THE COURT:  -- at their risk.  That is, if I find that

13   there has not been established a conspiracy to the standard

14   that Petrozziello calls for, then we have got a mistrial on our

15   hands, I think.

16             MS. BASSIL:  All right.  So, that was 4 and 5.

17             THE COURT:  So, we have taken care of those.  I will

18   understand that there is an objection to co-conspirator hearsay

19   by both of the defendants in this case.  You do not have to

20   raise that objection as the co-conspirator hearsay objection,

21   but if there are any other objections to documents that might

22   also be posed on co-conspirator hearsay grounds, I want to know

23   about those, but I am not going to make you pop up every time

24   there is a co-conspirator hearsay issue.

25             MS. FRIED:  Well, then, bringing us to the next

1    exhibit there is a problem with, Exhibit 7, which is a big --

2    it's a HUD --

3           THE COURT:  Right, I have it.

4           MS. FRIED:  -- publication.  An "Inspectors Training

5    Guide," it is referred to as.  There are a couple of objections

6    I have to it.  First is, that I don't think that would be

7    admissible against Mr. Fitzpatrick.  That is, he's not --

8           THE COURT:  Overruled.  Next.

9           MS. FRIED:  Okay.  The next objection is that that is

10   hearsay, that is, the information within it is being offered

11   for the truth about what the rules are --

12          THE COURT:  No.  That is overruled.  It is being

13   offered for notice that is being provided to individuals who

14   were in the program.  Next.

15          MS. BASSIL:  Your Honor, if I may, I also had an

16   objection to that exhibit, and my objection was because my

17   client was not an instructor, nor was he instructed by the Real

18   Estate Assessment Center.

19          THE COURT:  Well, I guess that question is one that I

20   have to take up.  So, what is the evidence of the notice to

21   Mr. Morosco of this "Inspectors Training Guide"?

22          MR. PEREZ-DAPLE:  Your Honor, in response to

23   Ms. Bassil's concern, the Government will be bringing a witness

24   that will introduce records of Mr. Morosco's training history,

25   certification training, and it will reflect that he was trained

1   in something called "Version 2.1," which is the number that

2   appears in the bottom right-hand corner of --

3           THE COURT:  So, there appears to be a foundation for

4   it.

5           MS. BASSIL:  That's not the same thing, your Honor, as

6   this Instructors Guide.

7           THE COURT:  It says "Version 2.1."

8           MS. BASSIL:  I understand that, your Honor, but this

9   is the Inspectors Guide.  Version 2.1 is actually a CD, that's

10  what he was trained in, and the CD is about how you download

11  things.  Version 2.1 is the mechanism for downloading property

12  profiles and so forth.  This is a different Inspector's Guide.

13          THE COURT:  I will just have to hear the foundation

14  for it.  If there is a foundation, I will let it in; if there

15  is not, I will not.

16          MS. BASSIL:  Okay.

17          THE COURT:  Next.

18          MS. FRIED:  All right.  Your Honor, Exhibits 9 and

19  10 --

20          THE COURT:  I note that 8 is opposed.  This is

21  Mr. Morosco's personnel file documents.  What is the problem

22  with that?

23          MS. BASSIL:  Your Honor, my objection to that was,

24  frankly, relevance.

25          THE COURT:  It seems fairly clear what the relevance

1    of this is.

2            MS. BASSIL:  The other issue is, your Honor, in that

3    exhibit his resume is listed, and circled on it are the words

4    "Trainer."  He was not a trainer in the type of REAC that is at

5    issue here.

6            THE COURT:  Well, that can be developed, I suppose, in

7    cross, but if there is a foundation created for this, this

8    resume, I guess, was submitted by him.  I am not sure I

9    understand who put the circles on that.

10           MS. BASSIL:  Not me.

11           MR. PEREZ-DAPLE:  Your Honor, I don't know that anyone

12   will explain who put the circles on it, but if the Government

13   uses the resume, a HUD witness will appear to say that the

14   resume is found in the database that they maintain of paperwork

15   collected on REAC contractors.  They collected --

16           THE COURT:  It has to be redacted.

17           MR. PEREZ-DAPLE:  The circling?

18           THE COURT:  Yes.

19           MR. PEREZ-DAPLE:  All right.

20           MS. FRIED:  Your Honor, again, this is not an exhibit

21   that should be relevant against Mr. Fitzpatrick.  That is, it's

22   not a statement -- his resume is not something that's made

23   during the course of the conspiracy, again, or in furtherance

24   of this conspiracy that's charged here.

25           THE COURT:  It is a matter of preparation.  It tells

1    us the role of a particular person in developing the

2    relationships that the Government alleges are part of the

3    conspiracy.  If you have some special instruction that you want

4    me to give, I will think about it and look at it, but this is

5    classic kind of introducing the individuals who are involved.

6         MS. FRIED:  Well, I will prepare a limiting

7    instruction as to that one that I will request at the end.  I

8    will just say that it is not prepared during the course of the

9    conspiracy or in furtherance of this conspiracy, and

10   Mr. Fitzpatrick doesn't even have any notice about that

11   particular statement in terms of --

12        THE COURT:  That simply is not a reason not to include

13   it as evidence in the case in terms of the background of the

14   individual who is involved in the conspiracy and creating that

15   conspiracy.  What is next, 9 and 10?

16        MS. FRIED:  Yes.  The Government may be curing this

17   problem.  I had hearsay objections to this.  That is, the

18   Government is going to be introducing lots and lots of,

19   basically, summary charts that were developed by or that are

20   maintained by HUD as to REAC scores earned by the Chelsea

21   Housing Authority over a period of years.  They had not until

22   today put on a records custodian from HUD to show that these

23   could be admitted as business records.  In other words, my

24   objection was -- I will put this on the record -- was that this

25   is all hearsay in the sense that it's reports of data of

 1     inspections done in the past.

 2          THE COURT:  You have raised a business records

 3     objection.

 4          MS. FRIED:  Right.

 5          THE COURT:  They say they are going to meet it.  I

 6     will have to hear it, if, in fact, somebody is going to be

 7     raising a business records objection to this that is

 8     meaningful.  I made clear that frivolous business records

 9     objections are not particularly welcome.  So, we will hear

10     whether they are frivolous or not.

11          Ms. Bassil.

12          MS. BASSIL:  I am going to Number 11, your Honor.

13     Number 11 is a chart that was, I believe, created by the

14     Government, which lists the REAC scores for Chelsea from 2004

15     to 2012.  My objection to this is that I believe that the chart

16     is not complete, and I believe the way in which it was done is

17     misleading.

18          THE COURT:  I am not sure I have a summary report.  I

19     have a series of what appear to be individual records.

20          MS. FRIED:  It looks like this, your Honor

21     (indicating).

22          MS. BASSIL:  It looks like this, your Honor

23     (indicating).

24          MS. FRIED:  Shall I come forward and show it to you?

25          THE COURT:  Is this 11?

1        MS. BASSIL:  Yes, 11.  So, your Honor, if you look at

2    11, you will see that Unit Points refers to the individual

3    inspection of apartments.  Possible Points is the next one.

4    But the final score has to do with many other variables.  It

5    also includes the financial management, the management itself

6    of the Housing Authority, and their use of the Capital Fund.

7    So, I believe the Government is intending to use this, because,

8    if you look at the final scores, you see how they are all quite

9    high until you get to 2012?

10        THE COURT:  Yes.

11        MS. BASSIL:  And 2012 is a 53, which sort of implies

12    that, once the Chelsea Housing Authority didn't have lists

13    ahead of time their scores plummeted, but, in fact, the 53 is

14    based on them receiving zero score for their financial records,

15    and that was because that by that point auditors had come in,

16    investigators had come in, and they were given zero, and that's

17    why their final score was 53.  So, I think that is misleading.

18        I also told the Government that, if they were going to

19    do such a complete list, that I thought the 2013 inspection

20    should be included, because the score went back up.

21        THE COURT:  Went back up?

22        MS. BASSIL:  It went back up.  It went up to 95.

23        So, that was my objection to this, your Honor.  I had

24    felt it was a chart that --

25        THE COURT:  So, let me understand.  I think it is an

1    objection of lack of completeness.

2           MS. BASSIL:  Correct.

3           THE COURT:  What is the response to that?

4           MR. MERRITT:  Well, your Honor, in our view it's not

5    misleading, because the point is that it is to show what the

6    physical inspection scores were.  I don't agree with counsel

7    that the final scores --

8           THE COURT:  So, the final score is not the physical

9    inspection score.  That is an amalgam of a variety of scores,

10   isn't it?

11          MR. MERRITT:  Your Honor, I believe this is the final

12   physical inspection score.

13          MS. BASSIL:  I can show you, your Honor.  I pulled a

14   page.  It is Bates Stamp Number 53035, where they explain

15   Physical was 21 out of 40, Financial was zero out of 25,

16   Management was 25 out of 25, and Capital Fund was 10 out of 10.

17   So, taking out that 25 points for financial is what put them in

18   such a low category.

19          THE COURT:  Well, let me understand from you.  Unit

20   Points are physical inspection points?

21          MS. BASSIL:  It's a little more than that.  "Physical"

22   includes the building site, the building exterior, building

23   systems, like elevators and hot water and so forth, and common

24   areas, such as the hallways.

25          THE COURT:  But that is the physical?

1          MS. BASSIL:  And then the last piece is the units.

2          THE COURT:  And Possible Points is the possible points

3   that someone could receive for those kinds of physical

4   analyses?

5          MS. BASSIL:  Correct.

6          THE COURT:  So, if the final score were taken out of

7   there, you would be satisfied with that?

8          MS. BASSIL:  I would be, your Honor.

9          MR. MERRITT:  Well, we have no problem with doing

10  that, your Honor, but I do want to clarify.  The unit points

11  are separately scored, and this reflects what the unit points

12  were and the possible points for units.  It's not the overall

13  physical inspection in terms of common sites and buildings.

14         THE COURT:  Well, but is there an overall physical

15  inspection, not final score, physical inspection?

16         MR. MERRITT:  I believe there is, but I think, your

17  Honor, we will take that out and just make this what the unit

18  points were, which is really I think what the focus is of the

19  charts.

20         THE COURT:  And the possible points?

21         MR. MERRITT:  The possible points for units.

22         MS. BASSIL:  So, the title should be "CHA Physical

23  Inspection Unit Scores."

24         MR. MERRITT:  We can certainly make that adjustment.

25         MS. FRIED:  Your Honor, I also do register, again, a

1    hearsay objection to this document.  It's a summary, again, of

2    inspections that were performed by other inspectors

3    historically who are not going to be here to testify about the

4    scores that they gave --

5         THE COURT:  It is based on a business record.  Is this

6    another one of the meretricious business records objections

7    that you have indicated you are going to be mounting?

8         MS. FRIED:  I don't know who the Government is going

9    to be putting on to put in the underlying data or to prove the

10   validity of the underlying data.

11        THE COURT:  I have made this point, and I will make it

12   again, which is you are entitled to challenge everything.  On

13   the other hand, meretricious, frivolous, tedious objections are

14   matters that are of some concern to me in this case.  If you

15   raise the objection, I will permit the objection to be

16   developed, and I will rule in front of the jury, who are going

17   to have this inflicted on them if it turns out to be improper

18   or, more accurately, meretricious or frivolous.

19        MS. FRIED:  If my objection is unfounded, I am sure

20   the Court will overrule it.  That doesn't mean that I'm not

21   going to make it, and I am just doing it now --

22        THE COURT:  So, the Government is on notice, and I

23   want to be sure about this, is this going to extend the trial

24   as a result of the unwillingness of counsel to agree to things

25   that probably are not in real dispute?

1           MS. FRIED:  I would hope not.  I'm not planning to

2      have it do.

3           THE COURT:  So, we are talking about a seven-day

4      trial, right?  Yes?

5           MS. FRIED:  About.

6           THE COURT:  Well, "about"?  Ms. Fried, you have been

7      involved in trials before, I have been involved with trials

8      before with you.  I have some sense in the way in which you try

9      a case --

10          MS. FRIED:  Yes.

11          THE COURT:  -- and you have some sense about how the

12     case is being tried.

13          MS. FRIED:  Right.

14          THE COURT:  Is seven days realistic?  Because I am

15     going to be telling the jury that, and I have a special

16     obligation not to take the jury's time unfairly.

17          MS. FRIED:  I don't think it's going to go that long.

18     I think it will be over before then.

19          THE COURT:  All right.  So, I understand that, if I

20     say "seven days," that is a realistic time period for the

21     presentation of the evidence.

22          Ms. Bassil, is that your view?

23          MS. BASSIL:  Oh, yes, your Honor.  And, if you recall,

24     you had very kindly given me Friday off so I could go represent

25     a witness.

1          THE COURT:  Right.

2          MS. BASSIL:  I'm sorry, your Honor, I wanted to just

3     go back to Exhibit 11 about my issue about the 2013 scores,

4     that I think those should be there as well.

5          THE COURT:  Is there any reason why they should not?

6          MR. MERRITT:  Well, your Honor, that's two years

7     beyond the scope of the facts in this case.  They can be, but I

8     do not see that it is in any way --

9          THE COURT:  The conspiracy is over.

10          MS. BASSIL:  Yes, your Honor.  But the reason why I

11     want them is the 2012 inspection was the first inspection after

12     everything sort of came to light about Chelsea, and I believe

13     that the Government is inferring from this that, without the

14     list this is how Chelsea -- without getting the list ahead of

15     time, this is how Chelsea scored.  2013, the numbers are back

16     up.

17          THE COURT:  It is remediable.  If you want to bring

18     that out yourself, you can --

19          MS. BASSIL:  All right.

20          THE COURT:  -- but it is remediable.  Presumably, the

21     argument is that they managed to get their act together after

22     the conspiracy was over --

23          MS. BASSIL:  Exactly.

24          THE COURT:  -- not immediately after, but after the

25     conspiracy was over.

1          MS. BASSIL:  Right.

2          THE COURT:  What else?

3          MS. BASSIL:  Your Honor, for me, all of the exhibits

4    that say "Vitus Shum" are the co-conspirator exception

5    objections.

6          THE COURT:  And that is already preserved here.

7          Anything else?

8          MS. BASSIL:  Your Honor, if you could turn -- let me

9    just -- I don't want to jump ahead of Ms. Fried.

10         THE COURT:  Well, why don't you jump ahead.  I think

11   Mrs. Fried is looking for other ones that she wants to press.

12         MS. BASSIL:  44 and 45, your Honor, are -- I am,

13   frankly, still unclear about this.  It is Rules of Behavior for

14   HUD Systems.

15         THE COURT:  What are you unsure about?

16         MS. BASSIL:  I'm still unsure as to where that comes

17   up.  There's been various times where people say it pops up on

18   a screen at different points, and I am still unclear as to

19   whether my client -- they have dates of acceptance, but I am

20   still unclear about that.

21         THE COURT:  What is the story?

22         MR. PEREZ-DAPLE:  Your Honor, Mr. Evans will testify

23   that every user of the HUD database system, starting in around

24   2006, is prompted approximately annually to accept the Rules of

25   Behavior.  So, it will appear on the screen before the person

1   is allowed to access the system.  They must accept it if

2   they're allowed to go inside.  So, Exhibits 44A and B are the

3   actual rules.  They're broken into those parts in response to

4   objections from the defense that our old 44 wasn't exactly what

5   you see on the screen.  So, 44 is the computer code that

6   explains how it appears, 44B is how it looks on the screen, and

7   Exhibit 45 is a compilation of the computer records showing the

8   dates on which an inspector with Mr. Morosco's number accepted

9   those rules in order to gain access to the HUD system.

10          THE COURT:  Sounds like a foundation to me.

11          MS. BASSIL:  Your Honor, I will just wait and see how

12  that plays out.

13          THE COURT:  All right.

14          MS. BASSIL:  46, your Honor, frankly, I objected to

15  this, because it literally is sort of computer code that makes

16  no sense to anyone.

17          THE COURT:  What is the story on this?

18          MR. PEREZ-DAPLE:  Your Honor, that exhibit was

19  included as a potential exhibit, and in the event that a

20  particular defense is raised, it shows changes in computer

21  codes between an older version of the software and a newer

22  version.

23          THE COURT:  Is this, then, in a rebuttal case?

24          MR. PEREZ-DAPLE:  No, your Honor.  We may introduce it

25  as part of the case in chief, if we feel that it is going to be

1    a theme of defense.

2              THE COURT:  Through the direct examination of

3    Mr. Evans?

4              MR. PEREZ-DAPLE:  Through the direct examination of

5    Mr. Evans.

6              THE COURT:  The idea of introducing code has

7    absolutely no appeal to me, so do not do it in your direct

8    examination.  If they raise something in their cross of him,

9    then we will talk about it.

10             MR. PEREZ-DAPLE:  All right, your Honor.

11             THE COURT:  But I just do not see presenting

12   gobbledygook to the jury and then attempting to explain

13   gobbledygook in anticipation of something that may not arise as

14   an approach that appeals.

15             MR. PEREZ-DAPLE:  All right, your Honor.  We will do

16   that.  And I will simply say that the idea of including the

17   exhibit was so that the witness would not be testifying about

18   the content of something without the document available, but I

19   understand, and we will not introduce it.

20             THE COURT:  Not every document that captures the

21   hearts and minds of counsel does have to be provided to the

22   jury.

23             MR. PEREZ-DAPLE:  Yes, your Honor.

24             THE COURT:  A little bit of pruning is important.

25             What else?

1          MS. FRIED:  Exhibit 21.  This is a table that I expect

2     the Government is going to say Vitus Shum, who is one of their

3     main witnesses, created.

4          THE COURT:  All right.

5          MS. FRIED:  I've got hearsay objections to this, and

6     let me explain what they are.  This was created based on

7     reports of -- there are these teams of people who went out to

8     look at the apartments.  You have probably heard them called

9     "SWAT Teams."  They were Chelsea Housing Authority employees

10     who were deployed to go examine apartments and then to make

11     reports of those apartments, and they were supposed to itemize

12     their observations I think on Exhibit 5, which is one of the

13     earlier exhibits that we looked at.  It's a chart.  And then

14     they were to send this information back, and it got into Mr.

15     Shum's hands, and he turned that data that are sort of

16     deficiencies of the apartment into this chart.  So, these

17     numbers represent what was reported to him by other Chelsea

18     Housing employees who were deployed as the deficiencies in the

19     apartments that they observed while inspecting them getting

20     ready for the REAC, the HUD inspection.

21          My objection is that that reported information about

22     these deficiencies, it's being offered for the truth.  That is,

23     this chart is being offered by Vitus Shum to say that apartment

24     in, let's just say Webster --

25          THE COURT:  If the foundation is there, if the

1    underlying document is a business record creating a summary of

2    those business records, it is admissible.

3          MS. FRIED:  Well, the underlying documents, that is,

4    these deficiencies reports, have never been provided to us.

5          THE COURT:  Well, let me understand.  What is the

6    story?  Can they?

7          MR. MERRITT:  Well, those reports are not in

8    existence.  They were not kept, your Honor.  These were part of

9    this unofficial SWAT Team.

10          THE COURT:  So, what are we supposed to say about

11   that?  How do they get to test whether or not this is an

12   accurate summary of what was provided to him and what was

13   provided to him was a business record?

14          MR. MERRITT:  Well, I would say that Mr. Shum, who is

15   a co-conspirator, would be able to say, and will say, that the

16   numbers were not reported to him.  He got a list of

17   deficiencies.

18          THE COURT:  Let me just understand this.  Are you

19   saying, then, that this is a co-conspirator hearsay document?

20          MR. MERRITT:  Yes, it is, your Honor.

21          THE COURT:  And what?  It accurately reports what

22   transpired?

23          MR. MERRITT:  Yeah.  It reports that these are the

24   assigned numbers to the deficiencies that were noted so that

25   Mr. McLaughlin then could send out the maintenance people to go

1   to all these apartments and make the necessary repairs.

2            THE COURT:  So, this is not presented as a compilation

3   of business records?

4            MR. MERRITT:  That is correct, your Honor.  This is on

5   Mr. Shum's computer, and he will be able to authenticate it.

6            THE COURT:  Well, there are lots of things on people's

7   computers, and I am not aware of an exception to the hearsay

8   rule because something is on a computer.  You are contending

9   that this is co-conspirator hearsay?

10           MR. MERRITT:  Yes, your Honor.

11           MS. FRIED:  But the data that's going into it is not

12   co-conspirator hearsay.  The data is coming from the

13   observations of the other Chelsea Housing employees who make

14   these reports.

15           THE COURT:  I will listen to it, but it sounds to me

16   like it is going to be co-conspirator hearsay.

17           MS. FRIED:  Well, that sounds like, with all due

18   respect, a real dodge, because what is being reported here are

19   observed deficiencies, not by Mr. Shum --

20           THE COURT:  I just heard what Mr. Merritt tells me,

21   and what he tells me suggests to me that it is likely to be

22   co-conspirator hearsay.  I am just telling you ahead of time.

23   It is clear to me that these objections, whether well founded

24   or not, are going to be raised in the presence of the jury no

25   matter what, even in the face of foundational evidence that

1    demonstrates that they are frivolous.  So, I will listen to the

2    objections.  I am being forewarned about them, and I will be on

3    point to deal with objections that may not be well founded.

4          MS. FRIED:  Well, I think that this is an extremely

5    well-founded objection, with all due respect.

6          THE COURT:  I do not want to hear any more argument

7    about it.

8          MS. FRIED:  All right.

9          THE COURT:  If I cannot rule on it ahead of time, I

10   cannot rule on it ahead of time.  The request that I make these

11   rulings is, in part, to give the parties some idea of where we

12   are going.  So, this is one co-conspirator hearsay document as

13   to which I will want to hear argument, if there is meaningful

14   argument after the witness testifies.

15         What else?  Are there other exhibits that we can deal

16   with while we are waiting for the jury?

17         MS. BASSIL:  Number 47, your Honor.  Again, this is a

18   chart that the Government has put together, and it's my

19   understanding, although it says "Downloads of Chelsea Housing

20   Authority Inspections by Morosco," it's my understanding that

21   they cannot determine what Mr. Morosco obtained.  What they can

22   determine is that he accessed the website but cannot determine

23   that he downloaded inspections necessarily.

24         THE COURT:  What is the response to that?

25         MR. PEREZ-DAPLE:  No, that's not right, your Honor.

1    The computer system automatically records the information that

2    is downloaded by the user using, in this case, Mr. Morosco's

3    User ID number.  So, there is a known set of information taken

4    on that date and at that time by the person using Mr. Morosco's

5    number.

6             MS. BASSIL:  Your Honor, I will see what the witness

7    says, but I don't think that's -- that was not my

8    understanding.  It more has to do with the title "Downloads of

9    CHA Inspections" than the actual information they have there.

10            THE COURT:  I am not sure I understand what that

11   means.

12            MS. BASSIL:  They have a title "Downloads of CHA

13   Inspections by Morosco."

14            THE COURT:  Isn't that what this is, CHA inspections?

15            MS. BASSIL:  I'm not sure it is.  I believe that what

16   it is is his access to the HUD system.

17            THE COURT:  They tell me that they can determine that

18   someone who accesses also downloads it.

19            MS. BASSIL:  I'm not entirely sure about that, but --

20            THE COURT:  Well, if they can, they can, if they

21   cannot, they cannot.

22            MS. BASSIL:  Your Honor, the rest of my objections

23   were co-conspirator hearsay.

24            THE COURT:  All right.  I think you have --

25            MS. BASSIL:  We've covered that.

1          THE COURT:  -- got an idea of protocol for dealing

2     with those.

3          MS. BASSIL:  Right.

4          THE COURT:  Anything else, Ms. Fried?

5          MS. FRIED:  Just a minute, please.

6                         (Pause)

7          MS. FRIED:  Well, there is one summary chart.  It is

8     the Government's Exhibit 53, a unit comparison chart.

9          THE COURT:  Hold on a second.

10                         (Pause)

11         THE FRIED:  This is simply a question of whether an

12    adequate foundation is going to be raised for the admission of

13    this chart.  I mean, I have a number of things.  I don't want

14    to irritate the Court by raising my foundational --

15         THE COURT:  It is not a matter of irritating.  I am

16    simply giving you directions about this --

17         MS. FRIED:  Right.

18         THE COURT:  -- based on my experience in this area.  I

19    will not rule on these things when there is an objection until

20    I have had an adequate opportunity to address it.  But this is

21    the time to do it, because, let me tell you something, I do not

22    want the trial -- but I will permit it to be interrupted -- to

23    be interrupted by requests for foundation that everybody knows

24    can be provided, and now we have to wait and go out and find

25    the person who is able to provide that foundation that we all

1    know is available.  So, if there is something that is missing

2    here or a witness that is necessary, the Government should be

3    put on notice so that we move through this seamlessly.

4            MS. FRIED:  That's what I'm trying to do.  This was

5    one of these exhibits where there was a question in my mind

6    about whether they were going to be able to lay the foundation

7    to put on the data from the -- this may be cured, because,

8    again, the inspector who did some of these inspections, I'm not

9    sure that they were on the Government's witness list.  This was

10   a 2007 list.  Now, if the Government is bringing in the records

11   custodian to testify about the data in these inspections, then

12   there's not going to be a problem.

13           THE COURT:  I do not understand the question.  This

14   is --

15           MS. FRIED:  It's a --

16           THE COURT:  Just a moment, if I can, just so I

17   understand it.

18           MS. FRIED:  Okay.

19           THE COURT:  They have got a download from Mr. Morosco

20   using the identifier M36855, and it is with a view toward the

21   2007 inspection, if I understand it.  And if I understand your

22   objection, it is that you do not know whether or not they

23   finally got this -- they may have gotten the download, but they

24   did not necessarily inspect those units.  Is that it?

25           MS. FRIED:  I'm looking at Exhibit 53, just to be sure

1    we are looking at the same exhibit.

2         THE COURT:  Right.  I am.

3         MS. FRIED:  On the left there is Vitus Shum, what is

4    supposed to be a summary of Vitus Shum's provided list of

5    apartments that were going to be inspected and that were,

6    therefore, prepped for inspection.

7         THE COURT:  Right.

8         MS. FRIED:  And then on the right is supposed to be

9    the list that was actually inspected by the REAC Inspector who

10   did that February 7th inspection.

11        THE COURT:  Right.

12        MS. FRIED:  The Government is putting it in because

13   there's only the slightest discrepancy between those two

14   things, trying to prove the accuracy of Mr. Shum's list in

15   order to prepare for a successful inspection.  My red flag on

16   this was simply a foundational one, that is, the data about the

17   2007 inspection, about what's actually inspected, that's sort

18   of HUD business records.  I'm just trying to put the Government

19   on notice that I'm not acquiescing to the admissibility of all

20   of this without their putting on a records custodian to say

21   that, "We have this data," et cetera, et cetera.  That's all I

22   am really doing.

23        THE COURT:  Is there any realistic possibility that

24   there is not?  And I will put it in a different way, which is

25   strategic, which is I am not sure the jury is that pleased with

1    objections that are made that are easily overcome.  I will rule

2    on whatever objections are made, and I will rule on the

3    evidence that comes in, but the extension of trial time to

4    obtain something that everybody knows is there is not generally

5    well received by the jury.  So, I guess I go back to this:  Is

6    there realistically a question about whether they inspected

7    those?

8          MS. FRIED:  My answer to that is, for me, as this

9    man's attorney, that's not the point.

10         THE COURT:  Answer my question.  As I have indicated,

11    you will get to sharpen your point however you see fit --

12         MS. FRIED:  All right.

13         THE COURT:  -- but so I understand what I am sitting

14    through.

15         MS. FRIED:  Right.  No, I'm not going to stand here

16    and say these apartments -- that this wasn't actually

17    inspected.  I'm not going to say that.  I'm not going to try to

18    maintain that.  I simply am not trying to grease the skids for

19    the Government to get this evidence in.

20         THE COURT:  It is hardly greasing the skids not to

21    raise an objection to something as to which the objection is

22    easily remediable, but the use of the phrase is illustrative.

23         So, the Government had better have somebody here,

24    because I do not want to wait around on this kind of thing.

25    So, if the objection is raised, I will deal with that objection

1    at that point.

2              MS. FRIED:  Thank you.

3              THE COURT:  What else?

4              MR. MERRITT:  Well, I just wanted to clarify

5    something.

6              THE COURT:  Sure.

7              MR. MERRITT:  Because a number of exhibits having to

8    do with Vitus Shum's computer were objected to in our

9    conference, and they appear to be shown on it as opposed, and

10   one of the objections was authentication, that Ms. Fried was

11   requesting the Government produce the FBI IT specialist that

12   took a mirror of the Chelsea server and would be able to

13   authenticate and testify that those emails and those files came

14   from either the server or Shum's computer.  We have that

15   witness, we are prepared to produce him, but I didn't know if

16   counsel had changed their objection.

17             MS. FRIED:  I have not.  I want a positive witness.

18             THE COURT:  So, you bring the witness in --

19             MS. FRIED:  Thank you.

20             THE COURT:  -- and we will have the experience of that

21   kind of testimony.

22             Anything else?

23             MR. MERRITT:  Yes, your Honor.  There is an additional

24   few exhibits that I don't think we had the opportunity to

25   provide to the Court, we provided to counsel over the weekend,

1    which are essentially taken pages from Mr. Morosco's website,

2    which is still currently on the Internet, and I can just,

3    please, pass these up to the Court, if that's appropriate.

4            THE COURT:  These are current statements by

5    Mr. Morosco?

6            MR. MERRITT:  Well, they are on the Internet, and it

7    appears to have been at least in February -- or, actually, 2011

8    that these kinds of services that he offered and his

9    qualifications and all those things were made available to the

10   public, actually.

11           THE COURT:  During the course of the conspiracy?

12           MR. MERRITT:  Yes, your Honor.

13           THE COURT:  And you can authenticate them as being

14   made during the course of the conspiracy --

15           MR. MERRITT:  Well, I think via the dates --

16           THE COURT:  -- as screen shots?

17           MR. MERRITT:  They are essentially clicking on the

18   various things that are offered and then printouts of that.

19           THE COURT:  But they are screen shots of what he was

20   saying during the course of the conspiracy?

21           MR. MERRITT:  Yes, your Honor.

22           MS. BASSIL:  I'm not sure that's correct, your Honor.

23   I don't know the various iterations of his website, so I don't

24   know if he had a website in 2006.  He was hired by Chelsea not

25   having anything to do with the website.

1          THE COURT:  Well, but if he is offering himself, that

2     those are admissions during the course of the conspiracy --

3          MS. BASSIL:  I understand.

4          THE COURT:  -- and they may be applicable to someone

5     else.  But it sounds like somebody is going to raise a

6     foundational question to this, too, so whoever it was who

7     captured these will have to, I assume, testify about the

8     circumstances in which they got them to be able to identify

9     what time they were obtained.

10          MR. MERRITT:  We will lay the foundation, your Honor.

11          THE COURT:  I have been passed up 44A and 44B as new

12     exhibits, or at least not ones that were put in the binder that

13     I received, and 47A and 47B.  These are in addition to those?

14          MR. PEREZ-DAPLE:  Yes, your Honor.  The documents that

15     Mr. Merritt was just describing are different than the ones you

16     have.

17          THE COURT:  And what is the number that you plan on --

18          MR. PEREZ-DAPLE:  We haven't assigned one, but I

19     suppose we should put them at the end of the list.

20          THE COURT:  So, let me just say this:  We now have

21     various numbering systems in place, but I think for the

22     Government it goes to --

23          MR. MERRITT:  54.

24          THE COURT:  -- 54, but it gets picked up, doesn't it,

25     by the defendants right after that?  So, we will just keep

1    going along.  It will be probably 113, I guess.  And in that

2    connection, what I would like, just as a scrivener's double

3    check, is that the Government keep track of this exhibit list

4    and give us an iteration every morning of what you understand,

5    give it to us and to defense counsel so we all understand what

6    has been admitted or what has not been admitted at that point.

7         MS. FRIED:  The only thing I want to say about this, I

8    haven't even had a chance to look at these exhibits.  I got an

9    email about them at 6:40 p.m. yesterday, I believe, and I

10   discovered that email this morning when I got up to check my

11   email at 6:00 or 5:30 this morning.  I just haven't had a

12   chance to review them.  I don't know what they say.

13        THE COURT:  They may be introduced later on, I assume,

14   here through -- I am not sure what witness is going to be

15   offering them.  Who is going first?  Is Ms. Jimenez going to be

16   the first witness?

17        MR. MERRITT:  Yes, your Honor.

18        MS. FRIED:  Your Honor, just a couple of housekeeping

19   matters.  Ms. Bassil and I would like, with the Court's leave,

20   to switch off taking leads on different witnesses, because

21   certain witnesses are more applicable to one client versus the

22   other, instead of my always going first or her always going

23   first on the cross-examinations, if you will permit that.

24        THE COURT:  Well, let me understand what is going to

25   be happening.  Are these witnesses who are only going to be

1    examined by one party or another?

2           MS. FRIED:  No, I don't expect that.  No.

3           MS. BASSIL:  I expect, your Honor, it's actually more

4    efficient and less boring for the jury.  We don't want to

5    repeat things.  So, one person is going to take the lead, and

6    the other person may have a few follow-up questions.

7           THE COURT:  Just as a choreography, how do you propose

8    I do it, just say, "Defense counsel --

9           MS. BASSIL:  Yes.

10          THE COURT:  "-- and then the one who is lead on a

11   particular witness leaps up and does it, and then there is

12   cleanup of additional particular matters by the other counsel?

13          MS. BASSIL:  That would be fine, your Honor.

14          THE COURT:  So, I will do it that way.

15          MS. FRIED:  All right.  Thank you.

16          THE COURT:  What else?

17          MS. FRIED:  Oh, I guess I had moved, I made that

18   motion regarding Mr. Russell.  I am just inquiring of the

19   record what was the outcome of whether he is going to be

20   appointed counsel, whether he is not going to be --

21          THE COURT:  That is between Mr. Russell and the Court.

22   It is not your business.

23          MS. FRIED:  Oh.  All right.

24          THE COURT:  I am concerned about the issue that was

25   raised by the Government, which is that the mere fact of making

1    such an inquiry, which is unusual, is disquieting to a witness

2    and is a strategic effort to put the witness in an awkward

3    position.  But, because the witness has been identified as a

4    co-conspirator, I have had a conversation with him, and what

5    the outcome of that is, is something that we will all learn at

6    some later point.

7          MS. FRIED:  All right.

8          THE COURT:  But I want to register, again, my concern

9    that the purpose was not altruistically to assure full and

10   adequate representation for Mr. Russell.

11         So, we will be in recess until we get the jury.

12         MR. MERRITT:  Perhaps, your Honor, we could just

13   quickly go over the jury selection process.  It has been 18

14   years since I have tried a case in front of your Honor.

15         THE COURT:  I have not been on the Bench that long,

16   have I?

17         MR. MERRITT:  It seems that way.

18         THE COURT:  I guess it probably seems like it to

19   counsel.

20         We will put in the box and the first row -- I forget

21   how many we have coming in.  It's something like 45, Jarrett,

22   is that it?  So, what we will do is put in the order in which

23   they are on the list people in the jury box and in the front

24   row and back, but we will put them in the spectator section, at

25   least provisionally.  I will make inquiry on matters for cause,

1    and from time to time people will be excused, and then we will

2    call up a new juror and put them in the seat for the person who

3    has been excused.  When I have gotten sufficient people for

4    exercise of peremptories I am going to turn to you and say,

5    "This is your time for peremptories," and you can exercise your

6    peremptories then.  But the people will be seated in the order

7    of the seats in which they find themselves.

8            So, to illustrate, let's assume that Juror Number 3,

9    the first Juror Number 3, is excused on cause.  Then someone is

10   called up from the back who might be Juror Number 40.  Juror

11   Number 40 will be in Seat 3, but Seat 3 is what governs, not

12   the juror number of the juror.  So, the purpose of all of this

13   is so that you can see who you are likely to have on the jury

14   by making a calculation of where you are going to exercise your

15   peremptories.  A peremptory exercised against Juror 45 is

16   probably not as valuable as one exercised against

17   Juror Number 1, or really anybody in the first 18 to 20 seats,

18   but it is your choice.

19           MS. BASSIL:  Your Honor, how many alternates are you

20   going to seat?

21           THE COURT:  I think in this case three, three or four.

22           MS. BASSIL:  Okay.

23           THE COURT:  I will give myself some fudge on that, and

24   that may lead to additional peremptories on --

25           MS. BASSIL:  That was my next question on the

1    peremptories.

2           THE COURT:  -- the alternates, but we choose

3    alternates separately from the regular jury.

4           MS. FRIED:  And will there be follow-up questions at

5    the Bench if somebody has an affirmative answer to --

6           THE COURT:  Yes.  As always, that will be the case,

7    but the follow-up questions will be mine, and they certainly

8    will not be in the format of the proposed questions that you

9    have offered.

10          MS. BASSIL:  Oh, okay.

11          MS. FRIED:  Can we suggest questions to you out of the

12   juror's hearing as well?

13          THE COURT:  Yes, you may.  I suggest that they be more

14   valuable if they are less tendentious or argumentative.

15          MS. BASSIL:  Your Honor, in my proposed voir dire, one

16   of the questions I had asked about was specifically about

17   whether they knew about the Chelsea Housing Authority.

18          THE COURT:  Right.

19          MS. BASSIL:  Are you going to ask something like that?

20          THE COURT:  Yes, I am going to ask something like

21   that.  It has been in the press and so on, so it seems to me to

22   be appropriate to ask that.  And, of course, I will ask at the

23   end if there is anything else.  I will go through some things,

24   but just because somebody has asked for a question does not

25   necessarily mean that we have not touched on it, but I will

1    afford you an opportunity to suggest additional questions.

2         MS. BASSIL:  One other thing, your Honor.  I just did

3    a lengthy impanelment in State Court, and I know we had two

4    potential jurors who, when asked, said that they could not

5    decide a case because of their religious beliefs, and so I was

6    wondering if you were going to gently ask around that.

7         THE COURT:  I probably will ask something that deals

8    with that.  I try not to do it in terms of religious beliefs --

9         MS. BASSIL:  Right.

10        THE COURT:  -- but something that will tease that out,

11   and at the end I generally ask a question that is open-ended,

12   which is to say, "We have asked you these questions during this

13   time period, but all of us are concerned that we have not asked

14   you all the questions that are necessary.  So, I want you,

15   Mr. Juror or Ms. Juror, to put yourself in the seat of

16   Mr. Morosco, or Mr. Fitzpatrick, or Mr. Merritt, wondering if

17   there is something else we should have asked."

18        MS. BASSIL:  Okay.

19        THE COURT:  "So, if you were in their seat, what else

20   would you want to know under those circumstances?"  That

21   frequently gets that out.  But in the case of people have a

22   belief that does not permit them to pass judgment against

23   others --

24        MS. BASSIL:  Right.

25        THE COURT:  -- it comes out almost immediately, I

1     think.

2               MS. BASSIL:  Okay.

3               THE COURT:  But if you want more --

4               MS. BASSIL:  It didn't when I was impaneling a month

5     ago, but it did eventually come out.

6               THE COURT:  I would think that that would be useful

7     for a defendant, that is, a juror seated like that.

8               MS. BASSIL:  I suppose.  It takes one person to hang a

9     jury.

10              MR. MERRITT:  That may not be useful in the long run.

11    But, your Honor, we have one question, and that general

12    question may cover it, but the only thing that we thought might

13    evoke some kind of response specific to the subject matter in

14    this case is people's views about public housing.

15              THE COURT:  Yes, I probably will ask a question about

16    public housing.

17              MR. MERRITT:  Okay.

18              THE COURT:  And there is a question about, "Can you

19    trust people who are in the public?"  And I will probably ask

20    something around that, not in the highly argumentative form

21    that Ms. Fried asked for, but something along those lines.

22              So, we will be in recess until we get our jury.

23              THE CLERK:  All rise.

24         (The Honorable Court exited the courtroom at 10:09 a.m.)

25                        (Recess taken)

1        THE CLERK:  All rise.

2     (The Honorable Court entered the courtroom at 12:11 p.m.)

3        THE CLERK:  This Honorable Court is now in session.

4  You may be seated.

5        This is Criminal Action 13-10308, United States v.

6  James H. Fitzpatrick and Bernard J. Morosco.

7        THE COURT:  Well, I guess I have to say "good

8  afternoon," ladies and gentlemen.  My name is Douglas Woodlock.

9  I am the judge in this session.  I am going to be involved in

10  trying to pick the fairest and the most impartial jury in a

11  criminal case.

12        The case is one that we will learn about together, I

13  think, but I can give you an overview.  The case is one in

14  which the United States has accused two individuals, the

15  defendants who are here before you, Bernard Morosco and James

16  Fitzpatrick, of having a role in a conspiracy that the

17  Government suggests occurred from approximately 2006 through

18  sometime in November of 2011.

19        That conspiracy, according to the Government, was one

20  to defraud the United States, particularly through its agency,

21  the Department of Housing and Urban Development, by impairing,

22  or impeding, or defeating the operation of that aspect of HUD's

23  activities that involved a valuation of the physical condition

24  of a Housing Authority.

25        The Housing Authority that we are dealing with here is

1    the Chelsea Housing Authority, and the Government's allegations

2    are essentially that, while the evaluation of physical

3    condition was supposed to be random, there was improperly given

4    advance notice of what was going to be evaluated so it could

5    not be a fair evaluation.

6         Now, that, in brief, is what the Government alleges.

7    But I want to step back.  That is their theory.  That is why

8    you are here.  The mere fact that they have indicted someone

9    does not mean anything at all.  It just means that we convene a

10   jury to decide whether or not what they have alleged is true,

11   and what that means is that there are some very important

12   Constitutional rights that are implicated here.

13        The first is the presumption of innocence.  Any person

14   who is accused of a crime in the United States is presumed

15   innocent, unless and until the Government proves beyond a

16   reasonable doubt each essential element of the offense charged

17   against that individual.  The individual does not have to do

18   anything at all.  The individual can look the Government

19   straight in the eye and say, "Prove it," and unless and until

20   they do against a very high standard, proof beyond a reasonable

21   doubt, that defendant must be presumed innocent.

22        Now, a defendant has the right to put on evidence or

23   not as he sees fit, but he is not obligated to, and at the end

24   you are going to evaluate all of the evidence that I permit to

25   be introduced in the course of the trial to decide whether or

1    not the Government has done what it undertook to do, which is

2    to prove each essential element of this offense beyond a

3    reasonable doubt.

4            So, we have got to start with that backdrop.  It is

5    fundamentally important.  It is what distinguishes this country

6    from other countries in the way in which we evaluate

7    allegations that the Government makes.  And so, in the older

8    formulation of what a jury does, when the Jury Clerk swears

9    you, says, "You stand between these defendants and the

10   Government as the country," you are the country.  You are the

11   final finders of fact, the persons who are going to exercise

12   common sense and judgment in evaluating this case.

13           And in order to emphasize the importance of it, I am

14   going to have Mr. Lovett swear you as the panel from which the

15   jury will be chosen in this case.

16           THE CLERK:  Members of the jury pool, will you please

17   all rise and raise your right hands.

18                       (The jurors complied)

19              (The jury panel was duly sworn by the Clerk)

20           THE COURT:  Before we get started and learn a little

21   bit about you -- and I will try to keep the questions to a

22   minimum, but you will understand that we are asking these

23   questions to be sure that there is not something in your

24   background, or your training, or your experience that may

25   interfere with your ability to be fair and impartial -- I want

1    to introduce the people who are involved.

2          Now, let me touch on this fair and impartial idea.  It

3    means that we have a jury that is going to decide this case

4    solely on the basis of the evidence that is presented here in

5    court and not something else that you have heard outside or

6    conversations that you may have had or predispositions; and,

7    second, that you will do it according to the law that I give

8    you.  You may not like the law.  You may think it needs

9    adjustments.  That is up to you.  But not in this case.  In

10   this case you have got to follow the law as I give it to you,

11   and you can only decide this case on the basis of the evidence

12   that is presented.

13         Now, who are you going to see in the courtroom?  You

14   get to see me.  I am the judge.  What is my role?  I think my

15   role is a little bit like a traffic cop.  I stand in the middle

16   of the intersection.  You have got the prosecution and the

17   defense traveling through the intersection to get to whatever

18   destinations they think they want to get to, and I try to make

19   sure that they do not crash into each other and they go in an

20   orderly fashion.

21         Now, I mean that to suggest something else.  I have no

22   position on this case.  I should not.  You are the final

23   finders of fact.  You are the people who are going to decide

24   this case.  I am not.  And if, during the course of the trial,

25   you think that you have got some idea of where I stand, think

1   again.  As I said, I sit as the traffic cop, to make sure that,

2   in an orderly and fair fashion, the parties get to whatever

3   destinations they think they want to go to.  My responsibility

4   is to move this case as fairly and efficiently as it possibly

5   can be moved and nothing more.

6        Now, sitting in front of me is Mr. Lovett, who just

7   swore you in.  Mr. Lovett is the Courtroom Deputy.  He is the

8   person who handles all the administrative matters and more in

9   this courtroom.  He swears you.  If you have creature comfort

10  issues, you talk to him.  The lawyers talk to him.  He marks

11  the exhibits, that sort of thing.  He is the Executive Officer,

12  and to the degree that anything runs smoothly and efficiently

13  when I am involved, it is because Mr. Lovett is really handling

14  all the details involved in that.

15       Sitting beyond Mr. Lovett is Ms. Hancock.  She is the

16  court reporter.  She is taking a stenographic record of the

17  case, kind of stenographic notes.  But I want to emphasize a

18  couple of things.  Number one, while the notes that Ms. Hancock

19  is making right now can be used for purposes of preparing a

20  transcript, that transcript is unlikely to be available to you.

21  The process of getting a transcript up is very difficult, very

22  demanding, and Ms. Hancock is a very demanding person on

23  herself in terms of the quality of the transcript.

24       I tell you that both as a descriptive matter but also

25  a philosophical matter.  The important thing for you to do

1   during the course of the trial is look across at the witnesses,

2   who will be sitting in that witness box over there

3   (indicating), evaluating what they have to say, evaluate their

4   credibility.  Do not take a mental vacation.  Do not take a

5   mental vacation thinking that you will be able to look at the

6   transcript afterwards, because you will not.  It will not be

7   there.  You have got to pay attention all the way through.

8        Now, I will permit you to take notes during the course

9   of the trial.  Some people take goods notes, some people take

10  not-so-good notes.  But, in any event, if that is something

11  that is helpful as an aid to memory, I will permit a certain

12  amount of note-taking.  But you will not have the transcript

13  available.

14       Just beyond Ms. Hancock is a table where my law clerks

15  sit.  They are relatively recent graduates of law school.  They

16  spend a year with me to get a little bit of training and

17  background, but their principal role is to keep me out of legal

18  trouble.  They do research and that sort of thing for me, and

19  from time to time they will be in the courtroom as we move

20  along, in light of what other obligations they may have.  But I

21  wanted to tell you that those seats will be filled from time to

22  time during the course of the trial.

23       Now, speaking directly about the parties, the United

24  States, which is the prosecution in this case, is represented

25  by two United States Attorneys, Ted Merritt --

1          Mr. Merritt, if you would stand.

2          -- and Brian Perez-Daple, both Assistant United States

3    Attorneys here in Boston.  And they will be assisted by Special

4    Agent Jamie Mazzone, who is a Special Agent with the Department

5    of Transportation, and she is going to be helping them out at

6    counsel table.  But that is who you are going to see for the

7    Government in this case.

8          Now, on behalf of the defendant, Mr. Morosco,

9    Mr. Morosco is represented by Janice Bassil and Sarah Javaheri,

10   and they are in practice here in Boston, and

11   Mr. Morosco is the fellow in between his two counsel here.

12         Then, the defendant James Fitzpatrick is represented

13   here by Syrie Fried, who is at the outside, and by Jason

14   Feinberg, and that, again, is Mr. Fitzpatrick in the middle.

15         You may be seated.  Thank you.

16         Now, I am introducing these people not merely to be

17   hospitable, but also because the questions that I am going to

18   be asking you are ones about, "Do you know any of these people?

19   Ever heard anything about this case?", that sort of thing,

20   because we are trying to find out whether or not you have had

21   some exposure to something on the outside, either relationships

22   or something like that.  There is another reason I introduce

23   them, because it is the last time you will be introduced to

24   them in this sense.  They are very nice people, very friendly,

25   and I am sure will be happy to chat with you, but we are in a

1   very formal setting here, and so you should understand that I

2   have told them that they cannot talk to you in any way.  So, if

3   you encounter them in the hallway and they seem like stiffs, it

4   is because I have told them to be stiffs here.  We have got to

5   stick to the formalities of this case in order to try it fairly

6   and impartially.

7        So, those are the people you are likely to see on a

8   regular basis in the courthouse.

9        It is now necessary, I think, for us to know a little

10  bit about you, and the way in which I would like to do that, if

11  we can, is to have each of you, at least the folks who are

12  sitting in the jury box, which is this area right here

13  (indicating), and the people sitting in the front row stand up

14  and introduce yourself.  Mr. Lovett has put on the screens

15  there a kind of name, rank and serial number question, and what

16  I would like you to do is, when you stand up, if you could tell

17  us your full name and spell your last name.  The lawyers are

18  very quick, I am slow, so it is important for you to spell the

19  last name so I get it clearly in mind.  Tell us what you do for

20  a living, if you are employed, tell us the town you live in,

21  tell us your spouse's or partner's or significant other's

22  occupation, if it is a household that you live in together,

23  more or less, and what your spouse, or partner, or significant

24  other does for a living, if they are employed as well.

25        Now, what I am going to do is, as I said, first have

1    the people in the jury box and the front row introduce

2    yourselves.  This is just a matter of convenience.  From time

3    to time I am certain, if it is like any other case that I have

4    had, there will be jurors who will be excused, and when they

5    are excused, then the people who have not yet introduced

6    themselves will be asked to come forward, and I will ask you to

7    introduce yourself at that point.  But for right now, all I

8    would like to have is folks in the jury box and the folks in

9    the first row.  And so, we will start with the woman in the

10   first seat there.

11           If you could introduce yourself.

12           THE JUROR:  I'm Hsien-Chi Lin, L-i-n.  I am a

13   part-time teacher at the middle school.  I'm from the Town of

14   Wellesley.  My husband is doing -- he is a software engineer.

15           THE COURT:  Fine.  Thank you.

16           Yes, ma'am.

17           THE JUROR:  Maryanne Peckham, P-e-c-k-h-a-m.  I am an

18   accountant.  I work for the Boston Police Department and H&R

19   Block.  I live in Roslindale, and I am unmarried.

20           THE COURT:  And, Ms. Peckham, do you work full time

21   for the Boston Police Department?

22           THE JUROR:  Yes.

23           THE COURT:  And H&R Block during the tax season,

24   during this season?

25           THE JUROR:  Yes.

1          THE COURT:  Thank you.

2          Yes, ma'am.

3          THE JUROR:  Elise Renoni, R-e-n-o-n-i.  I work at

4    Tufts University in the President's Office as his Assistant.  I

5    live in Billerica.  My husband, John, also works at Tufts

6    University as a Disbursement Compliance Analyst.  He works in

7    Financial Services at Tufts.

8          THE COURT:  Fine.  Thank you.

9          Yes, sir.

10         THE JUROR:  I'm Randy Souza, S-o-u-z-a.  I'm a

11   computer programmer.  I live in Norwood, and my wife is a

12   pastry chef.

13         THE COURT:  Thank you.

14         Yes, ma'am.

15         THE JUROR:  Ethel Galanis, G-a-l-a-n-i-s.  I am an

16   optician from Ipswich, and my husband is a retail store

17   manager.

18         THE COURT:  Fine.  Thank you.

19         Yes, ma'am.

20         THE JUROR:  Hi.  My name is Kathy Ireland,

21   I-r-e-l-a-n-d.  I'm a Registered Dietician out of Boston

22   Hospital, and I live in Mansfield, and my husband is a music

23   teacher.

24         THE COURT:  Thank you, Ms. Ireland.

25         Yes, sir.

1          THE JUROR:  My name is Charles Gately, G-a-t-e-l-y.  I

2     am a City of Haverhill Highway Department employee.  I live in

3     Haverhill, and I am unmarried, divorced.

4          THE COURT:  Thank you, Mr. Gately.

5          Yes, ma'am.

6          THE JUROR:  My name is Anne Adams.  I am an

7     Administrative Assistant, I live in Lynn, and my husband is a

8     Systems Engineer.

9          THE COURT:  And a Administrative Assistant in what

10    general industry or business?

11         THE JUROR:  For a hospital.

12         THE COURT:  Fine.  Thank you.

13         Yes, sir.

14         THE JUROR:  I'm Roger Dahlberg, D-a-h-l-b-e-r-g.  I am

15    retired.

16         THE COURT:  What did you do you for a living before

17    you retired?

18         THE JUROR:  I was in corporate finance.  And I live in

19    South Dartmouth, and my wife is a Dental Hygienist.

20         THE COURT:  Fine.  Thank you.

21         Yes, sir.

22         THE JUROR:  Steven Pinto, P-i-n-t-o.  I'm a fleet

23    mechanic for Nstar Electric.  I live in Fairhaven, and my

24    wife's an Administrative Assistant.

25         THE COURT:  Thank you, Mr. Pinto.

1                    Yes, sir.

2                    THE JUROR:  My name is Thomas Brady, B-r-a-d-y.  I

3      live in Bedford.  I am a plumbing contractor, and my wife is a

4      clerk.

5                    THE COURT:  Thank you, Mr. Brady.

6                    THE JUROR:  I'm Gwendolyn Nunes, N-u-n-e-s.  I'm

7      currently a Contract Administrator for a publishing company.  I

8      live in Essex.

9                    THE COURT:  Married?

10                   THE JUROR:  No.

11                   THE COURT:  Thank you.

12                   THE JUROR:  I'm Zachary Lehmann, L-e-h-m-a-n-n.  I'm a

13     mechanical engineering student at the moment, and I live in

14     Lowell, Massachusetts.

15                   THE COURT:  Thank you, Mr. Lehmann.

16                   THE JUROR:  Elizabeth Barnett.  I'm a City Planner, I

17     live in Lexington, and my husband is an engineer.

18                   THE COURT:  Thank you, Ms. Barnett.

19                   THE JUROR:  Hi.  Joy Lutz, L-u-t-z.  I'm retired from

20     the Postal Service.  I am now a full-time landlord.  We live in

21     Gloucester, and my husband is still a Postal Clerk.

22                   THE COURT:  Fine.  Thank you very much.

23                   Yes, sir.

24                   THE JUROR:  I'm George Bill.  I'm a full-time student,

25     I live in Boston, and I'm unmarried.  B-i-l-l.

1          THE COURT:  Thank you, Mr. Bill.

2          Yes, ma'am.

3          THE JUROR:  My name is Arleta Faulkner,

4  F-a-u-l-k-n-e-r.  I'm a Special Education Teacher for Boston

5  Public Schools, I live in Mattapan, and my husband is employed

6  by Boston Public also.

7          THE COURT:  Thank you very much.

8          Yes, sir.

9          THE JUROR:  My name is Todd Zahurak, Z-a-h-u-r-a-k.

10  I'm a high school guidance counselor and coach, I live in

11  Walpole, and my wife is a cardiac nurse.

12          THE COURT:  So, we will start with the woman in the

13  back row there, the first of the back rows.

14          THE JUROR:  I'm Kathleen Macdonald, M-a-c, small d,

15  o-n-a-l-d.  I'm a Math Specialist for the Westford Public

16  School System, and my husband is a Vice President of a small

17  aerospace company.

18          THE COURT:  Thank you.

19          Yes, ma'am.

20          THE JUROR:  Nancy Replogle.  I'm presently on medical

21  leave from teaching, and I live in the Town of Hanover, and my

22  husband is a commercial fisherman.

23          THE COURT:  Thank you, Ms. Replogle.

24          Yes, ma'am.

25          THE JUROR:  Pamela Manuel.  I'm from Peabody.  I'm a

1    housekeeper, laundry supervisor at a nursing home, and my

2    husband is deceased.

3          THE COURT:  And the town you live in?

4          THE JUROR:  Oh, Peabody.

5          THE COURT:  Fine.  Thank you, Ms. Manuel.

6          THE JUROR:  Stephanie Carlisle, C-a-r-l-i-s-l-e.  I'm

7    a high school English teacher, I live in Somerville, and I am

8    not married.

9          THE COURT:  Thank you, Ms. Carlisle.

10         Yes, sir.

11         THE JUROR:  Tim McEachern, M-c-E-a-c-h-e-r-n.  I'm a

12    compliance specialist for a placement agency.  I live in North

13    Andover, and my wife is an office manager for a venture capital

14    company.

15         THE COURT:  Thank you, Mr. McEachern.

16         THE JUROR:  Loriann Chisolm, C-h-i-s-h-o-l-m.  I'm a

17    bookkeeper at a security company.  I live in Norton, Mass, and

18    my husband is a paint contractor.

19         THE COURT:  Thank you.

20         THE JUROR:  Denise Ferreira, F-e-r-r-e-i-r-a.  I'm a

21    head teller at a credit union, I live in Brookline, and my

22    boyfriend is a landscaper.

23         THE COURT:  Thank you.

24         THE JUROR:  Rani Tremblay, T-r-e-m-b-l-a-y.  I am a

25    elementary teacher, and I live in Billerica, and my husband is

1    a chemical engineer.

2            THE COURT:  Thank you.

3            THE JUROR:  My name is Hagop Hagopia, H-a-g-o-p-i-a-n.

4    I am unemployed, I live in the City of Waltham, and I am

5    unmarried.

6            THE COURT:  And, Mr. Hagopian, what kind of work did

7    you do before the period of unemployment?

8            THE JUROR:  Most recently, I was making phone calls to

9    insurance companies verifying coverage, health insurance

10   coverage.

11           THE COURT:  Right.  Okay, fine.  Thank you.

12           THE JUROR:  My name is Brian Traumuller,

13   T-r-a-u-m-u-l-l-e-r.  I'm a Web Designer for a financial

14   company, I live in Medford, Mass, and I am currently unmarried.

15           THE COURT:  Thank you.

16           Yes, ma'am.

17           THE JUROR:  My name is Kathleen Marshall,

18   M-a-r-s-h-a-l-l.  I am a relationship manager for a large

19   financial services company in Boston.  I live in Charlestown,

20   and my significant other is currently unemployed and was

21   previously in sales for a technology firm.

22           THE COURT:  Thank you.

23           Yes, ma'am.

24           THE JUROR:  I'm Parul Joshi, J-o-s-h-i.  I work as an

25   IT Project Manager, I live in Billerica, and my husband works

1    as a product manager for a healthcare company.

2         THE COURT:  Thank you.

3         What I think I am going to do is stop at that point.

4    Bear in mind that the questions I am going to ask the people

5    who have introduced themselves apply to everybody, even the

6    folks who have not.  So, the folks who have not had better be

7    listening very carefully, because the first question I will ask

8    you, if you get called up, is, "Do you remember all those

9    questions I asked the other people?  Do any of them apply to

10   you?"  But I just want the folks who have introduced

11   themselves, just for management purposes, to answer the

12   questions that I am about to put to the jurors here.

13        So, let me turn to the larger issues.  Do you know

14   anything about this case?  Do you know any of the lawyers

15   involved?  Do you know the defendants?  Have you heard anything

16   about this case?

17        We will take you up when you have introduced yourself,

18   but I will keep in mind that you have answered positively to

19   this.

20        Let me sharpen this a bit more.  One of the persons

21   who the Government alleges was involved in this case was the

22   Executive Director of the Chelsea Housing Authority, a fellow

23   by the name of Michael McLaughlin.  Mr. McLaughlin has pleaded

24   guilty in this case for himself.  It received some publicity,

25   the case has received some publicity.

1          Do any of you recall hearing anything about the case

2    with that in mind?  I see a few responses, as I anticipated I

3    would.

4          Let me say something about that.  Number one, the fact

5    that you have been exposed to some information about the case

6    is not disabling, necessarily, but it is something I want to

7    explore.  Number two, you will understand that, now that you

8    are involved in the jury selection process, you are not

9    supposed to be doing any reading, outside investigation, going

10   on the Internet, doing anything like that.  You have got to

11   keep yourself immune from any outside influence at all.  You

12   have just got to put it out of your mind.  But it is important

13   for us to know at the outset whether any of you have been

14   exposed to aspects of this case or know people who are involved

15   in the case or you believe to be involved in the case.

16         So, I will see the folks who have identified

17   themselves and introduced themselves already over at the

18   sidebar.  It is the area over here to my right (indicating).

19   It makes it possible for me, with counsel present, to explore a

20   little bit more your positive response to the question.  You

21   will find us doing that from time to time here, and we are

22   going to start on this question, so I will see you at the

23   sidebar.

24

25   (SIDEBAR CONFERENCE AS FOLLOWS):

1                    (Juror approached the sidebar)

2           THE COURT:  Yes, ma'am.  And if you could identify

3    yourself for the record.

4           THE JUROR:  My name is Elizabeth Barnett.

5           THE COURT:  And Ms. Barnett is --

6           THE CLERK:  14.

7           THE COURT:  Juror Number 14.  I have to identify you

8    for the record.

9           What do you think you have heard or know about the

10   case?

11          THE JUROR:  I've just seen it in the newspaper.

12          THE COURT:  What did you see?

13          THE JUROR:  That there was an investigation, but I

14   don't know the details.

15          THE COURT:  Let me ask you this:  Is that going to

16   influence your judgment in this case?

17          THE JUROR:  No.

18          THE COURT:  Do you think you can decide this case

19   fairly and impartially?

20          THE JUROR:  Absolutely.

21          THE COURT:  And only in light of what you have heard

22   in the courtroom and in light of the law that I will give you?

23          THE JUROR:  Yes.

24          THE COURT:  Do you have any question about that?

25          THE JUROR:  No.

1          THE COURT:  Thank you.

2                    (Juror left sidebar)

3                 (Next juror approached sidebar)

4          THE COURT:  Can you tell us your name again for the

5   record.

6          THE JUROR:  Ethel Galanis.

7          THE COURT:  And Ms. Galanis is --

8          MR. MERRITT:  Number 5.

9          THE COURT:  Juror Number 5, is it?

10         MR. MERRITT:  Yes.

11         THE COURT:  Thank you.

12         Can you tell us what you heard or think you heard.

13         THE JUROR:  I'm a headline reader, basically, of the

14   paper.

15         THE COURT:  So, what do you think you heard?

16         THE JUROR:  Just that there was a Chelsea Housing

17   scandal, basically.  I don't think anything in depth.

18         THE COURT:  Well, let me ask you this:  The reason I

19   ask is just to orient us, but do you think that is going to

20   influence you in any way in this case?

21         THE JUROR:  No.

22         THE COURT:  Do you think you could decide this case on

23   the basis of the evidence that is presented here and the law

24   that I give you?

25         THE JUROR:  Yes.

1          THE COURT:  Do you have any question about that

2     ability?

3          THE JUROR:  No.

4          THE COURT:  That is all we can ask for.  Thank you.

5                    (Juror left sidebar)

6                  (Next juror approached sidebar)

7          THE COURT:  Can you tell us your name, again, for the

8     record.

9          THE JUROR:  Z-a-h-u-r-a-k.

10         THE COURT:  Mr. Zahurak is Juror Number 18.  What

11    aspect of the question brought you up here?

12         THE JUROR:  You had asked if we had heard about it

13    before, and I -- you know, following it on the news.

14         THE COURT:  What do you think you have been following?

15         THE JUROR:  Just that there was a problem at the

16    Housing Authority, and there was a question of whether or not

17    they were cheating and a man pleaded guilty.

18         THE COURT:  Is that going to affect your judgment in

19    this case?

20         THE JUROR:  I don't think so.

21         THE COURT:  Do you think you can decide this case on

22    the basis of the evidence that is presented here and only that

23    evidence?

24         THE JUROR:  Yes.

25         THE COURT:  And in light of the law that I give you?

```
 1                THE JUROR:  Mm-hmm.

 2                THE COURT:  Do you have any question about that?

 3                THE JUROR:  I don't.

 4                THE COURT:  Fine.  Thank you very much.

 5     (END OF SIDEBAR CONFERENCE)

 6

 7                THE COURT:  There are some names that will come to

 8     your attention during the course of the trial, obviously, the

 9     two defendants, Mr. Morosco and Mr. Fitzpatrick, and I have

10     mentioned Mr. McLaughlin's name, but I want to read out some

11     names of other persons whose activities may come to your

12     attention during the course of trial.  And the reason I am

13     doing that, obviously, is so that someone does not in the

14     middle of trial look across at the witness box and say, "That

15     is my brother-in-law," or someone that you know in some

16     fashion.  So, we want to try to identify that early on, if it

17     poses a problem.

18                So, let me go through these.  There is an individual

19     by the name of Orion Brogna B-r-o-g-n-a, who is from Chelsea, a

20     fellow by the name of Patrick Evans, who is with HUD, "HUD"

21     meaning Housing and Urban Development.  He is from Washington,

22     D.C.  There is a fellow by the name of Joseph Friesen

23     F-r-i-e-s-e-n.  He is an Information Technology Specialist with

24     the FBI.  He is here in Boston.  Another person in IT,

25     Information Technology, with the FBI, whose name is S-o-y-u-p,
```

1   H-a-h-n from New York City, an individual by the name of Terri

2   Holcombe from HUD in Washington, DC, an individual by the name

3   of Milagros Irizzary, I-r-i-z-a-r-r-y, who is from Chelsea, an

4   individual by the name of Alexandra Jimenez, also from Chelsea,

5   a person by the name of Flor Palacio, P-a-l-a-c-i-o from

6   Chelsea, a Richard Russell also from Chelsea, an FBI Special

7   Agent by the name of Kevin Sheahan, S-h-e-a-h-a-n, from the FBI

8   Office here in Boston, an individual by the name of Vitus Shum,

9   S-h-u-m, from Lexington, Massachusetts, an individual by the

10  name of Jessica Thompson, who is a Special Agent with HUD, a

11  person by the name of Carmen Torres, who is from Chelsea,

12  Massachusetts, a fellow by the name of James Cirino,

13  C-i-r-i-n-o, from Lynnfield, and a woman by the name of Jill

14  Rudy, R-u-d-y, with HUD, from Washington, DC.

15        In addition, there are a couple of other people whose

16  names I would like to bring to your attention:  a Sarah Alcorn,

17  who is from Boston, and a Daniel O'Neill, who I understand is

18  affiliated in some fashion with the Commonwealth of

19  Massachusetts Inspector General.

20        Have I covered all of the names that the parties are

21  interested in bringing to the jury's attention?

22        So, I brought them to your attention.  Now, has the

23  well run dry?  Is that the problem?

24        MS. FRIED:  Thank you, your Honor.

25        (The Court conferred with the Clerk off the record)

1          THE COURT:  Do you know any of those people, the

2     people I have just identified as potential persons of interest,

3     I guess we would call them, in the course of the trial?  And I

4     see no response to that.

5          You have heard that there are a number of people who

6     are affiliated with the Federal Government here.  Of course,

7     the case is being prosecuted by the United States Attorney's

8     Office.  You have heard that there are investigative agents

9     from the Department of Housing and Urban Development.  I

10    believe Ms. Mazzone was with Housing and Urban Development

11    before and is now with the Department of Transportation.  You

12    have heard people from the FBI may be testifying in the case.

13         Something that is of considerable interest to us is

14    whether or not you or any members of your immediate family have

15    now or in the past worked for the Federal Government in some

16    capacity?  And when I say "immediate family," I mean people

17    that you have lived with, and, maybe a little broader, people

18    that you feel exceptionally close to.  But do any of you,

19    yourselves, or have any of you, yourselves, or any persons that

20    I have defined as "immediate family" worked for the Federal

21    Government in any kinds of capacities?

22         I see several responses, so we will see you at

23    sidebar.

24    (SIDEBAR CONFERENCE AS FOLLOWS):

25                    (Juror approached sidebar)

1              THE COURT:  Can you tell us your name, again.  If you

2    would come forward a little bit.

3              THE JUROR:  Zachary Lehmann, L-e-h-m-a-n-n.

4              THE COURT:  Mr. Lehmann is Juror Number 13.

5              So, what aspect of the question brings you up?

6              THE JUROR:  My dad works for NOAA.

7              THE COURT:  For NOAA here in Boston?

8              THE JUROR:  Yes.

9              THE COURT:  What kind of work does he do?

10             THE JUROR:  He's on oil spill, like, organization of

11   cleanup and works for a lot of consulting-type things for,

12   like, the Federal Government in terms of cleaning up oil

13   spills.

14             THE COURT:  How long has he been doing that kind of

15   work?

16             THE JUROR:  Like, 20 years.

17             THE COURT:  Is that going to affect your judgment

18   here?  Are you going to feel you would lean toward one side or

19   the other because of that?

20             THE JUROR:  Probably not.

21             THE COURT:  "Probably not"?

22             THE JUROR:  I don't think so.

23             THE COURT:  People respond, lay people respond by

24   saying, "Probably not," and that kind of thing.  You will

25   understand that I have to ask a little bit more.  The real

1    question for us is will you decide the case on the basis of the

2    evidence that is presented here and in light of the law without

3    consideration of the fact that your dad may have worked for the

4    Federal Government at some point?

5           THE JUROR:  Yes.

6           THE COURT:  Do you think you can do that?

7           THE JUROR:  I can do that.

8           THE COURT:  Do you have any question about it?

9           THE JUROR:  No.

10           THE COURT:  Thank you very much.

11                 (Juror left sidebar)

12              (Next juror approached sidebar)

13           THE COURT:  And it is Ms. Barnett, Juror Number 14.

14           THE JUROR:  Elizabeth Barnett.  My sister was Abner

15    Mikva's Clerk in the D.C. Appellate Court, and she went on to

16    be Assistant General Counsel at the Whitehouse; and my

17    brother-in-law worked for the FDC, he was in litigation, and he

18    has since moved on to the Consumer Advocacy Agency.

19           THE COURT:  You put that, at least initially, in the

20    past tense.

21           THE JUROR:  Past tense.  My sister left the Whitehouse

22    in 1996.

23           THE COURT:  Now, is anything about that affiliation

24    going to affect your judgment in this case?

25           THE JUROR:  No, other than to be a good listener and

1    listen to both sides.

2            THE COURT:  Do you have any question about leaning

3    toward one side or the other?

4            THE JUROR:  No.

5            THE COURT:  Do you think you can be fair and

6    impartial?

7            THE JUROR:  Absolutely.

8            THE COURT:  Fine.  Thank you very much.

9                         (Juror left sidebar)

10                    (Next juror approached sidebar)

11           THE COURT:  Can you tell us your name again for the

12   record.

13           THE JUROR:  Elise Renoni.

14           THE COURT:  And Ms. Renoni is Juror Number 3.

15           What aspect brought you up?

16           THE JUROR:  My dad just worked for the Post Office,

17   that's all.

18           THE COURT:  For how long?  Most of his life?

19           THE JUROR:  Yeah.  I mean, he worked for the

20   Government as a soldier in World War II.  Probably -- yeah,

21   pretty much his whole life.  Maybe 20 years.  He worked as a

22   roofer before that.  Maybe 20 years.

23           THE COURT:  Is that going to affect your judgment

24   here?

25           THE JUROR:  I don't think it would.

1           THE COURT:  The question I ask is would you lean

2    toward one side or the other because of associations like that?

3           THE JUROR:  I don't think so.

4           THE COURT:  Well, what we really have to try ---it is

5    appropriate for you to think about it, but what we are really

6    interested in is trying to figure out whether or not people can

7    be fair and impartial, that is, decide the case solely on the

8    basis of the evidence that is presented here and in light of

9    the law, that they will not be influenced in some fashion like

10   that.  I realize it is a very formal, and somewhat

11   uncomfortable, and certainly unusual process, but do you think

12   you can do that?

13          THE JUROR:  You don't want me to say, "I think so,"

14   you want "Yes" or "No."  I think that I could.

15          THE COURT:  I want your candid answer, I really do.

16          THE JUROR:  I think that I could.

17          THE COURT:  You put it in a kind of contingent way,

18   and so you will understand I have to ask a little bit more.  Is

19   there any question in your mind that you could?

20          THE JUROR:  No, no question.

21          THE COURT:  All right.  Thank you very much.

22                       (Juror left sidebar)

23                     (Next juror approached sidebar)

24          THE COURT:  Can you tell us your name, again, for the

25   record.

1          THE JUROR:  Kathleen Macdonald.

2          THE COURT:  And Ms. Macdonald is Juror Number 19.

3          I have to put that on the record.  What aspect brought

4     you up?

5          THE JUROR:  My father worked for the Department of

6     Interior for many years and for Job Corps.  I worked as a law

7     enforcement officer for the National Park Service for a couple

8     of years.  Another brother-in-law worked for NCIS and is

9     currently working for NOAA, and my brother is Commander of the

10    Coast Guard in Alaska.  So, that's it.

11         THE COURT:  Let me just focus on your law enforcement

12    experience.

13         THE JUROR:  Yes.

14         THE COURT:  What were you doing?

15         THE JUROR:  I was a law enforcement officer for the

16    National Park on Cape Cod.

17         THE COURT:  And so, for the various parks there, kind

18    of infractions that would arise?

19         THE JUROR:  Right, yes.

20         THE COURT:  Did you have occasion to do any of the

21    prosecutions in the court that the Magistrate Judges handle

22    down there?

23         THE JUROR:  No, none.

24         THE COURT:  How long ago was this?

25         THE JUROR:  Late '70s.  I'm dating myself.

1          THE COURT:  No.

2          THE JUROR:  It was a good time.

3                      (Laughter)

4          THE COURT:  You are making me feel even older.

5                      (Laughter)

6          THE COURT:  The real reason for asking all these

7     questions is whether you are going to lean toward one side or

8     the other.

9          THE JUROR:  No.

10          THE COURT:  Do you think you can be fair and

11     impartial?

12          THE JUROR:  I do.

13          THE COURT:  Remind me what you have been doing for a

14     living for the last couple of years.

15          THE JUROR:  I'm a Math Specialist for the last 15

16     years working for the public school system.

17          THE COURT:  Your dad, you said, did stuff for the

18     Department of Interior?

19          THE JUROR:  Yes, restoration.  Washington's

20     Headquarters, Valley Forge, and then he worked for the Job

21     Corps for quite a few years.

22          THE COURT:  So, you were from the Washington area

23     before you came up here?

24          THE JUROR:  New Jersey.

25          THE COURT:  And was the job with the National Park

1     Service the first job you had --

2              THE JUROR:  Yes.

3              THE COURT:  -- out of school?

4              THE JUROR:  Yes, it was.

5              THE COURT:  Do you have any question about your

6     ability to be fair and impartial?

7              THE JUROR:  No, I don't.

8              THE COURT:  Fine.  Thank you very much.  I'm sorry,

9     just --

10             MS. FRIED:  Could I just propose -- pardon me.

11             THE COURT:  The lawyers have been told that I have to

12    ask the questions, but they can ask me if they can ask the

13    questions.

14             MS. FRIED:  I'm sorry.

15             (Atty. Fried conferred with the Court off the record)

16             THE COURT:  The question, that part, is off the

17    record, because she is asking me to ask a question.

18             THE JUROR:  Okay.

19             THE COURT:  One of the questions that Ms. Fried had,

20    and it is similar to mine, did you make arrests or anything

21    like that when you were doing --

22             THE JUROR:  Yes.

23             THE COURT:  What kinds of arrests?

24             THE JUROR:  Just for infractions.  Parking,

25    trespassing, those kind of very menial --

1          THE COURT:  Did you have to appear in court on behalf

2     of the Government?

3          THE JUROR:  No.

4          THE COURT:  So, you made the citations.

5          THE JUROR:  Citations are all that I gave out.  That's

6     it.

7          THE COURT:  Fine.  Thank you very much.

8          THE JUROR:  You're welcome.

9               (Juror left sidebar)

10         MS. FRIED:  Sorry.  That's awkward.

11              (Next juror approached sidebar)

12         THE COURT:  Can you tell us your name again for the

13    record.

14         THE JUROR:  Sure.  Denise Ferreira.

15         THE COURT:  Ms. Ferreira is Juror Number 25.

16         THE JUROR:  I worked for the Federal Government when I

17    was in my 20s, Department of the Army.

18         THE COURT:  But you are still in your 20s.

19         What did you do for them?

20         THE JUROR:  Secretary.

21         THE COURT:  Where?

22         THE JUROR:  Up in Watertown, the Old Arsenal.  That

23    was Department of the Army, but I worked in the Armory

24    Division.  I was a secretary there.

25         THE COURT:  Is that the Army?

1          THE JUROR:  Yeah, the Army.

2          THE COURT:  All right.  How long did you do that?

3          THE JUROR:  About five years.

4          THE COURT:  Is that going to affect your judgment in

5     this case?

6          THE JUROR:  No.

7          THE COURT:  Are you going to lean toward one side or

8     the other --

9          THE JUROR:  No, not at all.

10         THE COURT:  -- because of that?  Do you think you can

11    be fair and impartial in this case?

12         THE JUROR:  Yes.

13         THE COURT:  Any question about that?

14         THE JUROR:  No, not at all.

15         THE COURT:  Fine.  Thank you.

16         THE JUROR:  Thank you.

17                    (Juror left sidebar)

18                  (Next juror approached sidebar)

19         THE JUROR:  Good afternoon.

20         THE COURT:  Let me just grab your name first.

21         THE JUROR:  Joy Lutz.

22         THE COURT:  And Ms. Lutz is Juror Number 15.

23         THE JUROR:  Thank you.

24         THE COURT:  What aspect of the questions brought you

25    up here?

1          THE JUROR:  Gee, I forgot.  Oh, government service.

2          THE COURT:  Right.  What have you done?

3          THE JUROR:  I'm a retired Postal Clerk, and now I am a

4    landlord, and my husband is still a Postal Worker in

5    Gloucester.

6          THE COURT:  Is that going to make a difference to you?

7          THE JUROR:  I'm not sure.

8          THE COURT:  When you say you're "not sure," why?

9          THE JUROR:  I've had experience with the Housing

10   Authorities.

11         THE COURT:  And what aspect of that has given you

12   pause to say you are not sure?

13         THE JUROR:  I don't really know.

14         THE COURT:  Well, what we need are people who are

15   going to be fair and impartial.  It is not to say that you are

16   not --

17         THE JUROR:  I understand.

18         THE COURT:  -- fair and impartial, but what I am

19   trying to develop a little bit is background information.  You

20   gave us some or you gave yourself some pause about serving on

21   the jury here because of your views about public housing, and I

22   just want to understand what that might be that might affect

23   this case.

24         THE JUROR:  Just, as a landlord, sometimes it's been a

25   little difficult with the Housing Authority.

1          THE COURT:  Do you work with the Housing Authority,

2    yourself?

3          THE JUROR:  I work with them because I have units that

4    are rented by clients.

5          THE COURT:  Section 8 kinds of --

6          THE JUROR:  Section 8, correct.

7          THE COURT:  Now, there will be a lot of testimony, I

8    think, about the way in which the Government handles Housing

9    Authority facilities themselves, not Section --

10          THE JUROR:  Oh, this is a facility, okay.

11          THE COURT:  Right.  And there are various regulations

12    and so on.  Our concern, obviously, is someone who has had

13    experience in this area may have their own views about the law

14    or the facts or that sort of thing --

15          THE JUROR:  Correct.

16          THE COURT:  -- that would interfere with your ability

17    to be fair and impartial.  Do you think it would?

18          THE JUROR:  I don't really know that much about the

19    laws per se of the facilities.  Even myself, when I am dealing

20    with the Authority, I'm really not sure how the workings go.

21          THE COURT:  Here is my concern.  Are you going to

22    be --

23          THE JUROR:  Open minded?

24          THE COURT:  Yes.

25          THE JUROR:  Yes.

1          THE COURT:  That is part of it.  The other part of it

2     is I am always concerned that somebody who knows a little bit

3     about the area will listen to the evidence, and then they go

4     into the jury room and they say, "Forget about what you heard

5     in the courtroom.  Let me tell you how it really is."  You

6     cannot do that.

7          THE JUROR:  Right.

8          THE COURT:  You have got to limit yourself to the

9     evidence that is presented in court and the law that I give

10    you.  Do you think you can do that?

11         THE JUROR:  I'll try my best.

12         THE COURT:  Right.  But more than that -- I

13    understand --

14         THE JUROR:  I can't give you blood.  I don't know.

15         THE COURT:  There is somewhere in between blood and

16    you will do your best.

17                    (Laughter)

18         THE JUROR:  I'll do my best.

19         THE COURT:  Let me put it a different way.  I am going

20    to ask a question like this at the end of the proceedings, or

21    it is the last question:  If you were the defendants or the

22    Government in this case, would you want to have you as a juror?

23         THE JUROR:  I'm tainted by my career from the

24    Government.

25         THE COURT:  And how so?

1          THE JUROR:  I am disenchanted.

2          THE COURT:  So, you might start out a step behind with

3     the Government, is that it, even if it is a different aspect of

4     the Government?

5          THE JUROR:  It's very possible.  I couldn't wait to

6     retire from the Postal Service.  That's how soured.  I can't

7     answer you better than that.

8          THE COURT:  I ask the question in that way to see if

9     it has an effect.

10         THE JUROR:  I'm tainted from it.

11         THE COURT:  I think I am going to excuse you as a

12    juror.

13         THE JUROR:  I don't blame you.  It's not that I am

14    purposely trying to get excused, it's just that I really do

15    believe that there's frustrations along with the Housing

16    Authority, and I don't really know if I can totally separate

17    myself, to be fair.

18         THE COURT:  I appreciate your candor.  That is not a

19    reflection of you --

20         THE JUROR:  Exactly.

21         THE COURT:  -- but it is part of this process of

22    choosing a juror.

23         THE JUROR:  I just want to give everybody the -- do a

24    good job.

25         THE COURT:  Good.  What I would like you to do is, get

1    your card Mr. Lovett, go down to the jury room, and you will

2    get further instructions.

3              THE JUROR:  Thank you so much.  Good luck with your

4    trial.  Thank you.

5                        (Juror left sidebar)

6                   (Next juror approached sidebar)

7              THE COURT:  Can you tell us your name again for the

8    record.

9              THE JUROR:  I'm George Bill.

10             THE COURT:  And Mr. Bill is Juror Number 16.

11             THE JUROR:  My dad is currently retired, but when he

12   was working he was working for a research group specifically in

13   fire safety prevention, and they sometimes did work with the

14   Government, more specifically the Coast Guard.

15             THE COURT:  When you say "doing fire prevention," with

16   what entity was he working at the time?

17             THE JUROR:  It was Factory Mutual, which then became

18   FM Global.

19             THE COURT:  These are insurance companies; is that it?

20             THE JUROR:  He started his career when it was a

21   not-for-profit group, which was then absorbed by the insurance

22   group, yes.

23             THE COURT:  Is that going to affect your judgment in

24   this case?

25             THE JUROR:  No.

1          THE COURT:  Do you think you will lean toward one side

2     or the other in making your judgments?

3          THE JUROR:  No.

4          THE COURT:  And do you think you can follow my law?

5          THE JUROR:  Yes.

6          THE COURT:  That is all we can ask for.  Thank you.

7                    (Juror left sidebar)

8                  (Next juror approached sidebar)

9          THE JUROR:  My name is Kathy Ireland.

10         THE COURT:  And Ms. Ireland is Juror Number -- help me

11    out, Ms. Ireland.

12         THE JUROR:  I see it.  Juror Number 6.

13         THE COURT:  Number 6.

14         THE JUROR:  So, a couple of summers in college I was

15    employed by the Post Office as a casual clerk, sorting mail,

16    night shift.

17         THE COURT:  Is that going to cause you to lean toward

18    one side or the other in this case?

19         THE JUROR:  No.

20         THE COURT:  Do you think you can be fair and

21    impartial?

22         THE JUROR:  Yes, absolutely.

23         THE COURT:  Any question in your mind?

24         THE JUROR:  No.  And then my husband, he was active

25    duty in the Air Force for eight years and is currently in the

1    Air National Guard.

2            THE COURT:  What does he do for a living now?

3            THE JUROR:  He's a music teacher.  He was a

4    clarinetist in the Air Force.  He was a bandsman.

5            THE COURT:  What band?

6            THE JUROR:  He was based out of Hanscom, but when they

7    deactivated he decided to get out and pursue a career as a

8    music teacher.

9            THE COURT:  All right.  Thank you.

10           THE JUROR:  You're welcome.

11   (END OF SIDEBAR CONFERENCE)

12

13           THE COURT:  So, Mr. Lovett is going to call forward

14   one of your numbers, and when you come up, before you sit down,

15   you have to introduce yourself.

16           THE CLERK:  Rodney Harbaugh, Jr., that is Juror Number

17   31, will you please come forward and take Seat Number 15 in the

18   front row of the jury box.

19           THE COURT:  Mr. Harbaugh, if you could introduce

20   yourself.

21           THE JUROR:  Rodney Harbaugh, H-a-r-b-a-u-g-h.

22   Unemployed, from the City of Lynn, unmarried.

23           THE COURT:  And, Mr. Harbaugh, what had you done for a

24   living before --

25           THE JUROR:  Retail salesman.

1          THE COURT:  Fine.  Do any of the questions I have

2   asked so far apply to you?

3          THE JUROR:  No.

4          THE COURT:  So, we have talked a bit about the

5   Government being involved in this case, and you learned that

6   the activities and maybe the testimony of some Government

7   witnesses, including law enforcement witnesses, may be brought

8   to your attention.  One of the things that we are concerned

9   about is that people may have had backgrounds in law

10  enforcement or have attitudes toward law enforcement that may

11  affect their judgment in the case, or at least that we would

12  like to explore.  And so, I am going to put a rather broad

13  question, compound question, in that it involves a number of

14  things.  But we are interested in whether any of you,

15  yourselves, or any members of your immediate family, as I have

16  identified that class before, have been involved in law

17  enforcement either at the federal or the state or the local

18  level.  I am also interested in whether any of you, yourselves,

19  or any members of your immediate family have been drawn into

20  the criminal justice process.

21          One of the unhappy aspects of modern life, perhaps, is

22  that numbers of us have had such encounters, either as victims

23  or as witnesses or people accused.  In any event, we are

24  interested in learning whether or not you have had such

25  encounters in the criminal justice system.

1          So, what I am going to do is ask that question again.

2     Do any of you, yourselves, or any members of your immediate

3     family, or have any of you, yourselves, or members of your

4     immediate family been involved in law enforcement at the local,

5     the state, the federal level or been involved in -- I am

6     overwhelmed by the raised hands, but I will see all of the

7     raised hands at the sidebar when we get through it, but let me

8     finish the question and make sure I have everybody -- or have

9     any of you been involved in the criminal justice process as

10    victims or witnesses, and when I say "witnesses" I mean someone

11    who has been called to the grand jury or to a trial jury like

12    this or as persons who are accused.  So, I will see the folks

13    who have been patiently raising their hands while I tried to

14    finish the question.

15

16    (SIDEBAR CONFERENCE AS FOLLOWS):

17                    (Juror approached sidebar)

18          THE COURT:  Tell us your name, please.

19          THE JUROR:  Brian Traumuller.

20          THE COURT:  Mr. Traumuller, you are Juror Number 28.

21          THE JUROR:  Yes.

22          THE COURT:  What aspects of the question brought you

23    up?

24          THE JUROR:  My uncle was involved in a case.  He was

25    charged with endangering others.  Basically, he was under the

influence of a drug and tried to, basically, blow up his house.

            THE COURT:  He was trying -- I'm sorry?

            THE JUROR:  Trying to blow up his house.  The SWAT
Team came in.

            THE COURT:  How long ago was this?

            THE JUROR:  I was 18 at the time.  I'm 26 now.

            THE COURT:  Was he living nearby you?

            THE JUROR:  No.  He lives in Upstate New York,
Rochester.

            THE COURT:  You understand I am not asking these
questions to find out about people's families and all of that.

            THE JUROR:  Correct.

            THE COURT:  But really just to see whether that is
going to affect your judgment in this case.

            THE JUROR:  No.

            THE COURT:  What was the outcome of his activity?

            THE JUROR:  He was convicted for seven years in
prison.  He is right now out on probation and just trying to
restart his life.

            THE COURT:  Do you keep up with him?

            THE JUROR:  Yes.

            THE COURT:  Is there anything about the way in which
he was treated or that prosecution have any impact on the way
in which you view the criminal justice system?

            THE JUROR:  No.

1          THE COURT:  You understand this is not that case --

2          THE JUROR:  Yeah.

3          THE COURT:  -- this is another case?  But do you think

4    you can decide this case fairly in light of the evidence that

5    is presented here and the instructions on the law that I give

6    you?

7          THE JUROR:  Yes, I can.

8          THE COURT:  Any question about that?

9          THE JUROR:  No.

10          THE COURT:  Fine.  Thank you very much.

11                    (Juror left sidebar)

12                 (Next juror approached sidebar)

13          THE JUROR:  Hello.

14          THE COURT:  Is it Ms. Faulkner?

15          THE JUROR:  Yes.

16          THE COURT:  And Ms. Faulkner is Juror Number 17.  So,

17    what aspect the question brought you up?

18          THE JUROR:  I have, when you said any relations of law

19    enforcement in the family, my uncle is -- well, he is retired

20    Chief of Police of Mashpee.

21          THE COURT:  Are you close to your uncle?

22          THE JUROR:  Well, he is much older now, but --

23          THE COURT:  Do you talk to him about his work or that

24    kind of thing?

25          THE JUROR:  No.

1        THE COURT:  Is that going to lead you to lean toward

2    one side or the other?

3        THE JUROR:  No.

4        THE COURT:  Do you think you can be fair and impartial

5    in this case?

6        THE JUROR:  Of course.

7        THE COURT:  Do you have any question about that?

8        I'm sorry.  Ms. Fried has to ask the question of me.

9    That is why we are going through this process.

10        THE JUROR:  Okay.

11        (Ms. Fried conferred with the Court off the record)

12        THE COURT:  Was anyone other than your uncle involved

13    in law enforcement?  You mentioned your uncle.

14        THE JUROR:  I have a cousin who is in law enforcement

15    now on Cape Cod.  I'm originally from the Cape.

16        THE COURT:  I see.  Is the cousin a child of the uncle

17    or --

18        THE JUROR:  That would be his nephew.  It's another

19    brother of my father's.

20        THE COURT:  Do you talk to that cousin about his work?

21        THE JUROR:  No.  He is considered a lot younger.

22        THE COURT:  How could that be?

23        THE JUROR:  Oh, we have to disclose our age?

24        THE COURT:  No.  That is a question I will not ask

25    you.

1          THE JUROR:  I'm over the hill, number-wise only.

2          THE COURT:  It is in terms of maturity, I think.

3          Is that going to affect your judgment here?

4          THE JUROR:  Not at all.

5          THE COURT:  Do you think you can be fair and

6    impartial?

7          THE JUROR:  Oh, yes.

8          THE COURT:  Fine.  Thank you very much.

9          Is it Mr. Zahurak?

10          THE JUROR:  Yes, Zahurak.

11          THE COURT:  What aspect of the question --

12          THE JUROR:  My maternal grandfather, who lived with me

13    for a period of time, was a New York State Trooper and a

14    Corrections Officer, and my father-in-law is a retired police

15    detective.

16          THE COURT:  Where?

17          THE JUROR:  Westwood, Massachusetts.

18          THE COURT:  Did you grow up in New York State?

19          THE JUROR:  Yes.

20          THE COURT:  Where?

21          THE JUROR:  Schenectady.

22          THE COURT:  Is anything about that going to affect

23    your judgment in this case, that is, those relations?

24          THE JUROR:  I don't believe so.

25          THE COURT:  You are not going to lean toward one side

1   or the other as a result of that?

2           THE JUROR:  I don't think so, no.

3           THE COURT:  All right.

4       Ms. Fried.

5       (Atty. Fried conferred with the Court off the record)

6           THE COURT:  I will ask a question, and I probably

7   should have in this broad compound question before.  One of the

8   issues that we are concerned with is whether or not you would

9   favor the testimony of a law enforcement officer simply because

10  they are a law enforcement officer.

11          THE JUROR:  I would think I would have a positive view

12  of law enforcement.

13          THE COURT:  Right.  But I am going to give you an

14  instruction, I will give all the jurors an instruction, that

15  they have to evaluate each individual witness on their own

16  terms.  They do not give some special benefit or some discount

17  to a witness simply because they are a law enforcement officer.

18  Do you think you can follow that instruction?

19          THE JUROR:  I think so, yeah.

20          THE COURT:  Do you have any question about your

21  ability to be fair and impartial?

22          THE JUROR:  No.

23          THE COURT:  Thank you very much.

24          MS. FRIED:  Thank you.

25                      (Juror left sidebar)

1              (Next juror approached sidebar)

2         THE COURT:  Can you tell us your name, again, for the

3    record.

4         THE JUROR:  Anne Adams.

5         THE COURT:  And Ms. Adams is Juror Number 8.  What

6    aspect of the question brought you up?

7         THE JUROR:  My son is a police officer for the Town of

8    Rowley.

9         THE COURT:  And does he live with you, or has he lived

10   with you?

11        THE JUROR:  He lives with me.

12        THE COURT:  Do you live in Rowley?

13        THE JUROR:  No, we live in Lynn.

14        THE COURT:  Do you talk to your son about the work

15   that he does?

16        THE JUROR:  Sometimes.

17        THE COURT:  Do you think that you would lean toward

18   one side or the other in this case because of your son's work?

19        THE JUROR:  No.

20        THE COURT:  You understand you are not going to be

21   able to discuss this case with your son during the course of

22   the trial?

23        THE JUROR:  Right.

24        THE COURT:  Do you have any question about your

25   ability to be fair and impartial?

1          THE JUROR:  No.

2          THE COURT:  Follow the law as I give it to you?

3          THE JUROR:  (Nodding).

4          THE COURT:  You have to answer.

5          THE JUROR:  Yes.

6          THE COURT:  Fine.  Thank you very much.

7                    (Juror left sidebar)

8              (Next juror approached sidebar)

9          THE COURT:  Can you tell us your name again for the

10   record.

11         THE JUROR:  Sure.  Steven Pinto.

12         THE COURT:  Mr. Pinto is Juror Number 10.  What aspect

13   of the question brought you up?

14         THE JUROR:  I have a brother-in-law who is a

15   Correctional Officer.

16         THE COURT:  Where is that?

17         THE JUROR:  Bristol County House of Correction.  My

18   other brother-in-law is a Sergeant at the New Bedford Police

19   Department.  My godfather just retired as a Sergeant from the

20   New Bedford Police Department also.

21         THE COURT:  Remind me, are you from the New Bedford

22   area?

23         THE JUROR:  I'm from Newhaven, yeah, next town over.

24   And also, when you talked about cases, I was involved here in a

25   case in Boston where Ford Motor Company was sued by someone who

1   was in an accident.  I had sold the vehicle.  It's kind of --

2   it's a long-standing thing.  So, that was --

3          THE COURT:  That was a civil case?

4          THE JUROR:  It was, yeah.  They were suing them for --

5   I think they were saying the Ford Motor Company improperly

6   built the vehicle, if I'm not mistaken.

7          THE COURT:  How did that get resolved, do you know?

8          THE JUROR:  I know that there's two parts of the case.

9   The part that I was involved with the folks lost, and then

10  there was another part of the case that was ongoing that didn't

11  have anything to do with me, so I wasn't called on that one.

12         THE COURT:  Well, let me start with the family members

13  and law enforcement connections.  Is that going to affect your

14  judgment in this case?

15         THE JUROR:  No, I don't think so.

16         THE COURT:  Are you going to lean toward one side or

17  the other as a result of the connection?

18         THE JUROR:  No.

19         THE COURT:  Let me turn to the civil case that you

20  had.  Does anything about that give you a bad taste in your

21  mouth about the process of the courts and so on?

22         THE JUROR:  No.  It was stressful.  I have panic

23  disorder and depression, so these things take me a little bit

24  out of my comfort zone.  But I knew they were doing what they

25  had to do, I suspect, yeah.  So, no, I wasn't upset with --

1           THE COURT:  Do you have any question about your

2     ability to be fair and impartial?

3           THE JUROR:  Fair and impartial, no.

4           THE COURT:  Fine.  Thank you very much.

5           THE JUROR:  All right.  Thanks.

6                    (Juror left sidebar)

7                 (Next juror approached sidebar)

8           THE COURT:  Can you tell us your name.

9           THE JUROR:  Maryanne Peckham.

10          THE COURT:  Ms. Peckham is --

11          MR. PEREZ-DAPLE:  Number 2.

12          THE COURT:  Number 2.

13          See what I mean about the lawyers being faster than I

14    am?  What aspect of the question brought you up here?

15          THE JUROR:  My brother is a Boston Police Officer.

16          THE COURT:  Has he been a Boston Police Officer when

17    you lived together -- is that your older brother?

18          THE JUROR:  Yeah, mm-hmm.

19          THE COURT:  Did you discuss with him the kind of work

20    he did?

21          THE JUROR:  Well, I mean, I work for the Police

22    Department so --

23          THE COURT:  You have got to tell me about you, too.

24    What do you do for the Police Department?

25          THE JUROR:  Payroll.

1          THE COURT:  Are you going to lean toward one side or

2     the other here because you have got that affiliation with the

3     Boston Police?

4          THE JUROR:  I don't think so.

5          THE COURT:  Let me put it a different way.  Would you

6     feel uncomfortable if you found that you had to find against

7     the prosecution in a case like this?

8          THE JUROR:  No.

9          THE COURT:  You do not think that would be a problem

10    for you in your work?

11         THE JUROR:  No.

12         THE COURT:  Do you think you can follow my

13    instructions on the law?

14         THE JUROR:  Yes.

15         THE COURT:  And apply those, not ones that you might

16    think are more appropriate?

17         THE JUROR:  I would think so.

18         THE COURT:  And do you think you can decide the case

19    on the basis of the evidence that is presented here?

20         THE JUROR:  Yes.

21         THE COURT:  What does your brother do?  You say he is

22    a police officer, but what kind of work does he do?

23         THE JUROR:  He is just a patrolman.

24         THE COURT:  Where?

25         THE JUROR:  In Brighton.

1        THE COURT:  How long has he been with the Department?

2        THE JUROR:  20, 25 years.

3        THE COURT:  All right.  Thank you.

4        Ms. Fried.

5     (Atty. Fried conferred with the Court off the record)

6        THE COURT:  I am going to ask this question in a bit,

7  but I will ask you now, and the question is there will be law

8  enforcement witnesses.  A concern, obviously, is that someone

9  is going to favor a law enforcement witness just because they

10  are a law enforcement witness, and I am going to instruct the

11  jury that you have got to give each witness a separate

12  evaluation, they do not get a discount, or they do not get a

13  special benefit.  Can you follow that instruction?

14        THE JUROR:  I would like to think I could.

15        THE COURT:  I understand the contingent character of

16  that answer, but we have to be satisfied that you can.  I

17  realize it is formal, but it is very important.  Do you think

18  you can follow that instruction?

19        THE JUROR:  Yes.

20        THE COURT:  Any question in your mind about it?

21        THE JUROR:  No.

22        THE COURT:  Fine.  Thank you very much.

23        Mr. Merritt.

24     (Atty. Merritt conferred with the Court off the record)

25        THE COURT:  What is your brother's first name?

1           THE JUROR:  Kevin.

2           THE COURT:  And do you know if he was ever involved as

3      a witness in a federal trial?

4           THE JUROR:  No, not that I know of.

5           THE COUR:  Thank you.

6           THE JUROR:  Okay.

7                    (Juror left the sidebar)

8                 (Next juror approached sidebar)

9           THE JUROR:  Hi.

10          THE COURT:  Can you tell us your name again for the

11     record.

12          THE JUROR:  Sure.  Randy Souza.

13          THE COURT:  Mr. Souza is Juror Number 4.

14          THE JUROR:  I have a sister who has been arrested

15     multiple times and is currently in jail in Framingham.

16          THE COURT:  What kinds of charges?

17          THE JUROR:  Petty theft, probation violation.

18          THE COURT:  You understand I am not asking these

19     questions to find out about people's families?

20          THE JUROR:  Of course.  Absolutely.

21          THE COURT:  But one of the things that is on our mind

22     is, is that going to make a difference to you in the way in

23     which you approach this case?

24          THE JUROR:  No.

25          THE COURT:  Anything about the way in which your

1   sister has been treated in the criminal justice system that is

2   going to influence you here?

3          THE JUROR:  No.

4          THE COURT:  Do you think you can be fair and impartial

5   in evaluating the evidence in this case?

6          THE JUROR:  Yes.

7          THE COURT:  And follow the law that I give you?

8          THE JUROR:  Yes.

9          THE COURT:  That is all we can ask for.  I'm sorry.

10  Just one second.

11          (Atty. Fried conferred with the Court off the record)

12          THE COURT:  Thank you very much.

13                  (Juror left the sidebar)

14              (Next juror approached the sidebar)

15          THE COURT:  Can you tell us your name, again, for the

16  record.

17          THE JUROR:  Yes.  It's Charles Gately.  It's Charles

18  W. Gately.  I didn't say my middle name.

19          MS. FRIED:  Number 7, I believe.

20          THE COURT:  That's right.  What aspect of the question

21  brought you up?

22          THE JUROR:  What I have done is, I was a main witness

23  for the Attorney General's Office where I put two of my bosses

24  in jail in 2009, where I worked with the Attorney General's

25  Office and the State Police.

```
 1              THE COURT:  What was the nature of the case?
 2              THE JUROR:  It was embezzlement and fraud.
 3              THE COURT:  What was the agency that you were working
 4    for?
 5              THE JUROR:  For the Attorney General's Office.
 6              THE COURT:  Within the Attorney General's Office?
 7              THE JUROR:  Yes.  I was the main witness, and I was
 8    also the informant, where I instructed the Attorney General's
 9    Office on what we were doing, because he was embezzling money,
10    taking things from the City and working on house building and
11    also hot-top paving on the side.
12              THE COURT:  When I asked about the agency, I meant the
13    agency that was the target of the investigation.  This is a
14    City agency of some sort?
15              THE JUROR:  No, this was the State, State Attorney
16    General's Office.
17              THE COURT:  No.  I understand they prosecuted, but who
18    was it who was doing the paving?
19              THE JUROR:  It was my boss, Jim Flaherty.
20              THE COURT:  And he worked for whom?
21              THE JUROR:  He was Superintendent for the City of
22    Haverhill Highway Department.
23              THE COURT:  That is what I was trying to get at.
24              THE JUROR:  Oh, I'm sorry.  My apologies.
25              THE COURT:  Having worked like that for a prosecution
```

1    in conjunction with the prosecution --

2              THE JUROR:  It was the prosecution, yeah.

3              THE COURT:  -- is that going to affect your judgment

4    in this case, do you think?

5              THE JUROR:  It might because of the way I worked with

6    them, and they had him dead to rights.  They had him.  So, my

7    opinion is, if they're here, they did it.

8              THE COURT:  I think I cannot let you stay on this jury

9    under those circumstances.  So, I am going to excuse you from

10   the jury.  You should take the card and go down to the jury

11   room, and you will get further instructions about other cases

12   that you might be involved in.

13             THE JUROR:  Okay.  All right.  Thank you.

14                       (Juror left sidebar)

15                  (Next juror approached sidebar)

16             THE JUROR:  My name is Elizabeth Barnett.

17             THE COURT:  Ms. Barnett, you are like the student in

18   the class that sits in the front row and answers all the

19   questions.

20                          (Laughter)

21             THE JUROR:  I'm very sorry.  I know.  My father was a

22   police officer and a detective from approximately 1959 to 1968,

23   and he's deceased.

24             THE COURT:  Where was it?

25             THE JUROR:  This was in Buffalo, New York.

1          THE COURT:  And while you were growing up?

2          THE JUROR:  Yes, while I was growing up.

3          THE COURT:  Is that going to influence you in any way?

4          THE JUROR:  No, absolutely not.  I feel that wouldn't

5     influence me at all either way.  The testimony of a police

6     officer is -- either way.

7          Your Honor, I do have a question about my background.

8          THE COURT:  Sure.

9          THE JUROR:  I work part time for the Town of Carlisle.

10    I am the Housing Coordinator.  Half the time I support the

11    Board of Selectmen, and the other time I work with the Carlisle

12    Housing Authority, which is a small town board.  It has no

13    units.  It has no relationship with HUD.  It does ground leases

14    on town property.  And I don't belong to any Housing Authority

15    organizations or whatever.  But I just wanted to share that,

16    because I know a bit about housing, but I don't know anything

17    about managing.

18          THE COURT:  I am going to ask a question about that

19    later, but I will ask it now for you.  The concern I have is,

20    for all of the jurors, but you have raised this issue, is that

21    you have got some background or training that is going to lean

22    you towards one side or the other, or you are going to say, "We

23    heard all of that evidence," when you get in the jury room, "We

24    heard all that evidence, but let me tell you how it really

25    works."  Do you think you can decide this case on the basis of

1    the --

2        THE JUROR:  Actually, my job is to work with the law

3    with the Town of Carlisle.  I feel very strongly about not

4    changing laws for somebody else.  If I hear what the law is and

5    what the facts are, I will apply it to that.

6        THE COURT:  You also touched on it.  I know it is a

7    question Ms. Fried has raised as well.  I will give you an

8    instruction that you cannot favor the testimony of a law

9    enforcement officer or discredit it just because they are a law

10   enforcement officer.  You have got to decide them on their own

11   terms.  Do you think you can do that?

12       THE JUROR:  Yes, yes.  I have done that, had to do

13   that in the past in my work.  I am absolutely clear, if I'm

14   given an instruction and these are the facts, to look at the

15   case on the basis of the evidence.

16       THE COURT:  I am going to ask a Housing Authority

17   question.  You do not need to come up, unless there is

18   something more that you want to bring to our attention when I

19   do that.

20       THE JUROR:  Okay.

21       THE COURT:  Or unless you just want to come up and see

22   us.

23       THE JUROR:  You're all wonderful, but I don't want to

24   waste your time.  Thank you.

25                    (Laughter)

1                    (Juror left sidebar)

2                  (Next juror approached sidebar)

3          THE COURT:  Thank you.

4          THE JUROR:  Hi, your Honor.  My name is Robert

5    Rowland, R-O-W-L-A-N-D.  I'm a retired Correction Officer.

6          THE COURT:  Hold on just a second, Mr. Rowland.  I

7    want to be sure I have got your juror number.  Did you

8    introduce yourself yet?

9          THE JUROR:  No, no.

10         MS. BASSIL:  He is 42.

11         THE COURT:  I will listen to you right now, but I am

12   really dealing with the people who have stood up and introduced

13   themselves.

14         THE JUROR:  Oh.

15         THE COURT:  But where were you a Corrections Officer?

16         THE JUROR:  South Bay House of Correction.

17         THE COURT:  Are you going to favor one side or the

18   other?

19         THE JUROR:  Eighteen years I worked there.

20         THE COURT:  Right.  Are you going to favor one side or

21   the other as a result of that?

22         THE JUROR:  Excuse me?

23         THE COURT:  Are you going to favor one side or the

24   other as a result of being in law enforcement that way?

25         THE JUROR:  I have a brother that's a Boston Police

1    Officer.  He works Downtown.  He's been on 26, 27 years.  I

2    also served as a witness on a grand jury about a year ago in

3    Norfolk County for a vehicular homicide.

4              THE COURT:  Is any of that experience going to affect

5    your judgment in this case?

6              THE JUROR:  No.

7              THE COURT:  Do you think you can be fair and impartial

8    here?

9              THE JUROR:  Yes.

10             THE COURT:  Do you have any question about that?

11             THE JUROR:  I'm fair with everybody.

12             THE COURT:  You understand I am going to give an

13   instruction -- we are going to have law enforcement witnesses

14   -- that you cannot favor or disfavor the testimony of law

15   enforcement witnesses just because --

16             THE JUROR:  I'm just hoping I don't know anybody.

17             THE COURT:  But even if you did know somebody, would

18   you favor law enforcement over someone else?

19             THE JUROR:  No.  A lot of ex-inmates know me from the

20   jail.

21             THE COURT:  Right.  I do not think that's an issue in

22   this case.

23             THE JUROR:  No.

24             THE COURT:  Thank you very much.

25             THE JUROR:  Okay.  Thank you.

1                    (Juror left sidebar)

2          MS. BASSIL:  I just wanted to bring up I know there

3     was a federal prosecution of Corrections Officers in Nashua

4     Street, which, back in the day, people went back and forth

5     between Nashua Street and South Bay.  He would have been there

6     during that time period.

7          THE COURT:  If both of you are asking me to disqualify

8     him, I will.

9          MR. MERRITT:  I'm not, your Honor.

10         THE COURT:  I am going to disqualify him, anyway.  I

11    will do it at the appropriate time.

12                   (Next juror approached sidebar)

13         THE JUROR:  Déjà vu.

14                        (Laughter)

15         THE JUROR:  Kathleen Macdonald again.

16         THE COURT:  Right.

17         THE JUROR:  My father --

18         MS. FRIED:  Juror 19, I think.

19         THE JUROR:  My father was a police officer for a short

20    time in New Jersey, two of my brothers were police officers for

21    a short time on the Cape, and my brother-in-law worked for NCIS

22    for quite a few years and now works for NOAA.

23         THE COURT:  Again, is that going to affect your

24    judgment in this case?

25         THE JUROR:  No.

1       THE COURT:  One of the instructions I am going to give

2  is that you cannot favor or disfavor the testimony of a law

3  enforcement witness merely because they are a law enforcement

4  witness.

5       THE JUROR:  Right.

6       THE COURT:  Do you think you can follow that

7  instruction?

8       THE JUROR:  I can.

9       THE COURT:  Any question about it?

10       THE JUROR:  No.

11       THE COURT:  You can step back.

12       THE JUROR:  Thank you.

13              (Juror left sidebar)

14       THE COURT:  What I think I am going to do is send them

15  to lunch, I will ask you to stay away from them while they are

16  at lunch, and then we will come back here, I would hope, by 10

17  of 2:00.

18  (END OF SIDEBAR CONFERENCE)

19

20       THE COURT:  Ladies and gentlemen, we have gone a

21  little ways, but I want to be sure that you get lunch, which is

22  in the cafeteria downstairs where we have luncheon

23  arrangements, and you should go get your lunch there and then

24  go in the jury area down there and have your lunch there.  We

25  will be back here at 10 of 2:00.  We will take about a half an

1    hour for lunch, and we will see you back here at 10 of 2:00 in

2    your appointed seats.

3              THE CLERK:  All rise.

4              THE COURT:  You are free to go down to the second

5    floor.

6                    (Jury panel left the courtroom)

7              THE COURT:  So, are there any things that we should

8    take up before the break?

9              MS. FRIED:  I actually just have a question about the

10   jurors.  Do they have their lunch in the Jury Assembly Room, or

11   should we expect to run into them in the cafeteria?

12             THE COURT:  You can expect to see them but not run

13   into them.  You can expect to avoid them but in the cafeteria.

14             MS. FRIED:  Right.

15             THE COURT:  I have tried to get them to go over to the

16   jury area.

17             MS. FRIED:  I just don't know whether they serve food

18   over there.  I guess that's why I was asking that.

19             THE COURT:  No, they will have to go to the cafeteria

20   to get in line and go through.

21             MS. FRIED:  Just one other question about how far the

22   Court expects to go.  Will we open today?

23             THE COURT:  Probably.

24             MS. FRIED:  Okay.

25             THE COURT:  I hope that you do.  So, you should be

1    prepared to do it, and if we have got any time, which means

2    anything more than two minutes, we will start with our first

3    witness.

4              We will be in recess until 10 of 2:00.

5              THE CLERK:  All rise.

6         (The Honorable Court exited the courtroom 1:23 p.m.)

7                    (Lunch recess taken)

8              THE CLERK:  All rise.

9       (The Honorable Court entered the courtroom at 2:00 p.m.)

10             THE COURT:  I want to see counsel at sidebar.

11

12   (SIDEBAR CONFERENCE AS FOLLOWS):

13             THE COURT:  Ms. Bassil, Mr. Lovett said you had

14   something --

15             MS. BASSIL:  Yes, your Honor.  I am very concerned

16   that you told the jury that Michael McLaughlin pled guilty.  I

17   had no idea that you were going to do that.  Part of the reason

18   I am so concerned is the defense here is whether or not a crime

19   is committed and the issue of criminal intent.

20             THE COURT:  First, this is belated.  I did that about

21   two hours ago.  It was in response to your request.  And the

22   newspaper information was focused on the plea of

23   Mr. McLaughlin.

24             So, first, I do not see it as a problem.  Second, I

25   believe that it has been waived.

1    (END OF SIDEBAR CONFERENCE)

2

3          THE COURT:  So, Mr. Lovett is going to replace the

4    excused juror.

5          THE CLERK:  Nancy Poole, that is Juror Number 32, will

6    you please come forward and take Seat Number 37 in the back of

7    the jury box.

8          MS. FRIED:  Your Honor, I have a question about the

9    jury selection process.  Could I just ask -- could I come

10   forward with the question?  I'm sorry.

11         THE COURT:  Yes.

12         MS. FRIED:  Thank you.

13

14   (SIDEBAR CONFERENCE AS FOLLOWS):

15         MS. FRIED:  I apologize.

16         THE COURT:  Let me be clear.  Things are done in a

17   timely fashion.  If someone sits over lunch and decides that

18   they can confect an objection to jury commentary that is not

19   timely made, and then the process while the jury is here, is

20   not a good omen for orderly presentation of the case.  It

21   should have been done outside of the presence of the jury, and

22   this should, too.

23         So, what is it?

24         MS. FRIED:  It's simply a question of the order of the

25   people coming into the box.  I don't really know what I am

1    supposed to anticipate about.

2            THE COURT:  I explained it earlier.  You have tried

3    cases in front of me before.  It is that the jurors are in the

4    order in which they are seated in the box.

5            MS. FRIED:  I'm just really questioning about jurors

6    in 19 through the front row, through 30 -- 19 through 30, that

7    is.  Will those jurors ever move into the box?

8            THE COURT:  No.

9            MS. FRIED:  The Court has been replacing excused

10   jurors.

11           THE COURT:  No.  You know that.

12           MS. FRIED:  No, I don't know.  It's an honest

13   question, your Honor.

14           THE COURT:  This is a frivolous question, and it is a

15   question that bespeaks someone not paying attention.  I have

16   explained it all along.  They move from seat to seat.  That is

17   where they are seated now.  If someone gets excused, someone is

18   put in that seat.

19           MS. FRIED:  All right.  So, I don't expect, then,

20   Juror Number 19 or 20, for example, to move into the box.

21           THE COURT:  Right.

22           MS. FRIED:  Okay.

23           THE COURT:  Just as it has always been, that is right.

24   Just as I explained, that is right.

25           And let me be clear about this.  I really do object to

1    this idea of bringing a jury in and then listening to questions

2    that could have been asked before.  I will answer any question

3    that is put to me, but I do not want to take time from the

4    jury.

5              MS. FRIED:  I apologize.

6    (END OF SIDEBAR CONFERENCE)

7

8              THE COURT:  Is it Ms. Poole?

9              THE JUROR:  (Nodding).

10             THE COURT:  Ms. Poole, if you could introduce

11   yourself.

12             THE JUROR:  My name is Nancy Poole, P-o-o-l-e, and I'm

13   an Administrator, a Lab Administrator, at Harvard University.

14             THE COURT:  And what town do you live in?

15             THE JUROR:  Newton.

16             THE COURT:  Any domestic relationships?

17             THE JUROR:  Oh, my husband and my kids.  My husband is

18   an engineer.

19             THE COURT:  Fine.  Thank you.

20             Do any of the questions I have asked so far apply to

21   you?

22             THE JUROR:  (Shaking head).

23             THE COURT:  So, let me go a little bit deeper into the

24   question about law enforcement, but it touches on other

25   problems that we can anticipate.  I am going to give you

1    instructions about the way in which you deal with witnesses and

2    the testimony of witnesses.  The foundational point is that it

3    is going to be up to you to decide whether you believe all that

4    a witness says, none of what a witness says, or some bits and

5    pieces of what a witness says.  But there are certain kinds of

6    witnesses that call for a little bit more extended explanation.

7    There are law enforcement witnesses, and I will give you the

8    instruction that they do not get any discount, or they do not

9    get any special benefit simply because they are law enforcement

10   witnesses.  You evaluate them the same way you evaluate any

11   other witness.  But you recognize that people in their life

12   experiences, particularly outside of a formal setting like a

13   courthouse or a courtroom, may have an inclination to lean

14   toward one side or the other.

15          And so, my question for you -- and there are three

16   classes of witness I am going to talk about now -- but my

17   question for you is going to be will you have any difficulty

18   following my instruction that you evaluate each witness on

19   their own terms, including law enforcement witnesses?  There is

20   a second category of witnesses, I am told, anyway, that one or

21   more witnesses may have a criminal record, and it may come to

22   your attention.  That is something that you can consider in

23   making your own evaluation of the witnesses's testimony.  It is

24   not disqualifying.  It is a factor for you to keep in mind.

25   But, again, I will urge you and tell you that you cannot

1  disregard a person's testimony simply because they have been

2  convicted of a crime ahead of time.  You cannot have that

3  categorical dismissal of a witness or tendency toward favoring

4  or disfavoring a witness.

5          There is a third category of witness who may testify

6  in this case.  It is persons who have been given what is called

7  a "grant of immunity," which means that they testify without

8  being exposed to what is called a "Fifth Amendment privilege."

9  Such persons are not disqualified.  They are permitted to

10 testify.  They are witnesses for whom you should receive their

11 testimony with great care and evaluate it with great caution.

12 But I emphasize this point about evaluating each witness on

13 their own terms, having in mind all of the facts and

14 circumstances, but not taking a categorical approach toward the

15 testimony until you have heard all of the testimony in the

16 case, and that means not merely the witness himself or herself

17 but other testimony that surrounds the testimony of witnesses.

18          So, having outlined that in, perhaps, greater detail

19 than you would otherwise want, but it is a very important

20 factor, among the instructions I am going to give you is that

21 you evaluate each witness in terms of their own circumstances

22 in light of all of the evidence.  We are concerned that

23 sometimes the kind of natural tendency of people to favor one

24 side or the other or to favor some background or another

25 background may interfere, but you are in a formal process now,

1    one in which you have to be self-conscience about what you are

2    doing.

3            And so, my question for you is will you have any

4    difficulty following my instructions about evaluating the

5    testimony of law enforcement witnesses, evaluating the

6    testimony of persons who have been convicted of a crime,

7    evaluating the testimony of persons who may be testifying here

8    pursuant to a grant of immunity?  Do any of you think that you

9    would have difficulty following my instructions with respect to

10   those kinds of witnesses?

11           And I see no response to that.

12           Now, let me put it in a different way.  We have a case

13   involving a Public Housing Authority.  Public Housing

14   Authorities and questions of public funding and that sort of

15   thing have always been in our history matters of controversy.

16   That is what a democracy is about.  People pull and tug over

17   expenditures and that sort of thing, and people have strong

18   views about public expenditures and public employees and that

19   sort of thing.  I have told you that you have got to follow my

20   instructions on the law, and you have got to decide the case in

21   light of the evidence that is presented.  I do not mean to

22   suggest that you cannot have your own personal views about

23   various matters, like public expenditure for public housing or

24   the kinds of people who work in public jobs.  But you have got

25   to put that out of your mind, if you have those kinds of views,

1    either pro or con.  You have got to decide this case solely on

2    the basis of what is presented here in court.

3           I am not inquiring into your personal views about

4    public figurers, or public employees, or even judges.  I am

5    inquiring into whether or not you will be able to follow my

6    instructions with respect to the law without being influenced

7    in any way about public-policy kinds of questions that may be

8    looming in the background, like, "How are Public Housing

9    Authorities supposed to work?"  To the degree that it is not

10   subject of a legal instruction here, you are entitled to your

11   own views, but do not let it affect your judgment in this case.

12          Similarly, what you think about people who are

13   employed by the public should not influence you one way or the

14   other.  You are evaluating people as individuals, not as part

15   of a class.

16          But having said all of that, just as I said it in a

17   different way with respect to law enforcement personnel or

18   people who have been convicted of a crime or people who are

19   testifying regarding immunity, what is of interest to me and of

20   interest to the parties is whether or not you have such strong

21   views about expenditure of funds in connection with Public

22   Housing Authorities, or public housing generally, or with

23   respect to people who work in the public sector that it would

24   interfere with your obligation in this case to decide the

25   matters after a careful, nuanced, disciplined evaluation of the

1    witnesses who testify and your view about them after you have

2    had the opportunity to consider all of the evidence?  In short,

3    do you have such strong views about public policy or those who

4    are involved in the public sector that it might influence you

5    in some way in this case, apart from the instructions I give

6    you?

7              And I see no response to that.

8              Now, there is a set of circumstances that we sometimes

9    encounter where we have persons who have strong philosophical

10   views stemming from perhaps religious background, perhaps

11   ethical background, perhaps different approaches to the way in

12   which someone must function as a juror, that it is important

13   for us to ask a question about whether or not any of you have

14   such strong views, religious, moral, philosophical, that it

15   would be difficult for you to be a fair and impartial juror in

16   this case because it would be difficult for you to reach a

17   judgment with respect to another person.  Your role as a juror

18   is to answer a question, and the question is has the Government

19   proved its case beyond a reasonable doubt?  Has the Government

20   overcome the presumption of innocence that the defendants have?

21             Some people feel very strongly that they should not be

22   sitting in judgment as to other individuals, and that is a

23   matter of conscience that we must recognize, but it is

24   important for us to identify whether or not any of you have

25   that view before we move on to the next stage of jury

1    selection.

2            Do any of you have such views?  And I see no response

3    to that?

4            THE JUROR:  Are you still talking to the people up

5    there (indicating)?

6            THE COURT:  I am just talking to the folks who have

7    introduced themselves so far.

8            THE JUROR:  Thank you.

9            THE COURT:  And I will keep in mind, if you are called

10   up, you should call it to our attention, if that is a question

11   that you should respond to.

12           So, then we turn to this larger set of issues.  The

13   testimony in this case, at least as I understand it, and I have

14   not heard the testimony, because you have not heard the

15   testimony in the case, but as I understand it, it will involve

16   the question of what coworkers are supposed to do in the

17   context of what at least the Government contends is misconduct

18   by their superiors or their colleagues.  This poses, perhaps, a

19   question of a moral dimension or a philosophical dimension for

20   people.  I am not really interested in what your personal views

21   are with respect to that.  The question I have is whether or

22   not you can follow the law that I give you about the

23   obligations of individuals even in an organization that has a

24   hierarchy, and that involves people giving directions that may

25   or may not be illegal.

1          The short of it is, do any of you have such strong

2     views about the obligations of persons, perhaps subordinates,

3     but certainly colleagues, the obligations of subordinates and

4     colleagues to confront and, perhaps, challenge what is

5     perceived to be misconduct, such strong views that you would

6     not follow my instructions about what it is that the Government

7     has to prove under these circumstances?  Does that apply to any

8     of the jurors?

9          And I see no response to that.

10         Now, let me deal with scheduling issues.  I am afraid

11    you are going to have to listen to what my wife calls my "Boy

12    Scout speech," but it is important.  In this country, unlike

13    other countries, we permit citizens to make important public

14    decisions.  Those of us who are from New England, or at least

15    the towns in New England, are familiar with the idea of town

16    meeting, where we all get together once a year, vote on the

17    budget, do those kinds of things.  That is direct democracy.

18    Other parts of the country do not have that.  We do.

19         But all parts of this country have the jury system.

20    The jury system is an occasion in which we make a judgment, and

21    the judgment is this:  The resolution of factual disputes in a

22    legal context is too important to leave to judges, is too

23    important to leave to lawyers.  We leave it to people with

24    common sense.  That is what you are.  You are the common

25    conscience of the community.  It is a price we pay for

1    democracy, I suppose.  Any one of us involved in public service

2    understands that it is under-appreciated, undercompensated, not

3    properly evaluated, all of that, and inconvenient, to boot.

4    Other countries have dictators who take that off our shoulders.

5    We do not.  We do it ourselves.  And that means that, when you

6    are called, the expectation is that you are going to serve on

7    the jury.

8            Nevertheless, I recognize, we all recognize, that some

9    of you may have scheduling problems, or physical problems, or

10   emotional problems, or psychological problems that make it

11   difficult for you to do what the parties are entitled to, and

12   the parties are entitled here to a group of people who will be

13   paying attention, not be distracted in this very important

14   aspect of their lives.

15           Think about it.  What would you like?  You would like

16   people who are going to pay attention to the evidence and give

17   you a fair shake, and so, if any of you are suffering from

18   distractions, I will put it in that broad sense, we need to

19   know about it to make an evaluation of whether you can serve on

20   this jury.

21           The way in which cases are tried in this session, my

22   session, is, ordinarily, we sit from 9:00 to 1:00 in the

23   morning, and then you are free in the afternoon.  One of the

24   reasons for being free in the afternoon is that I recognize it

25   is an interruption, but it gives you a chance at least to kind

1   of keep up with what is going on.  We take a break of about 15,

2   20 minutes at 11:00 so that people can stretch and go back into

3   the jury room and unwind a little bit.  And I should add this

4   week we will not sit on Friday in this case.  This is a case

5   that will extend into next week, I believe.  I will do my level

6   best to make it run as efficiently as possible, but I think you

7   should assume that the evidence presentation is probably going

8   to take about six days, six trial days, and then after that you

9   have deliberations, and during deliberations you will be

10  sitting from 9:00 to 5:00, more or less, a full day at that

11  point, once the case is given to you.

12       Now, that may pose some scheduling problems.  Let me

13  be clear about scheduling problems.  Macy's may be having a

14  sale on Thursday, but it is not going to be something that is

15  going to give me a reason to excuse you.  But prepaid

16  vacations, things of real significance are matters that I will

17  consider for purposes of excuse.  I will say in advance that,

18  while I will try to be sympathetic, you will understand my

19  perspective on this, which is that this is an obligation that

20  people have to serve, if they can.

21       I am concerned about physical problems.  Can you hear,

22  can you see?  Are you having difficulty with that?  Can you sit

23  for a little less than two hours that we sit for the

24  presentation of evidence before we take a break?  Are you faced

25  with emotional problems of some sort that are distracting?  Are

Case 1:13-cr-10308-DPW   Document 197   Filed 04/21/15   Page 119 of 188

119

1    you faced with psychological problems that may be distracting?

2    I put it, as you can see, in this broad way, because I do not

3    want someone singling themselves out if they have got an issue

4    that they want to bring to our attention in some fashion that

5    characterizes what the issue is for them.  But this is an

6    important point both in terms of time and in terms of issue for

7    us to get our handle on them.  I tell you in advance, not to be

8    discouraging, you make whatever request you make, but you will

9    understand that I take a pretty firm and austere view with

10   respect to jury service generally.

11           So, with that very long windup, the pitch is this:  Is

12   there anything about the schedule or your personal condition

13   that means that you will not be able to give the parties what

14   they are entitled to, which is a fair hearing and a fair shake

15   in the evaluation of the evidence in this case?

16           I see a couple of responses, but only for the people

17   who have introduced themselves so far.  So, I will see you at

18   sidebar.

19

20   (SIDEBAR CONFERENCE AS FOLLOWS):

21           THE COURT:  Ma'am.

22                    (Juror approached sidebar)

23           THE COURT:  Can you tell us your name, again, for the

24   record.

25           THE JUROR:  Yes.  It's Kathy Ireland.

1          THE COURT:  Ms. Ireland is Juror Number 6.

2          THE JUROR:  Yes.  I'm a nursing mom.  I have a

3    six-month old.  She wakes up around 6:00 -- first of all, it

4    takes me, like, two hours to get here, so I would have to nurse

5    her right before I came, and, as I was arriving, I need to

6    nurse her, like, at 10:00.

7          THE COURT:  Let me just ask you, are you employed?  I

8    can't recall.

9          THE JUROR:  Yes, I have a full-time employment also.

10          THE COURT:  What do you do?

11          THE JUROR:  So, I have my own office, and I don't see

12    patients in the morning.  So, I hook up while I type away on

13    the computer, some emails, while working, so they are very

14    accommodating in that regard, because I have my own office and

15    can close the door.

16          THE COURT:  Right.  But you don't bring the child to

17    the office, do you?

18          THE JUROR:  No.

19          THE COURT:  You do pumping of some sort?

20          THE JUROR:  Yeah, I pump.

21          THE COURT:  Is there any reason why you couldn't do it

22    here?

23          THE JUROR:  I can do it here, but I would need about a

24    40-minute break around, like, 9:30 in the morning.

25          THE COURT:  I think I am going to excuse you in this

1    case.

2            THE JUROR:  Okay.  Thank you.  I would gladly pump

3    there (indicating), if it weren't distracting.  I'm not

4    embarrassed, but other people --

5            THE COURT:  Ordinarily, with people who have problems

6    with their back and stuff --

7            THE JUROR:  Right.

8            THE COURT:  -- I ask if they do not feel bad about

9    standing up, but I have found that this is an issue in which

10   people have a broad range of attitudes on.

11           THE JUROR:  I realize that.

12           THE COURT:  So, what I think I am going to do is

13   excuse you as a juror here.  You will get called back at some

14   point.

15           THE JUROR:  That's fine.

16           THE COURT:  -- in the future, but I think this is too

17   long a period of time.

18           THE JUROR:  All right.  Thank you very much.

19                         (Juror left sidebar)

20                    (Next juror approached sidebar)

21           THE COURT:  Is it Mr. Pinto?

22           THE JUROR:  Yeah, Steven Pinto.

23           THE COURT:  And that is Juror Number 10.

24           THE JUROR:  It's not trying to get out of it, but as I

25   had explained before, that I do have some issues of Panic

1    Disorder.  I do pretty well with it, and I'm a pretty smart

2    guy, but on occasion I do have a little bit of --

3              THE COURT:  Do you take meds?

4              THE JUROR:  I do.

5              THE COURT:  What are they?

6              THE JUROR:  I take Celexa and Ativan.

7              THE COURT:  Let me ask you, do you think you can sit

8    through this?

9              THE JUROR:  I do think I could sit through it, but I

10   do have some issues with small panic attacks from time to time.

11   I mean, I function well, I work full time, I don't miss any

12   work, I'm a smart guy, but I just didn't -- when you said you

13   wanted to know, I just wanted you to know that those things

14   happen.

15             THE COURT:  You know why I ask these questions.

16             THE JUROR:  No, I understand.

17             THE COURT:  I guess the issue for me is, let's assume

18   that you have one of these small panic attacks.  Would you feel

19   uncomfortable just raising your hand?  Is it a matter of kind

20   of --

21             THE JUROR:  Getting out and regrouping.

22             THE COURT:  -- slow the ball down?

23             THE JUROR:  Yes.  I've just got to get out and regroup

24   sometimes, yeah.

25             THE COURT:  Would you have any problems with just

1   raising your hand and my recognizing it is a time for us to

2   take a break?

3           THE JUROR:  No, I don't suspect I would.

4           THE COURT:  Do you think you can serve under those

5   circumstances?

6           THE JUROR:  I'll do the best I can.

7           THE COURT:  But you do work full time.

8           THE JUROR:  That's what I was saying.  You said to

9   make sure we told you these things, and I didn't want to, you

10  know, halfway through the thing I'm having an attack, and you

11  say, "Why didn't you tell me earlier?"  That's all.  That was

12  my only concern.

13          THE COURT:  I appreciate that.  I think I am not going

14  to excuse you under these circumstances.

15          THE JUROR:  That's fine.  Thanks.

16          THE COURT:  Thanks.

17                      (Juror left sidebar)

18                  (Next juror approached sidebar)

19          THE COURT:  Ms. Lin?

20          THE JUROR:  Yes.

21          THE COURT:  And you are Juror Number 1.

22          THE JUROR:  Yeah.  I am originally from Taiwan.  I

23  came to this country when I was 35, so I am not very confident

24  in English.

25          THE COURT:  What do you do for a living?

1          THE JUROR:  I am a part-time Chinese language teacher.

2          THE COURT:  Do you think you really would have

3     difficulty understanding the language?

4          THE JUROR:  I don't speak English at home, and when I

5     teach I speak mostly Chinese.  When it's a long time listening

6     in an English environment, I can get lost.

7          THE COURT:  I appreciate that.  What I am going to do

8     is, I will excuse you as a juror in this case.  You should take

9     the card and go down to the jury room, and you will get further

10    instructions about other ones.  Okay?

11         THE JUROR:  Thank you.

12               (Juror left sidebar)

13             (Next juror approached sidebar)

14         THE COURT:  Can you tell us your name again for the

15    record.

16         THE JUROR:  Rani Tremblay.

17         THE COURT:  And Ms. Tremblay is Juror Number 26.

18         What aspect of the question brought you up?

19         THE JUROR:  I think the schedule would be a hardship

20    for my job.  I am a Montessori teacher.  I teach fourth, fifth

21    and sixth grade.

22         THE COURT:  Where do you teach?

23         THE JUROR:  At Oak Meadow.  It's a private Montessori

24    school.

25         THE COURT:  Where is it?

1          THE JUROR:  In Littleton, Mass.

2          THE COURT:  What happens when you are out sick?

3          THE JUROR:  Well, I get a substitute teacher, but,

4    being a Montessori classroom, I teach fourth, fifth and six

5    graders.  I am really the only one qualified to give math and

6    language lessons.

7          THE COURT:  Well, I will tell you my general view is I

8    prefer to have teachers on the jury, even if it imposes a

9    special difficulty.  There is a reason for that, and part of it

10   is teaching; that is, it is a teaching moment as well.

11         THE JUROR:  It is.

12         THE COURT:  But I also recognize that there are

13   particular problems.  How big a school is it?

14         THE JUROR:  Not a very big school.

15         THE COURT:  How many kids are in the fourth grade?

16         THE JUROR:  In my classroom I have mixed --

17         THE COURT:  Just generally how many kids in the fourth

18   grade in the school?

19         THE JUROR:  17.

20         THE COURT:  And is that more or less the same in all

21   the other classes as well?

22         THE JUROR:  Correct, yeah.

23         THE COURT:  This case is going to be long enough so I

24   think it is more of a hardship for you than it should be.  So,

25   what I am going to do is excuse you from this case.  You may

1    get called for other cases.

2              THE JUROR:  Oh, that's fine.

3              THE COURT:  But for this one it is going to take a

4    little bit longer, so I will excuse you.

5              THE JUROR:  Thank you.

6                        (Juror left sidebar)

7              THE COURT:  So, let me tell you what I plan on doing,

8    which is, we will fill the slot and see who else comes into the

9    slot.  Once we have gone through all of those questions, I am

10   going to do that kind of general question that I limned

11   already, which is, "We are all concerned that we have not asked

12   the appropriate questions.  Are there things you would want to

13   know if you were the prosecution or the defense in this case?"

14             Is there any other specific question you would like me

15   to ask?

16             MR. MERRITT:  Not from the Government, your Honor.

17             MS. FRIED:  No.  I guess the only request or, perhaps,

18   recommendation in terms of saving time would be to fill the

19   seats.  I know this isn't the procedure.

20             THE COURT:  I am filling the seats.

21             MS. FRIED:  No, but I mean with Jurors 19 on, simply

22   because those jurors have already introduced themselves.

23             THE COURT:  I am not changing what I have been doing

24   for the last 29 years --

25             MS. FRIED:  All right.

1          THE COURT:  -- which is a much more intelligent way of

2     dealing with this.

3          MS. FRIED:  All right.

4     (END OF SIDEBAR CONFERENCE)

5

6          THE COURT:  So, Mr. Lovett is going to fill the seats

7     of the jurors who have been excused.

8          THE CLERK:  Stephen Smith, that is Juror Number 33,

9     will you please come forward and take Seat Number 1 in the back

10    row of the jury box.

11         Andrew Ryan, that is Juror Number 34, will you please

12    come forward and take Seat Number 6 in the back row of the jury

13    box.

14         Elaine Breslow, that's Juror Number 35, will you

15    please come forward and take Seat Number 26 in the front row of

16    the spectator section.

17         THE COURT:  So, I guess we will start with Mr. Smith.

18    If you could introduce yourself.

19         THE JUROR:  My name is Stephen Smith, S-m-i-t-h.  I am

20    a software engineer, Peabody, Mass, and I am not married.

21         THE COURT:  And the town you live in?

22         THE JUROR:  Peabody.

23         THE COURT:  Thank you.

24         And, I guess, Mr. Ryan.

25         THE JUROR:  My name is Andrew Ryan, R-y-a-n.  I'm an

1    underwriting assistant at a mortgage company, and I am from

2    Woburn.  Unmarried.

3              THE COURT:  Thank you, Mr. Ryan.

4              And is it Ms. Breslow?

5              THE JUROR:  Yes.

6              THE COURT:  Ms. Breslow, can you introduce yourself.

7              THE JUROR:  Oh, sure.  Elaine Breslow.  I'm an

8    attorney, I live in Cohasset, and my husband is an

9    anesthesiologist for a critical care physician.

10             THE COURT:  So, let me ask the three of you -- I think

11   Ms. Breslow raised your hand earlier about a question, but all

12   the questions that I have asked so far that you have been

13   listening to, do any of them apply to you?

14             So, Ms. Breslow, we will see you at the sidebar.

15

16   (SIDEBAR CONFERENCE AS FOLLOWS):

17                              (Juror approached sidebar)

18             THE JUROR:  Hello.

19             THE COURT:  So, what question applies?

20             THE JUROR:  I have a severe hearing impairment in my

21   right ear.  I don't wear hearing aids, which is, I am realizing

22   this exercises further evidence that I need to do something

23   about it.  So, I have had a very hard time hearing you, and I

24   basically rely a lot on lipreading.

25             THE COURT:  Let me ask you this:  Would you feel

1    uncomfortable -- we have these kinds of hearing devices

2    (indicating).  Would you feel uncomfortable using them?

3         THE JUROR:  I wouldn't feel uncomfortable.  I try to

4    use them when I go to the movies and elsewhere, symphony, and I

5    find they really aren't that effective for me.

6         THE COURT:  Do you have some sort of doctor's note or

7    something that deals with this kind of --

8         THE JUROR:  I have hearing test results and things

9    like that.

10        THE COURT:  But not with you?

11        THE JUROR:  I mean, I could get one.

12        THE COURT:  Right.

13        THE JUROR:  The reason I bring it up, I would have

14   come forward sooner, is that some of the questions that I

15   believe you asked were so important, and it's very hard for me

16   to discern nuances, and I just find that I'm missing a lot.

17        THE COURT:  Well, I will take you at your word on

18   that.  It is a difficult set of issues, particularly since you

19   do practice law with this kind of disability, but I will excuse

20   you.

21        THE JUROR:  My clients sit face-to-face with me.

22        THE COURT:  I will not get too deeply into it, but I

23   will excuse from you this case, but you should go down to the

24   jury room and tell them that I excused you because you have

25   reported hearing difficulties.  Okay?

1           THE JUROR:  Okay.

2           THE COURT:  All right.  So, you should go down to the

3     second floor.

4           THE JUROR:  Okay.  Thank you.

5     (END OF SIDEBAR CONFERENCE)

6

7           THE CLERK:  Whitney Brinton, that is Juror Number 36,

8     will you please come forward and take Seat Number 26 in the

9     front row of the spectator section.

10          THE COURT:  So, if you could introduce yourself,

11    Ms. Brinton.

12          THE JUROR:  Sure.  Whitney Brinton, B-r-i-n-t-o-n.

13    I'm a lighting designer for corporate events parties, trade

14    shows, all that sort of stuff.  I live in Everett, and I have

15    no spouse.

16          THE COURT:  And do any of the questions I have asked

17    apply to you?

18          THE JUROR:  Yes, a couple of them.

19          THE COURT:  I will see you.

20

21    (SIDEBAR CONFERENCE AS FOLLOWS):

22                          (Juror approached sidebar)

23          THE COURT:  What were the questions that apply to you?

24          THE JUROR:  The any relation to a police officer of

25    any sort.  My god-brother per se, we spent a lot of time

1   together growing up, and I still spend a lot of time with, is a

2   police officer.

3          THE COURT:  This is the son of your godparents?

4          THE JUROR:  Correct.  He ran for Sheriff in the town

5   that I grew up in.

6          THE COURT:  Essex?

7          THE JUROR:  No.  Actually, he lives in Utah.

8          THE COURT:  Oh, you grew up there?

9          THE JUROR:  Yes, I grew up there, and I spend a lot of

10  time and go home at least three times a year and spend a lot of

11  time with his family.

12         THE COURT:  Is that going to affect your judgment in

13  this case?  Are you going to lean toward one side or the other?

14         THE JUROR:  I don't think so.

15         THE COURT:  You paused, and I think I am obligated to

16  press you when you pause.

17         THE JUROR:  I think that I would spend a little more

18  time thinking about it, but I think I could be impartial.  I

19  would just have to put more effort and thought into that end.

20         THE COURT:  Is that something that you are going to

21  find difficult to do?

22         THE JUROR:  Maybe a little bit.

23         THE COURT:  Let me put it in a way that pre-stages the

24  last question I am going to ask:  Would you feel comfortable

25  having you as a juror if you were on trial?

1           THE JUROR:  Probably not.

2           THE COURT:  Because of the facing one side or the

3      other?

4           THE JUROR:  Yes.

5           THE COURT:  I think I am going to excuse from you this

6      case.  You will get a card, and go down to the jury room.

7      Thank you.

8           THE JUROR:  Thank you.

9      (END OF SIDEBAR CONFERENCE)

10

11          THE CLERK:  Jeffrey Brainerd, that is Juror Number 37,

12     will you please come forward and take Seat Number 26 in the

13     front row of the spectator section.

14          THE COURT:  If you could introduce yourself,

15     Mr. Brainerd.

16          THE JUROR:  Yes.  Jeffrey Brainerd.  I'm a software

17     developer, I live in Concord, and my spouse is at home with our

18     children.

19          THE COURT:  Thank you.  And do any of the questions I

20     have asked apply to you?

21          THE JUROR:  A couple of questions.

22          THE COURT:  I will see you.

23

24     (SIDEBAR CONFERENCE AS FOLLOWS):

25          THE COURT:  So, which of the questions apply to you?

1          THE JUROR:  One of them was I have family in law

2     enforcement, so my stepfather, who I lived with for many years,

3     was a member of the Bloomfield, Connecticut Police Department.

4          THE COURT:  Are you from that area?

5          THE JUROR:  Yes, I am.  I lived there for many years.

6          THE COURT:  When you say "stepfather," was he in the

7     house when you were --

8          THE JUROR:  He was in the house for about six years

9     when I was growing up in high school, pre-high school and high

10    school.

11         THE COURT:  Is that going to affect your judgment in

12    this case?  Are you going to favor one side as opposed to the

13    other?

14         THE JUROR:  I don't believe so.

15         THE COURT:  You will keep in mind my instruction about

16    the proposition that you have to evaluate the testimony of a

17    law enforcement officer without regard to their status but in

18    terms of your own evaluation of their testimony.  Do you think

19    you can do that?

20         THE JUROR:  Yes, your Honor, I think I can.

21         THE COURT:  What are the other questions?

22         THE JUROR:  I have a scheduling issue that has to do

23    with child care.  So, I have small children and my wife is

24    scheduled to go out of town starting Wednesday, and so that

25    presents an issue with me trying to put together childcare at

1    the last minute.

2           THE COURT:  Let me ask you this:  I am, trust me,

3    fairly sensitive about questions about childcare, but is she

4    gone for an extended period of time?

5           THE JUROR:  Wednesday to Monday.  She is visiting

6    relatives in Minneapolis.

7           THE COURT:  When does she leave on Wednesday?

8           THE JUROR:  She lives Wednesday about midday.

9           THE COURT:  Could you cobble something together for

10   what is, essentially, Thursday and Monday?

11          THE JUROR:  I believe the issue is that -- I don't

12   have relatives in the area, and so my children are six and

13   nine, and so the youngest child is six, and so it presents

14   issues with also trying to get him somewhere either very early

15   morning --

16          THE COURT:  Is he pre-K?

17          THE JUROR:  No, he is in first grade.

18          THE COURT:  I will excuse you.  What I will do is say

19   that you will become available, say, three months from now as a

20   juror.

21          THE JUROR:  Okay.

22          THE COURT:  I think it is better that I excuse you in

23   this case.

24          THE JUROR:  Thank you.

25          THE COURT:  So, you take the card, go down to the jury

1    room, and you will get further instructions.

2              THE JUROR:  Okay.  Thank you.

3              THE COURT:  Thank you.

4    (END OF SIDEBAR CONFERENCE)

5

6              THE CLERK:  Sarah Wu.

7              THE JUROR:  Yes.

8              THE CLERK:  That is Juror Number 38.  Will you please

9    come forward and take Seat Number 26 of the front row of the

10   spectator section.

11             THE COURT:  Ms. Wu, can you identify yourself.

12             THE JUROR:  I am Sarah Wu.  I work in a Chinese

13   restaurant, and my husband is working in food court as a

14   manager.

15             THE COURT:  I'm sorry?

16             THE JUROR:  My husband is a manager in fast food, food

17   court.

18             THE COURT:  Fast foods, okay.  And do any of the

19   questions I have asked apply to you?

20             THE JUROR:  Yes.

21             THE COURT:  So, we will see you at the sidebar.

22

23   (SIDEBAR CONFERENCE AS FOLLOWS):

24                        (Juror approached sidebar)

25             THE COURT:  Wait until all the lawyers are up here,

1    okay?

2              THE JUROR:  Okay.

3                              (Pause)

4              THE COURT:  So, what are the questions that apply?

5              THE JUROR:  English is my second language.

6              THE COURT:  I'm sorry.  It is hard for me to hear.

7              THE JUROR:  English is my second language.  I have a

8    hard time to follow you, and I have a hard time for put

9    information together.  The second thing is I have kids I take

10   care in daytime, and at nighttime I wake up a few times, and I

11   always feel sleepy.

12             THE COURT:  Well, I will tell you what, I am going to

13   excuse you from this case.  You should take the card and go

14   down to the jury room, and you will get further instructions

15   about other cases.

16             THE JUROR:  Yes.

17             THE COURT:  Thank you.

18             THE JUROR:  Thank you.

19   (END OF SIDEBAR CONFERENCE)

20

21             THE CLERK:  James Zine, that is Juror Number 39, will

22   you please come forward and take Seat Number 26 of the front

23   row of the spectator section.

24             THE COURT:  And before you sit down in that very hot

25   seat, Mr. Zine, if you could introduce yourself.

1          THE JUROR:  James Zine.  I live in Wareham.  I own a

2     furniture restoration shop.  My wife is a teacher's assistant

3     in a local high school for a special needs class.

4          THE COURT:  And do any of the questions apply to you?

5          THE JUROR:  Just one, sir.

6          THE COURT:  I will see you at sidebar.

7

8     (SIDEBAR CONFERENCE AS FOLLOWS):

9                    (Juror approached sidebar)

10         THE COURT:  What is the question that applies?

11         THE JUROR:  Well, certainly two weeks away from my

12    job.  I have one full-time employee, and my business will

13    certainly take a pretty big financial hit if I was not there

14    for two weeks.

15         THE COURT:  I will tell you what.  I understand it.  I

16    do not disagree, I guess, entirely, but I am not going to

17    excuse you, because there is the time available later in the

18    afternoon.  It poses a burden.  I recognize that.  We will also

19    have this Monday (sic) off, and, while the case will extend

20    into next week, I do not think it is so overwhelming that I am

21    going to excuse you in this case.  It is not that I am

22    rejecting, but that is the kind of line I draw on it.

23         THE JUROR:  Okay.

24         THE COURT:  Let me just make one other point.  I want

25    a fair cross-section of the people.  People who run their own

1    businesses have their heads screwed on straight, and that seems

2    to me important as potential jurors there.  So, you are the

3    victim of your own success.

4    (END OF SIDEBAR CONFERENCE)

5

6              THE COURT:  So, let me ask one final question before

7    we move to the next stage of the jury selection process.  The

8    question works a little bit like this:  We had a little bit of

9    a late start this morning, but we have really only been at this

10   about two hours, a little less than that, and this is the point

11   at which I, and I suspect the lawyers and the defendants as

12   well, get this kind of sinking feeling, and it is like this:

13   What question should we have asked them that we did not ask?

14   What kinds of things are there in their background, or their

15   training, or their experience that we should know before we

16   move on to this next stage of the process?  So, I want you to

17   put yourself in, let's say, Mr. Merritt's shoes or Ms. Bassil's

18   shoes or Ms. Fried's shoes.  You are sitting here looking at

19   these people you do not know very well.  You learned a little

20   bit about them, but not very much.  You are wondering can they

21   be fair and impartial.  You have got to make some choices about

22   that, and the best way to focus that is, is there something

23   else, some other question, something about your background,

24   your training, your experience, your predispositions, your

25   biases, your prejudices, is there something else that we have

1    not touched on yet that, if you were in their shoes, you would

2    want to know before you moved on to this next stage?  Does

3    anything like that apply to the people who have introduced

4    themselves so far?

5              And I see no response to that.

6              So, what we are going to do is move on, and the

7    parties are going to start thinking about this, but move on to

8    the question of what are called "peremptory challenges."  I

9    think you get a video downstairs that tells you a little bit

10   about the jury selection process, but let me add something more

11   while the lawyers are working on this.  This process of

12   peremptory challenges has always been a mystery to me.  I did

13   it myself as a lawyer.  I have observed it for the last 29

14   years as a judge, and I can give you no general theory of

15   peremptory challenges.  It is the essence of arbitrariness and

16   caprice.  It is the exercise of a kind of gut instinct on the

17   part of the parties.  And it is important, because it helps the

18   parties understand that they have got an investment in the case

19   as well, and they can make choices as well in the shaping of

20   the jury.  But you never know what is animating those choices,

21   and if you do not know what is animating them, you will

22   understand it is no reflection on you in any way if you find

23   yourself the subject of a peremptory challenge.

24             I will tell you that everybody in the state system, it

25   is not quite true in the federal system, but everybody in the

state system is required to appear for jury service, even the Judges, even Federal Judges.  So, every three years I get called, I go to the county courthouse, and go through the jury process.  I have even been selected as a juror while I have been on the Bench.  Why anybody would want another judge in the courtroom is beyond me, but they, apparently, were content. But, in any event, I go through this process myself.

One time, probably maybe a dozen years ago, one of my colleagues was called to the same courtroom on the same day, which is very unusual, since there are only 11 active Federal Judges in Boston.  He got into the jury box where you people are.  I was still back in the bleachers, and it came time for the exercise of peremptory challenges, and one of the lawyers looked up, looked over, perhaps remembered an unhappy experience in the Federal Court in Boston in his courtroom, and struck him, and as he was marching out, he went by me and said, "This is very embarrassing.  We are in the fairness business, and they just struck me as a juror."

Now, why do I tell you that story, apart from giving the lawyers time to think about what their peremptories are going to be?  It is because I know that you will handle it in a much more mature fashion if you find yourselves the subjects of a peremptory challenge at the end of this process, because you will understand it is part of the process, and it is not altogether explicable, and it is not a reflection on you

1    personally but part of the way in which we get to find the

2    jurors in a case such as this.

3              So, we will wait to hear when the lawyers are ready to

4    begin the process of exercising challenges.

5              MS. FRIED:  Your Honor, could I consult with

6    Ms. Bassil?

7              THE COURT:  Yes.

8                                    (Pause)

9              THE COURT:  Ready?  Is the Government ready?  I will

10   see you at the sidebar.

11

12   (SIDEBAR CONFERENCE AS FOLLOWS):

13             THE COURT:  Defendant's first with the first two.

14             MS. BASSIL:  All right.  Can I do it by seat number?

15             THE COURT:  Sure.

16             MS. BASSIL:  Seat Number 2.

17             THE COURT:  That is Ms. Peckham.

18             MS. BASSIL:  Yes.  Seat Number 8, Ms. Adams.

19             THE COURT:  Okay.

20             MS. FRIED:  It's the first two or --

21             THE COURT:  You are doing the first two, and then I

22   will get one from the Government and then back to you for

23   another two.

24             MS. BASSIL:  So, do I just do two?

25             THE COURT:  Yes, just two at this point.

1          So, the Government?

2          MR. MERRITT:  Yes, your Honor.  Mr. Brady in Seat

3     Number 11.

4          THE COURT:  Yes.  Next two.

5          MS. FRIED:  Mr. Pinto in Seat Number 10.  Do you need

6     these done in order?  Ms. Bartlett in Seat Number 14.

7          THE COURT:  All right.  The Government's next.

8          MR. MERRITT:  Mr. Lehmann, Zachary Lehmann, Seat

9     Number 13.

10          THE COURT:  One from the defendants.

11          MS. BASSIL:  Yes.  If I could have just one second to

12     ask?

13          THE COURT:  Sure.

14                         (Pause)

15          MS. BASSIL:  Juror in Seat Number 18, Mr. Zahurak, I

16     think.

17          THE COURT:  Okay.

18          Government?

19          MR. MERRITT:  Rodney Harbaugh, Number 31.  He's in

20     seat Number 15 now.  Rodney Harbaugh.

21          THE COURT:  One from the defendants.

22          MS. BASSIL:  Number 16, George Bill or Bill George.

23          THE COURT:  All right.  And from the Government?

24          MR. MERRITT:  Mr. Ryan, who is in Seat Number 6.

25          THE COURT:  Ryan, right.

1          MR. MERRITT:  I think.

2          MS. FRIED:  Your Honor, if I may ask the running

3     tally.  Does that mean defense has gone through six of theirs?

4          THE COURT:  Yes.

5          MS. FRIED:  And the Government has gone through?

6          THE COURT:  Four.

7          MS. FRIED:  Four.  All right.

8          THE COURT:  Next one?  Next for the defense?

9          MS. BASSIL:  I think --

10         MS. FRIED:  I know you think I'm being stupid, and I

11    just want to be sure --

12         THE COURT:  I do not yet.  I have not heard what you

13    are going to do, though.

14         MS. FRIED:  Well, I am just trying to figure out who

15    is going to be coming into those next seats, because I need to

16    know --

17         THE COURT:  Nobody is coming into a next seat.  You

18    have a list and you know precisely who is seated there.

19         MS. FRIED:  All right.

20                        (Pause)

21         MS. FRIED:  Just a minute, your Honor.

22    (Defense counsel conferred off the record)

23         MS. FRIED:  I don't have anything to add at this

24    point, your Honor.

25         THE COURT:  Nothing further from the defendants?

1            MS. BASSIL:  No, your Honor.

2            THE COURT:  Anything further from the Government?

3            MR. MERRITT:  Yes, your Honor.  Mr. Hagopian.

4            MS. BASSIL:  I'm sorry, your Honor, I misunderstood, I

5      really did.

6            THE COURT:  I go back and forth.

7            MS. BASSIL:  No, no.  I misunderstood who we were

8      going to after 18.  So, we're going to anybody who --

9            THE COURT:  Yes.

10           MS. BASSIL:  Oh, okay.  I'm sorry.  I misunderstood.

11     I'm sorry, your Honor.

12           THE COURT:  So, I take it that the defense does have

13     some.

14           MS. FRIED:  Yes.

15           THE COURT:  I just want the --

16           MS. FRIED:  Juror in Seat Number 19.

17           THE COURT:  19.  Macdonald?

18           MS. FRIED:  Ms. Macdonald, that's correct.

19           THE COURT:  And from the Government?

20           MR. MERRITT:  I am repeating myself, but Hagopian.

21           THE COURT:  And the defense?

22           MS. BASSIL:  21, your Honor.

23           THE COURT:  Seat Number 21.  That is Mr. Manuel, is

24     that it?

25           MS. BASSIL:  Yes.

1          THE COURT:  All right.

2          MS. FRIED:  Your Honor, if I may ask, was it the juror

3    in Seat Number 20 who said that she was out on a work

4    health-related injury?

5          THE COURT:  I cannot respond to that.

6          MS. FRIED:  All right.  Is it still the defense's

7    turn?  I'm sorry.  Then, I am going to ask to strike --

8          THE COURT:  Mr. Lovett has been asked to go over to

9    talk to one of the jurors, but you go ahead.

10          MS. FRIED:  The juror in Seat Number 20, who is Nancy

11    Replogle.

12          THE COURT:  And the Government?

13          MR. MERRITT:  The Government is content.

14          THE COURT:  And one more for the defense.

15                        (Pause)

16          THE COURT:  Anything else?

17          MS. BASSIL:  No.

18          THE COURT:  All right.  So, we have two extra people,

19    by my calculation, on this, and we have to go through a round

20    for alternates as well.  So, the two last people in line -- who

21    I think are Marshall and Joshi, is it?  I am not sure.  But

22    Jurors Number 29 and 30 will be eligible for alternates, and I

23    probably will inquire of -- because I want two alternates, I

24    will get two more people to be qualified, but first we are

25    going to put the people in the jury box at this point.

1          MS. FRIED:  So, we were going to have two alternates?

2          THE COURT:  Two alternates, that is right, but in

3     order to get two alternates, or be sure that I am going to get

4     two alternates, I need four people qualified, in case you

5     exercise peremptories.

6          MS. FRIED:  All right.

7               (Counsel conferred off the record)

8          THE COURT:  But we have a total of 14 people left.  Do

9     you think we have 16 left?

10         THE CLERK:  Unless I missed something.

11         THE COURT:  Let's go through it, so we are certain

12    about it.  To be seated are Juror Number 33 in Seat Number 1.

13         MS. FRIED:  Mm-hmm.

14         THE COURT:  Juror Number 3 in Seat Number 3, juror in

15    Seat Number 4.

16         MS. FRIED:  That's right.

17         THE COURT:  Juror in Seat Number 5, juror in Seat

18    Number 7, juror in Seat Number 9.

19         MS. FRIED:  Right.

20         THE COURT:  Juror in Seat Number 12.

21         MS. FRIED:  And Number 17 is what I have as the next

22    one.

23         THE COURT:  Let me see if I can do it and then get

24    them to add something.  Juror in Seat Number 17, juror in Seat

25    Number 22.

1        MS. FRIED:  Yes.

2        THE COURT:  Number 20 was the defendant's.  Juror in

3    Seat Number 23, juror in Seat Number 24, juror in Seat Number

4    25.  That makes 12.  Actually, we have four left.

5        MS. FRIED:  I beg your pardon, your Honor, but I see,

6    and maybe I'm wrong, I see the seats that need to be filled 2,

7    6, 8, 10, 11, 13, 14, 15 and 16.

8        MS. BASSIL:  18.

9        MS. FRIED:  Oh, but we have got 18 seats.  I'm sorry.

10   That's where my math is wrong.  All right.

11       THE COURT:  So, we have now Seat Numbers 26, 28, 29

12   and 30.  You can exercise your peremptories against them.

13       MS. BASSIL:  Your Honor, we all thought you excused

14   the Corrections Officer, Mr. Rowland.

15       THE COURT:  I do not get into personal characteristics

16   of people.  You have to recall --

17       MS. BASSIL:  I'm sorry.

18       THE COURT:  So, what we have left, by my calculation,

19   Mr. Lovett will correct me, is in Seat 26, Number 39,

20   Mr. Zine, in Seat Number 28, Number 28, Traumuller, Seat Number

21   29, Marshall and Seat 30, Joshi.

22       THE CLERK:  Joshi.

23       MS. BASSIL:  We thought you excused Juror Number 42.

24       THE COURT:  He never got up there.

25       MS. BASSIL:  Oh, I see.  He just --

1          THE COURT:  He volunteered his --

2          MS. BASSIL:  Okay.

3          MR. MERRITT:  Do you want us to just caucus here

4    quickly on the alternates?

5          THE COURT:  Yes, as quickly as possible.

6               (Counsel conferred off the record)

7          MS. FRIED:  May I ask is 28 now about to take the seat

8    -- Juror Number 28, is he taking over Seat Number 11, or who is

9    taking over Seat Number 11?

10         THE COURT:  No, no.

11         MS. FRIED:  Sorry.  I don't mean to be thick about

12   this.

13         THE COURT:  Look it, we are now dealing with the

14   alternates.

15         MS. FRIED:  I understand that, but we're trying to

16   figure out which person is an alternate.  I understand we are

17   dealing with the alternates.  I want to be sure that my

18   recordkeeping is straight about who is moving into what seat.

19         THE COURT:  They do not move into seats.

20         MS. FRIED:  My understanding is that the juror

21   currently sitting in Seat Number 11 was struck by the

22   Government; is that correct?

23         THE COURT:  Yes.

24         MS. FRIED:  All right.  I guess that answers my

25   question.

1          THE COURT:  The Government first.

2          MR. MERRITT:  The Government strikes Mr. Traumuller,

3     Seat Number 28.

4          MS. BASSIL:  I'm sorry.  Who was that?

5          MR. MERRITT:  Mr. Traumuller in Seat Number 28.

6          THE COURT:  The defendant?

7          MS. BASSIL:  This is, now we're going 29, 30?

8          THE COURT:  Pardon me?

9          MR. MERRITT:  26, 29, 30.

10         MS. BASSIL:  Wasn't 26 excused?

11              (Counsel conferred off the record)

12         MS. FRIED:  I don't have anything to add.

13         THE COURT:  Well, do you want to go with three people

14    as alternates?  Or do you want me to just do it?  I will go

15    with three.

16         MS. FRIED:  Three alternates is fine.

17         MS. BASSIL:  That's fine.

18         THE COURT:  All right.

19    (END OF SIDEBAR CONFERENCE)

20

21         THE COURT:  So, what is going to happen is Mr. Lovett

22    is going to call out the names of the persons who are excused.

23    In addition, the people who have not yet introduced themselves

24    are also excused from service here.  What is going to happen is

25    the first person whose name is called out will come up and get

1    the cards from Mr. Lovett, those are the jury cards, and you

2    should go down to the jury room on the second floor.  You will

3    receive further instructions about other cases or your

4    continuing responsibilities.

5         But I do want to thank all of you -- I will not be

6    able to thank individually the folks who are being excused at

7    this time -- for your attendance here this afternoon, but now

8    we have focused on the jury that is actually going to hear the

9    case.

10        So, Mr. Lovett, if you would call out the names of the

11   persons who are excused, and maybe you can follow Mr. McAlear

12   downstairs.

13        THE CLERK:  Maryanne Peckham, Andrew Ryan, Anne Adams,

14   Steven Pinto, Thomas Brady.

15        THE COURT:  Just, if I can interrupt.

16        Ms. Peckham, if you can get the cards so you can kind

17   of lead the parade downstairs.

18        THE JUROR:  All right.

19        THE CLERK:  Zachary Lehmann, Elizabeth Barnett, Rodney

20   Harbaugh, George Bill, Todd Zahurak, Kathleen Macdonald, Nancy

21   Repogle, Pamela Manuel, Hagop Hagopian, Brian Traumuller,

22   Kimberly Medeiros, Jessica Jordan, Robert Rowland, Sonya

23   Nersessian, Gerald Manning, Gerry Lux, Cassandra Wallace, Jason

24   Johnson, Scott MacDonald, Karen Lahey, Jody Moore.

25        THE COURT:  Thank you.  So, Mr. Lovett is going to put

1    you in the jury seats now, kind of organize the jury seats.

2    Then we will take a brief break.  He will explain a little bit

3    about the jury room back here, and then we are going to have

4    opening statements in the case in which the parties will

5    outline what their respective contentions are.  But, first,

6    Mr. Lovett is going to get you seated.

7                             (Pause)

8              THE COURT:  So, ladies and gentlemen, you are the

9    people who are going to decide this case.  In order for you to

10   do so, you have to take another oath.  Before Mr. Lovett gives

11   you that oath, I want to emphasize the points I have made

12   before, that this case is to be decided solely on the basis of

13   the evidence that is presented here in the courtroom and in

14   light of the law that I give you, and that means do not talk to

15   anybody about this case, even among yourselves.  You can talk

16   about anything else that you want to talk about.  Now, maybe

17   the snow has stopped, that kind of thing, but do not talk about

18   the case, because the evidence in this case is going to come to

19   you in bits and pieces, and it would be immensely unfair to the

20   parties if you were to start talking about the case, because

21   once you start you can talking about the case you start taking

22   positions and you start defending positions.  This case is not

23   over until you have heard all of the evidence and you have

24   heard all of the instructions.  So, please do not talk about

25   the case, even among yourselves.

1      Do not do any research about the case.  Everything
2   that is necessary is going to be heard in court.  And you will
3   understand, if you think about it, why that is.  The parties
4   should have the opportunity to confront the evidence, and if
5   you are doing research or reading on your own or that sort of
6   thing, that means they do not get the chance to confront the
7   evidence and bring to your attention various nuances and
8   differences.  So, do not do any research.
9      Similarly, do not use any social media.  About two
10  years ago I had a case that went three weeks.  Two of the
11  jurors decided that they would look things up on the Internet.
12  We had to declare a mistrial in the case.  It is a loss of time
13  and effort for the parties, but it is also causing a breakdown
14  among the jurors.  Do not do anything that touches on this case
15  either by research or talking to anybody or communicating with
16  anyone, anything like that.  You do not have to do anything at
17  all except pay attention here in the courtroom while the
18  evidence is submitted.
19      We are going to take, as I said, a short break.  Then
20  we will have the opening statements of counsel, kind of an
21  outline of what the case is about from their perspective, and
22  then you will be free to go, and tomorrow we will start with
23  the evidence itself.
24      So, Mr. Lovett will take you into the jury room at
25  this point and kind of give you an orientation.

1           THE CLERK:  All rise for the jury.

2                (The jury exited the courtroom)

3           THE COURT:  So, how long for the Government?

4           MR. MERRITT:  Under 15 minutes, your Honor.

5           THE COURT:  I guess I will, at least for the openings

6      and closings, just use the Indictment.

7           For Mr. Morosco how long?

8           MS. BASSIL:  About 15 minutes.

9           MS. FRIED:  For opening about 10, something like that.

10          THE COURT:  So, we will try to get back here in 10

11     minutes and start with the openings at that point, and then we

12     will conclude for the day.  All right.  We will be in recess.

13          (The Honorable Court exited the courtroom at 3:17 p.m.)

14                        (Recess taken)

15          THE CLERK:  All rise.

16        (The Honorable Court entered the courtroom at 3:28 p.m.)

17          THE CLERK:  This Honorable Court is back in session.

18     You may be seated.

19          THE COURT:  Ready for the jury?

20          MS. BASSIL:  Yes, your Honor.  I just wanted to raise

21     one thing with the Court.

22          THE COURT:  Sure.

23          MS. BASSIL:  I have a chalk for my opening, which I

24     have shown to the Government.  It is simply a blowup of the

25     Indictment.  They have no objection to it, but I just wanted to

1    let the Court know.

2                  THE COURT:  Fine.

3                  All right.  We will bring the jury in.

4                  Mr. Merritt, are you going to be opening or

5    Mr. Perez?

6                  MR. MERRITT:  I am.

7                  THE COURT:  While I think of it, Mr. Perez, should it

8    be Perez-Daple?

9                  MR. PEREZ-DAPLE:  Both, your Honor.  Thank you.

10                 THE COURT:  Together?

11                 MR. PEREZ-DAPLE:  Yes, your Honor.  Thank you.

12                 THE CLERK:  All rise for the jury.

13                        (The jury entered the courtroom)

14                 THE CLERK:  Members of the jury, please rise and raise

15   your right hands.

16                        (The jurors complied)

17                   (The jury was duly sworn by the Clerk)

18                 THE COURT:  You may be seated, ladies and gentlemen.

19                 So, as I indicated, the last thing we will do in this

20   case this afternoon is to have the opening statements of

21   counsel.  You will understand this is not evidence itself.  It

22   is a kind of outline of what counsel think the evidence is

23   going to be.

24                 One way, I think maybe the best way, of thinking about

25   an opening statement, is to think about the top of a jigsaw

1    puzzle box.  I told you that the evidence is going to come to

2    you in bits and pieces, and this is a chance for the parties to

3    tell you how they think the evidence is going to fit together

4    when it is all completed.  But if you have had the same kind of

5    experience I have had with jigsaw puzzles, you know sometimes

6    not all the pieces are there, and sometimes they do not fit

7    together.  So, you are going to have to wait and see what the

8    evidence itself is before you make any kind of judgments in

9    this case.  Nevertheless, it is very important for you to have

10   an outline of where the parties think they are going to be

11   going with it, and this is a road map or a jigsaw puzzle box

12   top to help orient you.  But it will not be until we start

13   tomorrow with the evidence that you are going to be hearing the

14   things that you are going to be relying on in this case, and

15   if, at the end of the case, you remember something from the

16   opening statement that was not in the evidence, well, you will

17   disregard it in the entirety.

18          Nevertheless, we start first with the Government.  We

19   will hear from Mr. Merritt, and then we will hear from the

20   defendants.

21                        OPENING STATEMENT

22   BY MR. MERRITT:  Now, it's been a long day, and I'll try to be

23   brief.

24          This case is about cheating.  Who did the cheating?

25   Well, two of them are sitting right over there at that table

1    (indicating), James Fitzpatrick, formerly an executive official

2    for the Chelsea Housing Authority, which managed public housing

3    for low-income and elderly tenants, substantially funded by the

4    Department of Housing and Urban Development, known as "HUD,"

5    and with him is Bernard Morosco, a self-employed consultant who

6    was hired by Chelsea Housing Authority and who was also a

7    Certified Inspector of public Housing Authorities, who did

8    inspections for HUD.

9         How did they cheat?  Well, Morosco used his access to

10   the secure HUD database to give Fitzpatrick a list of the

11   specific 25 apartments out of a possible 350 that would be

12   selected to be inspected on the day of the inspection by HUD,

13   and Morosco gave Fitzpatrick that list sufficiently in advance

14   so that officials at Chelsea could and did spend weeks fixing

15   up, repairing, fumigating those 25 units so they could, and

16   did, ace the test without having to make the same repairs to

17   all 350 units.

18        So, who was cheated?  Well, HUD has a responsibility

19   under the law to ensure that it's federal money that is spent

20   by public Housing Authorities to provide decent, safe and

21   sanitary housing for its tenants, and to do that HUD relies on

22   the validity of a random simple generated on the day of the

23   inspection to give it a representative picture of how well the

24   Housing Authority is maintaining its properties.  But, as you

25   will hear, there was a way to generate a sample in advance that

1    would match the same sample generated on the day of the

2    inspection, and that's what Morosco did for Fitzpatrick and

3    other Chelsea officials before three consecutive HUD

4    inspections.  So, the defendants' scheme distorted what was

5    supposed to be a representative picture by defeating the whole

6    purpose of random sampling.

7            Now, let me briefly reintroduce myself.  My name is

8    Ted Merritt.  I'm an Assistant U.S. Attorney.  Along with my

9    colleague, Brian Perez-Daple, it's our job to present the

10   evidence to you on behalf of the United States, and that

11   evidence is going to prove beyond a reasonable doubt that, by

12   agreeing to get that list in advance so Chelsea authorities

13   could concentrate on fixing up those specific units, Morosco

14   and Fitzpatrick conspired with each other and with others to

15   defraud the United States and to defraud it by impairing and

16   impeding the proper operation of the physical inspection

17   conducted by HUD.

18           Now, to understand how the defendants' unlawful plan

19   worked, you are going to have to know a little bit about how

20   the HUD inspection process is supposed to work.  You are going

21   to hear the term REAC, R-E-A-C a lot in this case.  That stands

22   for "Real Estate Assessment Center," and that's an agency of

23   HUD that has the oversight responsibility of public Housing

24   Authorities.  REAC evaluates the performance of these Housing

25   Authorities on a number of things, including how well they

1    maintain the physical condition of their properties, and they

2    have to meet the required standard that's in the regulations of

3    being decent, safe, sanitary and in good repair.

4         Now, because it was impractical and costly for REAC to

5    conduct a full, 100-percent inspection of every piece of the

6    property and every unit, and because studies showed that an

7    inspection of a statistically valid random sample of the units

8    would achieve the same result, the regulations, the REAC

9    Regulations actually have in it that, quote, "The dwelling

10   units inspected in a property are a randomly selected,

11   statistically valid sample of the units in the property."

12        Now, the people who conduct REAC inspections are

13   generally not HUD employees but independent contractors who

14   receive training about the substance of the HUD Regulations,

15   about the inspection protocol and how to navigate the

16   inspection software that they are provided by REAC.  Now, one

17   of the obvious rules that they learn is that it's forbidden for

18   the inspector to provide the list ahead of time to the Housing

19   Authorities prior to the inspection.

20        Now, once certified, a REAC inspector is given an

21   inspector number and, with a password, can access the secure

22   REAC server.  Bernard Morosco was a Certified REAC Inspector

23   and a self-proclaimed expert on REAC inspections, fully

24   familiar with all the regulations and the purpose and the

25   requirement of a statistically valid random sample.

1          Now, when a REAC inspector gets an assignment using

2     his inspector number and the number of the inspection assigned

3     by REAC, he can download the Housing profile of the Authority

4     he is going to inspect.  The Housing profile is really just a

5     list of the buildings and the units.  The REAC inspector then

6     contacts the Housing Authority.  They arrange a date for the

7     inspection sometime in the future.  And then on the day of the

8     inspection, the inspector meets with the property manager of

9     the Housing Authority, he makes sure that the buildings are

10    correct and the units, and at that time, using a handheld

11    computer, the inspector hits a button that actually says,

12    "Generate a sample," and then an embedded algorithm in the

13    program, based on the number of buildings and the units in the

14    Housing Authority, generates a statistically valid random

15    sample of units to inspect.  So, for example, for a 350-unit

16    Housing Authority, such as Chelsea, the sample size would be

17    25.

18          The inspector then conducts the inspection, notes any

19    deficiencies in the handheld computer.  Everything is checked

20    in the units, everything, from electrical outlets, to plumbing,

21    to appliances, to windows, to mold and mildew, to infestation

22    of cockroaches, rats, rodents, those kinds of things.  Common

23    areas outside the buildings and the exteriors of the buildings

24    are also checked.

25          And when he is done, the inspector uploads in that

handheld computer all the deficiencies that he has found, and then the REAC database generates an inspection report based on what the inspector did.  The Housing Authority score on the units was 35 percent of the overall physical inspection score. The overall score, which included other categories, such as financial and management, if a Housing Authority scored 90 or above, that makes them a high performer, and when you're a high performer a couple of things happen.  First, you're not inspected every year, it's every two years, there is less scrutiny, oversight, by HUD, and you also get a 3 percent bonus in your grant money.

Now, that's how a REAC inspection is supposed to work, and, as a REAC inspector and as a Chelsea Housing official, Morosco and Fitzpatrick, respectively, were well aware of it. But as a consultant, even though Morosco's own published promotional material says that it is not possible to know in advance what units an inspector will go into, Morosco had a way to game the system, which he shared with Fitzpatrick.

Beginning in 2006 and for three inspections through 2011 Morosco identified for Fitzpatrick the 25 units which would be selected to be inspected.  You see, there was a glitch in the software and in the security, which Morosco exploited. At that time all Morosco needed was the inspection number, and, using his own password, he could access the REAC database, and he could download the Chelsea Housing profile, and because the

1    software permitted the so-called random sample to be generated

2    more than once, Morosco was able to duplicate the same units,

3    the 25 units that the inspector would generate on the day of

4    the inspection.  So, Morosco passed on this valuable

5    information to Fitzpatrick, who relayed it to other Chelsea

6    officials who were part of this conspiracy.

7            But, as with most crimes committed by a computer or

8    with a computer, there is an electronic trail that is left, and

9    you will see electronic and documentary evidence that

10   corroborates what Fitzpatrick told his other co-conspirator was

11   true, that Morosco used his access to the same database that

12   the REAC Inspector uses and could get the same information.

13           Of course, knowing in advance what units to be

14   inspected was only half the scheme, because what good is the

15   information unless you act on it?  And, boy, did they ever.

16   And that's where a third co-conspirator, Michael McLaughlin,

17   the former Executive Director of Chelsea Housing Authority,

18   took that list and ran with it.  Weeks before the inspection

19   date McLaughlin would convene numerous meetings of all

20   administrative personnel, and he would divide them into teams

21   of two, which they would call "SWAT teams" and they would go

22   out and go to those 25 units, perhaps doing three or four at a

23   time, and they were inspected for everything.  The employees

24   would then do those inspections, they would report back to

25   McLaughlin.  He would then give the information to the

1    Maintenance Director, Richard Russell, and have him go back and

2    fix any of the problems in those units.  But then he would send

3    a different team to go to different units, so they would

4    reinspect each other's own work until the whole thing would

5    show that everything was in perfect condition.

6         So, for weeks, actually, that's all these

7    administrative employees did, is work in these SWAT Teams, and,

8    in fact, in 2011 they were given a bucket with equipment so

9    that they could go in and do small repairs themselves, like

10   patching walls, caulking bathtubs, and, of course, each of

11   those 25 apartments were fumigated to erase any signs of

12   rodents or cockroaches.

13        Now, naturally, to some of the employees it became

14   obvious that McLaughlin knew in advance which 25 units were

15   going to be inspected, but he falsely told them, as he coached

16   his co-conspirators to say, that his Finance Director, Vitus

17   Shum, had come up with some kind of formula to predict the

18   units.  In concealing Morosco's role in this conspiracy, it was

19   also important that Fitzpatrick knew.  As you will see, he sent

20   an email reminding Morosco, quote, that "Mike says to remember

21   that Diane Cohen," who was another Chelsea official, "was not

22   in the REAC inner circle."

23        And on the day of the inspection Morosco, acting as an

24   consultant and a representative for Chelsea, would accompany

25   the REAC Inspector as he inspected the grounds and then the

1    very same 25 units that Morosco had identified in advance.

2    Needless to say, Morosco kept hidden from the REAC Inspector

3    the kind of extra services that he had provided.

4         Well, the results of this unlawful plan are what you

5    might expect, perfect or near-perfect scores on the units,

6    which contributed to Chelsea being a high performer in those

7    years, and, notably, you will find out that in 2012, without

8    Morosco's extra services, the scores on the units dropped

9    precipitously.

10        Now, you are going to hear a lot in this case about

11   Michael McLaughlin, what kind of boss he was, about other

12   misconduct that he had committed as the Executive Director of

13   the Chelsea Housing Authority.  But he is not on trial in this

14   case, so, as far as he is concerned, your focus should be only

15   on what his actions relating to the REAC inspections, how they

16   shed light on the conspiracy and fleshed it out, the conspiracy

17   that these two defendants knowingly participated in.

18        One principal co-conspirator, however, will testify

19   for the Government, and that's Vitus Shum, the former Finance

20   Director, and he will testify how in the beginning Fitzpatrick

21   told him that Morosco said he could get the list of the units

22   in advance because he was a REAC Inspector, and in each of the

23   inspections Fitzpatrick provided Shum the list that Morosco

24   gave him, which Shum then just put on his computer, transposed

25   it into a spreadsheet, and you will see that spreadsheet for

1    yourself.  And Shum will testify how then he gave that list of

2    the units to McLaughlin, who then kicked off the whole SWAT

3    Team frenzy that I described earlier.

4         Now, Shum is not testifying out of some civic duty.

5    Way back in 2012, in an investigation connected to something

6    else having to do with Mr. McLaughlin, Shum entered into an

7    immunity agreement with the Government, an agreement where he

8    agreed to tell the truth and cooperate, and the Government

9    essentially agreed not prosecute him, and, as you listen to his

10   testimony, you should take that into consideration.

11        But does that mean his testimony will falsely

12   implicate these defendants?  Well, as you answer that question,

13   just keep your eye on the ball, see how his testimony is

14   corroborated by other evidence, both documentary, electronic

15   and witnesses, and remember it is the defendants who trusted

16   Shum enough to make him part of this REAC inner circle.

17        Now that I have told you what this case is about, let

18   me briefly tell you what it's not about.  It's not a referendum

19   about the overall condition of the Chelsea Housing Authority or

20   how they maintained their properties, because they are not

21   charged with failing to maintain it, these defendants.  What

22   they are charged with is conspiring to impair the process of

23   random sampling, the process by which HUD makes the evaluation

24   about the apartments the tenants live in, and it's not about a

25   mistake of judgment or good faith, because the evidence will

1    show that both of these defendants knew what they were doing

2    undermined the whole random-sample requirement, knew it was

3    wrong, and did it anyway.  No.  As I said in the beginning,

4    this case is about cheating, unlawful cheating, because it was

5    designed to rig the test that HUD uses to do its job to make

6    sure that the tenants are living in safe, sanitary and decent

7    housing.

8         Now, some of the evidence in this case may surprise

9    you, like the fact that at the time of this scheme HUD didn't

10   have the security in its software that could have prevented the

11   kind of fraud perpetrated by these defendants.  And I'm sure

12   some of the evidence in this case will bore you, because,

13   frankly, the regulations and the inspection protocol is a

14   little bit dry.  But the important thing is that the evidence

15   in this case will convince you beyond a reasonable doubt that

16   these defendants are guilty of the charge, and at the end of

17   the case, after you've heard the evidence, and after you've

18   heard the law presented to you by the Judge, and when you apply

19   your common sense to the evidence, we will return and ask you

20   to return a verdict of guilty.

21        Thank you.

22        THE COURT:  Thank you, Mr. Merritt.

23        Ms. Bassil.  Oh, I'm sorry.  Ms. Fried.

24                   OPENING STATEMENT

25   BY MS. FRIED:  Good afternoon, ladies and gentlemen.  My name

1    is Syrie Fried, and it's my privilege to represent Jim

2    Fitzpatrick in this case.

3          Ladies and gentlemen, the Chelsea Housing Authority

4    was not a well-run place.  You are going to learn during the

5    course of this trial that my client, Jim Fitzpatrick, was a

6    good man working in a place where the rot had set in, and that

7    rot started at the top.

8          The Chelsea Housing Authority had a really big problem

9    between the years of about 1999 and 2011, and that problem was

10   its Executive Director, Michael McLaughlin.  Michael McLaughlin

11   terrorized his staff.  You are going to hear from a number of

12   people who worked at the Chelsea Housing Authority during the

13   decade of 2000 to 2010, 2011, and they're all going to tell you

14   the same thing, that Michael McLaughlin, who was *the* boss, *the*

15   head of that agency, who had power over everybody, terrorized

16   his staff and made it incredibly hard for people to do their

17   jobs.  You are going to hear plenty about that before this

18   trial is over, so I'm not going to spend a lot of time on that

19   right now, but you're also going to hear that people who worked

20   there made a point, to the extent that they could, of trying to

21   stay out of his way and trying to avoid him, because having to

22   deal with Michael McLaughlin, the number one guy, meant trouble

23   most of the time.

24         What were some of the symptoms of the rot?  One of the

25   big symptoms of the rot that had set in over at the Chelsea

1    Housing Authority was that there was a huge amount of

2    sloppiness in regard to people's job descriptions and their job

3    duties.  People were hired to do certain things, and I am going

4    to describe some of that in a minute, but what would happen

5    there is that Michael McLaughlin would force people to do jobs

6    that weren't their jobs, and that's because he was so cheap

7    with Chelsea Housing Authority money that he did not want to

8    hire a full staff to do the work that was supposed to be done.

9         So, what you would have, for example, was the Director

10    of Finance, this man Vitus Shum, who you have heard mentioned

11    to you by the Government, who was a numbers guy, it was his job

12    to look over the finance's books, doing Section 8 Housing

13    inspections.  Why?  Because the Section 8 Housing inspector

14    quit, and Mike McLaughlin didn't want to hire another Section 8

15    Housing inspector, so he made Vitus Shum spend 30 or 40 percent

16    of his time not with the books but inspecting houses for

17    Section 8.

18         Now, my client, Mr. Fitzpatrick, was also a victim of

19    his being forced to do stuff that didn't really have anything

20    to do with his job.  Mr. Fitzpatrick was the Director of

21    Modernization at the Chelsea Housing Authority.  He did his

22    job, and he did it responsibly.

23         And let me describe for you what his job really was.

24    The Director of Modernization was responsible for big

25    renovations and major upkeep on the units, and you're going to

1    learn during the course of this trial that the Chelsea Housing

2    Authority had units that were funded by the Federal Government

3    and units that were funded by the Commonwealth of

4    Massachusetts.

5        This trial is going to focus on three different

6    buildings.  They are called Mace, Scrivano and Margolis, and

7    those were three buildings that received money from the

8    Department of Housing and Urban Development, and they were

9    subject to this particular kind of inspection that you're going

10   to hear so much about over the next week.  There were, though,

11   many other buildings that were funded by the Commonwealth of

12   Massachusetts.

13       My client's job, Mr. Fitzpatrick's job (indicating),

14   was to keep track of and provide for and make sure major

15   modernization got done on all of these buildings, not simply

16   the federal buildings.  And what do I mean by that?  I mean

17   things like new roofs, boilers, reconstruction of stairwells,

18   installation of big capital improvements, like putting a water

19   park in on some of the units, anything that required a

20   construction contract, putting things out to bid, hiring of

21   architects, and that's for across the whole universe of

22   buildings and units that were at the Chelsea Housing Authority.

23   That was Mr. Fitzpatrick's responsibility.

24       But you are going to learn during the course of this

25   trial that Michael McLaughlin made it very hard for

1   Mr. Fitzpatrick to do his job, particularly when it concerned

2   doing modernization projects on the federal buildings, the ones

3   that are really going to be talked about during the course of

4   this trial:  Mace, Scrivano and Margolis.  Why?  Because of the

5   way certain regulations work that you are going to learn about

6   during the course of this trial, the Executive Director,

7   Michael McLaughlin, had the power to interfere with and stop

8   modernization funds from being used to actually modernize those

9   particular buildings.  When it came to buildings on the

10  Stateside, the State buildings, Mr. McLaughlin's authority was

11  limited, just because of different rules and laws in place

12  about whether or not Michael McLaughlin had the discretion to

13  stop my client, Mr. Fitzpatrick (indicating), from actually

14  doing his job.  As it turned out, Mr. McLaughlin couldn't

15  interfere to the same extent with Jim Fitzpatrick's job doing

16  the modernization, so that's what he did.  Mr. Fitzpatrick did

17  his job.  You're going to hear about the modernization projects

18  that he actually worked on, because that was his job.  It was

19  his job to do modernization.  He got pulled into doing other

20  things as well that weren't his job, just like so many people

21  did.

22          You heard Mr. Merritt talk to you about all these

23  folks being called in to do these cleaning up of apartments,

24  and we are talking about secretaries, Directors of Operations,

25  you know, finance people, modernization people.  None of their

1    jobs had anything to do with cleaning up apartments.

2           And what is REAC really about?  This is what you're

3    going to learn.  REAC was about maintenance.  It was about

4    maintenance of the condition of the apartments.  It was about

5    things like whether things were painted, whether electrical

6    outlets were proper, whether lighting fixtures were fixed,

7    whether windows were broken or windows were cracked.  And there

8    was a separate Director of the Chelsea Housing Authority whose

9    responsibility that was, and that was the Maintenance

10   Department, and the Director of Maintenance is a man Richie

11   Russell, Mr. Merritt mentioned him to you, who is also going to

12   be testifying about how he was ordered -- knew about all of

13   this, and how he sent his folks out to do these fix-ups, these

14   fix-ups on the units that were going to be inspected.

15          And let me just say something about REAC and this

16   whole inspection process.  One of the things I would submit to

17   you, and I think you are going to hear more about this, is that

18   there is nothing wrong with trying to get a good score on your

19   inspections.

20          And let me just say another thing:  The housing

21   development was periodically inspected, not just by the

22   Department of Housing and Urban Development, but by the State.

23   There was constant evaluation of the state of the property.

24   And you're going to find out that, as harsh a boss as Michael

25   McLaughlin was, he did, in fact, take certain aspects of his

1    job quite seriously when it came to responding to certain

2    tenant complaints, that he was not tolerant of things like

3    infestations of pests and that sort of thing, that he got his

4    Maintenance Department out there to fix these problems.  So, to

5    the extent that the Government in its evidence is going to try

6    to suggest that the only apartments that ever got fumigated,

7    the only pests that were ever dealt with were the ones that

8    were on this REAC inspection list, we submit that the evidence

9    is going to show you that that's not the case at all, that, in

10   fact, people at this Authority were trying to do their jobs.

11         And I think that that's another thing that you ought

12   to keep in mind.  Just because there was rot at the top at the

13   Chelsea Housing Authority, and there's no question that there

14   was, that doesn't mean that everybody who worked there was lazy

15   or venal or a criminal.  My client, Jim Fitzpatrick, was none

16   of those things.  He's not guilty of this conspiracy.

17         It was not his job, or his aim, or his desire to

18   participate in REAC.  He was a Modernization Director.

19   Maintenance had nothing to do with his job.  But you are going

20   to learn that there was a pattern during -- there was a pattern

21   at the Chelsea Housing Authority of people being forced to do

22   jobs by Michael McLaughlin, jobs that weren't theirs, and, as

23   Mr. Merritt mentioned to you, one of those people who is going

24   to testify is a man by the name of Vitus Shum.  And he said

25   that he didn't testify out of any kind of a sense of civic

1    duty.  Well, that's certainly true.  He got a deal.  He got an

2    immunity deal.  He got an immunity deal because, aside from

3    whatever he did in terms of helping Michael McLaughlin figure

4    out what apartments were going to be inspected, he very

5    corruptly handled the Chelsea Housing Authority's books in

6    order to enable Michael McLaughlin to collect an outrageous

7    salary for years, for years, and that was all done with the

8    connivance of Vitus Shum, and that's why he got his deal,

9    because he was able to help nail Michael McLaughlin on

10   basically getting paid four times as much as he should have

11   been paid for doing his job.

12        Now, the Government used the phrase that they were

13   "cheating," "cheating" in order to be able to pass these

14   inspections.  Well, I would submit that, after you hear the

15   evidence, you are going to want to spend some time considering

16   whether trying to prepare to pass an exam is cheating, because

17   that's really sort of what was going on here, and the question,

18   really, is whether the Chelsea Housing Authority stepped over a

19   legal line in trying to do everything it could in order to pass

20   an exam, because this was viewed as an exam.  And you're also

21   going to hear that this was viewed -- that Michael McLaughlin

22   had sort of an obsession with trying to have the best score.

23   Not that anything particular hinged on it, not that it mattered

24   one way or another, but it was just part of his personality,

25   because it's just the kind of guy he was, that, whether it was

1        important or not, he had to have the best score.

2              And so, he hired a consultant, which there's nothing

3     wrong with that, he hired Mr. Morosco, Bernard Morosco.  And

4     you're going to hear from his lawyer about what Mr. Morosco's

5     job was, but one of his jobs was to tell people at the Housing

6     Authority what do you need to do to do well on these

7     inspections in order to get good scores?  What do you need to

8     do?  What are they interested in?  They're not so interested in

9     windows, but they're really interested in the bricks.  They're

10    not so interested in this, but they're really interested in

11    that.  If you want a good score, you ought to focus your

12    attention on this.  There's nothing wrong with that.  There's

13    nothing wrong with studying to pass a test.  Part of the

14    Government's idea in this case that they are trying to sell is

15    that it's wrong to try to pass a test.  The only thing I would

16    ask you to do is to think about that as you hear the evidence.

17             But my client, Jim Fitzpatrick, is not guilty.  You

18    are going to find out that he was a very responsible person,

19    that he had a responsible job, that he tried to do it, and that

20    he was working for somebody who was horrible, who made it very,

21    very difficult for him to do his job and very, very difficult

22    to stay out of this horrible mess that he has found himself in,

23    a mess that engulfed almost everybody at the Chelsea Housing

24    Authority, because you're going to hear from a lot of people

25    who work there and you are going to hear about other people who

1     aren't going to testify in this trial but who knew all about

2     this, because everybody at the Authority was forced to

3     participate in these SWAT Team apartment cleanups.  That's

4     definitely one thing you're going to hear.  Every single person

5     who worked there was forced to do this, and you're going to

6     find out that, if you didn't do what Michael McLaughlin said,

7     you were out, and that was it.  That's the kind of person he

8     was.  Unfortunately, that's the kind of place it was, if you

9     weren't the top dog.

10          I'm going to sit down.  I'm going to come back to you

11    at the end of the trial.  But my client is not guilty.  I'm

12    going to ask you to return a verdict of not guilty when the

13    trial is over.  Thank you very much.

14          THE COURT:  Thank you, Ms. Fried.

15          Ms. Bassil.

16                    OPENING STATEMENT

17    BY MS. BASSIL:  Good afternoon.  My name is Janice Bassil.  I

18    represent Bernard Morosco, and I represent him with a young

19    woman from my office named --

20          THE COURT:  I am sorry to interrupt, but I think we do

21    have to take a break, because I think there is an emergency

22    matter for one of the jurors.  So, we will take a break at this

23    point to attend to that.  I am sorry to interrupt.

24          THE CLERK:  All rise for the jury.

25               (The jury exited the courtroom)

1            THE COURT:  Mr. Lovett signalled to me that one of the

2     jurors had signalled to him that she had to make an emergency

3     phone call.  That was the reason for the break.  So, we will

4     take however long that takes, and we will be back at it.

5            THE CLERK:  All rise.

6        (The Honorable Court exited the courtroom at 4:12 p.m.)

7                        (Recess taken)

8            THE CLERK:  All rise.

9       (The Honorable Court entered the courtroom at 4:12 p.m.)

10           THE COURT:  Ready for the jury?

11           MS. BASSIL:  Mm-hmm.

12           THE CLERK:  All rise for the jury.

13                  (The jury entered the courtroom)

14           THE CLERK:  You may be seated.

15           THE COURT:  As you were saying, Ms. Bassil?

16                    CONTINUED OPENING STATEMENT

17    BY MS. BASSIL:  As I was saying, good afternoon.  It really is

18    the end of the day, and I'm the last one up here, so I thank

19    you for your patience in advance.

20           My name is Janice Bassil.  I represent Bernie Morosco,

21    who is seated there (indicating), and next to him is a young

22    woman from my office named Sarah Javaheri, and the two of us

23    together are going to represent Mr. Morosco.

24           What is this case about?  Well, you have heard already

25    two different opinions or two different views, but it is about

1     the Government deciding there was a crime here.  Michael

2     McLaughlin, whose name is going to be all the way through this

3     trial, got himself paid an outrageous salary, it varied, but

4     about $366,000 a year off the budgets of Federal and State

5     low-income housing, and it became exposed by a newspaper in

6     2011, not through inspection, not through investigation.

7            My client is Bernie Morosco.  He comes from Upstate

8     New York.  He is a consultant for low-income housing.  And let

9     me repeat that.  He is not an inspector.  He is not a REAC

10    Inspector.  He is not a REAC instructor.  He is not a quality

11    assurance inspector.  He's a consultant.  And you have had a

12    lot of terms thrown at you.  When I first got involved in this

13    case, I was confused as well.  It will straighten out over

14    time.  It's not as complicated as it seems.  There are a lot of

15    initials that get thrown around.

16           But in 1998, Congress wanted to know what was going on

17    with their money.  "We're giving you all this money for

18    low-income housing.  Where's the money going?  We want to know

19    what's going on."  So, this program was created, this Real

20    Estate Assessment Center, to figure out what's going on in

21    public housing.  And there's two kinds of public housing.

22    There's the big public housing projects that you all probably

23    have seen, like Chelsea, and there's also federally assisted

24    private housing, property that's not owned by the Federal

25    Government, but maybe the Government helped the owners maybe

1    with a federally assisted mortgage or where the Federal

2    Government helps tenants with rental assistance, like Section 8

3    Housing that some of you may have heard of.

4            So, this was created, and regulations were written to

5    support this endeavor, and, like all federal bureaucracies,

6    those regulations grew and grew and grew, and the red tape grew

7    and grew and grew.  Part of the program was that it was

8    determined that it was important for independent third parties

9    to go out and inspect these projects, not people who work for

10   the Government, but independent third parties, because they

11   didn't want Government agencies essentially inspecting

12   themselves, and these inspections cover hundreds, if not

13   thousands, of possible defects.  The score starts at 100, and

14   each defect that an inspector finds can be a tenth of a point,

15   a hundredth of a point.  I believe there's something like 2,000

16   deductions for a 100-point score.  Some of it is a lot of

17   minutiae, and some of it is important.

18           It was supposed to be a neutral, uniform way to

19   inspect public housing, but, of course, a defect is in the eye

20   of the beholder.  Some inspectors were strict, some were

21   severe, some not were not, and scores varied.  And the

22   inspection included not just individual apartments, but the

23   inspector had to walk around and look at the site, cracks in

24   the sidewalk, was it attractive, was there graffiti, was there

25   garbage, the exterior of buildings.  The inspector had to look

1   at the building systems, like boilers and so forth, and the

2   inspector had to look at common areas, like hallways and

3   basements, and, finally, the inspector is supposed to look at

4   individual apartment units.  Chelsea had 350 Federal apartments

5   and over 900 State apartments, and the Federal Government

6   didn't have the money to inspect every single Federal

7   apartment, so they determined a way in which they could, and

8   this is important, because terms and words are very precise in

9   this case and very important.  And the phrase is "A

10  statistically valid random sample."  You will hear that a

11  "random sample" means it's random; it can't be repeated.  But

12  that is not what occurred here.  The samples could be

13  determined before, during and after inspection.  The same

14  sample could be determined over and over again.  That's not

15  random.  And the Government knew, REAC knew this was a problem

16  at least as early as 2005, maybe earlier.

17          Now, this inspector, when he comes, he is also

18  supposed to be inspecting the finances of the Public Housing

19  Authority, the management, and what they call a "Capital Fund,"

20  money that's supposed to be used to modernize things.

21          Bernie Morosco was a REAC Inspector in 1998, when it

22  first started.  There was no official training or classes, like

23  there were later.  He became an inspector for privately owned

24  multi-family, HUD-assisted properties, but he stopped doing

25  that after a while as well.  By 2010, he hadn't done

1    inspections for a couple of years, and theoretically he did not

2    have a certification.  You needed to do, I think, one

3    inspection every six months to keep your certification and your

4    password that Mr. Merritt talked about.  But that was okay with

5    him, because he wasn't doing inspections, he was a consultant.

6         He consulted with Chelsea Housing Authority beginning

7    in 2006.  What did he do for them?  Well, you will hear that he

8    would come to the property at least once a year, and he would

9    go through every single Federal apartment, not random samples,

10   every single one.  And he would give Chelsea, he would give the

11   authorities a handwritten list of what was wrong and what was

12   right, what were health and safety hazards that he said needed

13   to be fixed immediately, what were things that should be fixed,

14   what were defects that a REAC Inspector would notice and cause

15   the Housing Authority to lose points in their inspection.

16        What else did he do?  He walked around with the

17   inspector the day of the inspection, and if he believed the

18   inspector had found a defect that wasn't appropriate, he would

19   help the Chelsea Housing Authority appeal.  He wrote a

20   Preventive Maintenance Policy for Chelsea to try to get their

21   maintenance organized so that old housing, it wouldn't become a

22   crisis; if you maintain something, hopefully you can avoid

23   having emergencies.  Mr. Morosco was not unique in this field.

24   There were a lot of consultants.  HUD encourages consultants,

25   and they encourage being prepared for these inspections.

1    Mr. Morosco did not examine financials or management or capital

2    funds.  That wasn't his role.

3            Before Mr. Morosco became a consultant to Chelsea,

4    they scored quite well on these inspections, and after that low

5    score Mr. Merritt mentioned they continued to score well.  And

6    that low score, by the way, was in 2012, after all of this was

7    exposed about Mr. McLaughlin, and the low score was based,

8    you'll hear, on the fact that they got zero points for their

9    financial management.  Well, of course, when a newspaper has to

10   expose a $366,000 salary, it's kind of a zero financial

11   management.

12           Scoring well was important.  If a Housing Authority

13   scored well, they were a high performer, and a few things

14   happened.  They got a plaque, they got recognized, and, believe

15   it or not, this was very important to Michael McLaughlin.  He

16   loved to go to conferences and essentially be what my mother

17   would call a "big shot."  They got a bonus, very small, not

18   much, and they also didn't get inspected every year, it was

19   every other year, which did save money and effort and time.

20           And, finally, based on how Michael McLaughlin and

21   Vitus Shum interpreted the Regulations, they got more

22   discretion about how they spent the money they received from

23   the Federal Government for capital improvements; that is,

24   Michael McLaughlin and Vitus Shum determined that they could

25   spend it any way they wanted, and some of the way they spent it

1   was essentially for maintenance, garbage collection and things

2   that weren't actually improvements.

3        Michael McLaughlin wanted these high scores.  It was

4   important to him, and he hired a consultant, and he prepared

5   for these inspections.  He made everyone crazy preparing for

6   these inspections.  Mr. Morosco had no knowledge of SWAT Teams,

7   or buckets, or administrative staff inspecting and

8   reinspecting.  That wasn't his role.  He was in and out of that

9   place.

10       And the Government alleges that Bernie Morosco got a

11  list of the apartment units that would be inspected in 2007,

12  2009 and 2011, and gave them to Chelsea Housing Authority, and

13  that Michael McLaughlin took that list and fixed and fixed and

14  fixed and fixed those apartments, and they never scored 100

15  percent on those apartments, but he fixed them, and that, by

16  doing so, there was a conspiracy, here we go, to impede "the

17  proper operation of the physical condition assessment of the

18  federally-funded housing units of the Chelsea Housing Authority

19  by the Real Estate Assessment Center, which relies on a

20  statistically valid random sample of units to inspect."

21       Now, that's a mouthful, that's a real mouthful, but

22  that's what the Government alleges is a crime, and that Bernie

23  Morosco conspired with Michael McLaughlin and James Fitzpatrick

24  to do this.

25       What's the evidence of this?  You will hear there is

1    not a single piece of paper the Government will produce, not an

2    email, not an instant message, not a text, nothing, where

3    Bernie Morosco says to anyone, to Vitus Shum, "Here is the

4    list."

5            The evidence of a so-called conspiracy will come from

6    the testimony of Vitus Shum, and you have already heard a lot

7    about him, but he is a man who lied and lied and lied.  He hid,

8    *he* hid Michael McLaughlin's excessive salary.  He misallocated

9    funds from State to Federal.  He lied to the accountant who

10   reconciled the books each month, he lied to the accountant who

11   did the annual budget, he lied to the State auditor, he lied to

12   the State when he submitted fake budgets, and he lied to the

13   Federal Government with the same budgets, and he was neck deep

14   in these inspections for a Finance Director.  He created lists

15   on his computer of apartments that were to be inspected.  He

16   created on his computer checklists.  He created on his computer

17   lists of teams to inspect the apartments.  He created on his

18   computer spreadsheets showing defects in apartments and how

19   this would affect the score.  And he misallocated the money in

20   the Capital Funds paying for things, as I said, like garbage

21   collection instead of a new roof.  And he got immunity, and

22   that means he gets to walk away from this without being

23   charged.  He got to retire, he got to collect his pension.

24           Now, this is not the most exciting of cases.  It

25   involves a lot of detail.  And by the time we're through,

1    you're going to know more about public housing inspections than

2    you ever wanted to know or thought you ever would know.  But it

3    is important, and it's important to Bernie Morosco.  He was

4    just a consultant.  All he knew was that he consulted and he

5    got paid for it.  His invoices, you will see them, they might

6    have been for, like, $1,200, $1,095.  He didn't know about

7    oversized salaries and misallocated budgets.  He didn't know

8    about SWAT Teams or buckets.  He didn't know that Michael

9    McLaughlin ran Chelsea Housing Authority like his own private

10   kingdom.

11          And in the end, after you have learned all of this

12   about public housing inspections, I suggest you'll see that

13   this evidence does not and will not show that Bernard Morosco

14   is guilty, and I'm asking you to listen to these words, because

15   these words matter, and I'm going to show you the words and how

16   they say one picture is worth a thousand words.  So, I don't

17   know what a picture of words looks like, but this is the

18   Indictment, and I wanted to show it to you, because I wanted to

19   show you how important some of the words were in this, and to

20   ask you to keep these words in mind as you listen to the

21   evidence.

22          So, From in or around sometime in 2006 through in or

23   around sometime in November 2011, in Chelsea, James

24   Fitzpatrick, Michael McLaughlin and Bernard Morosco knowingly

25   and unlawfully conspired to defraud -- all right -- the United

1    States and an agency, Housing and Urban Development, by

2    impairing, impeding and defeating the proper operation -- all

3    right -- of the physical condition assessment of the

4    federally-funded housing units of the Chelsea Housing Authority

5    by the Real Estate Assessment Center, which relies on, and this

6    is important, a statistically valid random sample of units to

7    inspect.

8            Ladies and gentlemen, when we get through all of the

9    inspections that you are going to see about, hear from all of

10   the people here, look at the evidence in this case, you are

11   going to hear instructions from the Judge on virtually all of

12   those words, I am going to get up here, and I'm going to ask

13   you to find Bernie Morosco not guilty of this conspiracy.

14           Thank you.

15           THE COURT:  Thank you very much, Ms. Bassil.

16           So, ladies and gentlemen, that ends the day for us.

17   What I am going to ask you to do is try to be back to the jury

18   room by 8:45 tomorrow morning.  You can understand that there

19   are a large number of people involved in this case.  If one of

20   us is late, we are all late.  Do not be the person to make us

21   late.

22           Have in mind as well that there are a couple of other

23   trials going on, including one that requires fairly substantial

24   security here.  Make adjustments for your schedule to deal with

25   that problem; not to mention the fact that you are in the

1    middle of a construction district, so try to make the plans

2    that are necessary to get you here at 8:45.

3          I told you that you can take notes, and I want to

4    emphasize a couple of things about those notes.  They are there

5    as a way of reminding you about pieces of evidence.  I said

6    some people take good notes, some people take different kinds

7    of notes.  Note-taking is only as good as it is useful for you,

8    but you should understand that the evidence is what you hear in

9    court, and, while you may have notes and so on, you are not

10   going to be able to rely on those notes to say to your fellow

11   jurors, "See, it's in my notes."  It has to be in the evidence

12   in the case.  But it is there as a way of helping you to work

13   your way through it.

14         There was a Judge of the Supreme Court who was not

15   highly regarded; there was once one of the professors in a law

16   school, who said that he used precedent the way a drunk uses a

17   lamppost: not so much for illumination as something to grab

18   ahold of.  Do not use your notes that way.  The notes are there

19   to help illuminate your recollection of the case, but they are

20   not something to grab ahold of as if they are the key to the

21   case.

22         I told you not to talk to anybody about the case.

23   Avoid having conversations at home.  Avoid doing anything that

24   touches on this case at all.

25         As you can see from the opening statements, you have

1   got good lawyers who are going to bring to your attention the

2   things that are really important.  You do not have to do

3   anything except listen very carefully to that, and it would be

4   immensely unfair if you were to do anything more than that.

5          In short, put the case out of your mind until tomorrow

6   morning, when we are going to start with the evidence, and we

7   will start giving you the bits and pieces that you are going to

8   need to put this puzzle together, if it can be put together.

9          Have a good afternoon.  We will see you tomorrow

10  morning.

11         THE CLERK:  All rise for the jury.

12              (The jury exited the courtroom)

13         THE COURT:  So, anything we have to talk about before

14  tomorrow?  We will see you at 9:00 tomorrow morning.

15         MR. PEREZ-DAPLE:  Sorry, your Honor.  There is one

16  thing.  The regulations submitted by the Government on Friday

17  evening, tomorrow we plan to present the witness with whom we

18  wanted to discuss those regulations, and we wanted to inquire

19  how the Court would like to handle them.

20         THE COURT:  These kinds of things, I leave the

21  choreography to the lawyers on however you want to have it

22  done.  I am not sure that a dramatic reading by me is the most

23  arresting way of presenting this evidence, but I leave it up to

24  you.  If that is what you think, then I am here to read those

25  things, but if you want to refer the witness to it and say, "Do

1    you see these regulations?  Can we read them to the jury," or

2    however you want to present it, that is fine with me.

3            MR. PEREZ-DAPLE:  Thank you, your Honor.

4            THE COURT:  We will be in recess.

5            THE CLERK:  All rise.

6        (The Honorable Court exited the courtroom at 4:33 p.m.)

7         (WHEREUPON, the proceedings adjourned at 4:33 p.m.)

C E R T I F I C A T E

1

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Reporter

5    of the United States District Court, do hereby certify that the

6    foregoing transcript constitutes, to the best of my skill and

7    ability, a true and accurate transcription of my stenotype

8    notes taken in the matter of *United States of America v. James*

9    *H. Fitzpatrick and Bernard J. Morosco*, No. 1:13-cr-10308-DPW.

10

11

12   Date: April 21, 2015              *s/ Brenda K. Hancock*
                                      Brenda K. Hancock, RMR, CRR
13                                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25